## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL EDUCATION ASSOCIATION, Inc.** | : |
| | : |
| plaintiff, | : |
| | : |
| v. | : |
| | :Case No. 1:05CV02324 EGS |
| | : |
| **ROBERT M. GATES,** Secretary, | : |
| United States Department of Defense, *et al.,* | : |
| | : |
| | : |
| defendants. | : |

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Federal Education Association, Inc., hereby moves this Court for Summary Judgment pursuant to Fed. R. Civ. P. 56(a). A Memorandum of Points and Authorities in Support of this Motion and a Statement of Material Facts Not in Dispute are attached hereto. A Declaration of FEA President Sheridan Pearce with exhibits, an appendix of legislative history and certain other authorities discussed in Plaintiff's Memorandum, and a proposed order have been electronically filed as attachments to this Motion.

Plaintiff filed a similar motion for summary judgment in January, 2006. On April 26, 2006, the Court issued an order denying that motion "without prejudice to refiling upon resolution of the appeal in the lead case, *AFGE v. Rumsfeld*, No. 05-2183." The Court of Appeals issued a decision in *AFGE v. Rumsfeld* on May 18, which overturned the District Court's decision in that matter and which held that the Labor Relations System contained in

regulations issued by the Defendant were consistent with Chapter 99 of Title 5 - to the extent challenged in that case.

The FEA has refiled this Motion because the FEA's case does not attempt to litigate the same issues as the plaintiffs in *AFGE*. The FEA's allegations are unique in that they challenge the decision to include its members in the NSPS *ab initio* rather than the content of the NSPS.

The plaintiff respectfully requests an opportunity to present oral argument on this motion.

For the reasons explained in the Memorandum of Points and Authorities, Plaintiff respectfully requests that the Court grant judgment in its favor.


                                        Respectfully submitted,


                                            /s/

                                        RICHARD J. HIRN
                                        5335 Wisconsin Ave NW
                                        Suite 440
                                        Washington, D.C. 20015
                                        202-274-1812
                                        richard@hirnlaw.com
                                        DC Bar No. 291849

                                        Attorney for the Federal Education
                                        Association, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL EDUCATION ASSOCIATION, Inc.,**    :

                   plaintiff,                   :

       v.                               :

                                     :Case No. 1:05CV02324 EGS

**ROBERT M. GATES,** Secretary,             :
United States Department of Defense, *et al.,*    :

                   defendants.             :

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

RICHARD J. HIRN
5335 Wisconsin Ave NW
Suite 440
Washington, D.C. 20015
202-274-1812
richard@hirnlaw.com
DC Bar No. 291849

Attorney for the Federal Education
Association, Inc.

**Table of Contents**

Introduction ..................................................................................................................1

Statutory Background and Statement of the Case ....................................................3

A.     The Department of Defense School Systems. ................................................3

     1.     DODDS and the overseas dependents schools. ....................................4

          a.     The Overseas Teachers Pay and Personnel Practices Act
               created a special personnel system for educators in DODDS. ..............4

          b.     The Federal Education Association has collectively bargained on behalf
               of DODDS educators for nearly 40 years without interfering with
               DOD's ability to protect the nation's security. ......................................5

     2.     DDESS and the domestic dependents schools....................................6

          a.     Congress authorized a school system on military bases within the
               continental United States so that military dependents could attend
               integrated schools. ..................................................................................6

          b.     Congress enacted a special personnel system for the domestic
               dependents schools so that personnel practices for instructional
               personnel could be patterned after those usually encountered
               in the teaching profession rather than those which have been
               developed for the Federal service as a whole. This statute also
               gives dependents school personnel the right to collectively bargain
               over wages, hours and other conditions of employment........................9

B.     Congress granted the Secretary and the Director authority to establish an
     additional special personnel system for national security personnel. .........................15

C.     The Secretary and the Director issue regulations creating a personnel system
     designed for national security personnel.  The Secretary and the Director
     included the domestic school personnel in the NSPS human resource
     management system and both domestic and overseas educators in the
     NSPS labor relations system.  ...................................................................................17

*i*

ARGUMENT ........................................................................................................................23

I.      The inclusion of DOD domestic school personnel in the NSPS human
        resources management system is contrary to law because the pay and other
        terms and conditions of employment of domestic school personnel are covered
        by 10 U.S.C. § 2164, the provisions of which were not waived by Congress
        in 5 U.S.C. § 9902. ...............................................................................................23

        A.      The provisions of 10 U.S.C. § 2164(e) are not discretionary and conflict
                with the NSPS. ..........................................................................................23

        B.      Chapter 99 did not supersede or repeal the provisions of 10 U.S.C.
                § 2164(a) because a statute with more general applicability does not
                supercede a statute of more narrow applicability, regardless of the order
                of enactment.                                                                               26


II.     The inclusion of DOD domestic school personnel in the NSPS human resources
        management system, while the teachers in the overseas schools are excluded, is
        arbitrary and capricious and an abuse of discretion. .....................................................30


III.    The inclusion of DOD domestic school personnel in the NSPS human resources
        management system is arbitrary and capricious and an abuse of discretion
        because DOD domestic school personnel are not involved in national security work,
        have no national security responsibilities, are hired under the authority
        10 U.S.C. § 2164 to work only within the schools, and cannot be reassigned to
        substitute for uniformed personnel or to perform defense or national security related
        duties. ...................................................................................................................34


IV.     The inclusion of both the overseas educators and domestic school personnel in
        the NSPS labor relations system is arbitrary, capricious and an abuse of discretion
        because they cannot be covered by the NSPS human resources management system,
        are not involved in national security work, have no national security responsibilities,
        are hired under the authority of the Overseas Teachers Pay and Personnel Practices
        Act or 10 U.S.C. § 2164 to work only within the schools, and cannot be reassigned to
        substitute for uniformed personnel or to perform defense or national security related
        duties. ...................................................................................................................35

V.   The inclusion of DOD domestic school personnel in the NSPS labor relations system
     is contrary to law because it conflicts with Section 351(c) of the National Defense
     Authorization Act for Fiscal Year 1995, 10 U.S.C. § 2164 note, which guarantees the
     right of DOD domestic school personnel "to negotiate or bargain collectively with the
     Secretary with respect to wages, hours, and other terms
     and conditions of employment." ...............................................................................38


VI.  Assuming that the overseas and domestic school personnel may legally be
     included in the NSPS labor relations system, the Secretary's and the Director's
     reason for denying domestic dependent school personnel the right to continue
     to collectively bargain over pay, and for denying the overseas educators the
     right to continue to collectively bargain over extra duty compensation, is
     arbitrary and capricious because it would not constitute, as the defendants
     claim, an expansion of the right to collectively bargain which is prohibited
     by 5 U.S.C. § 9902. ...................................................................................................38


Conclusion ...........................................................................................................................40

**Introduction**

The Federal Education Association is the certified collective bargaining representative of most of the educators, and many of the educational support personnel, in the elementary and secondary schools which the Department of Defense operates for military dependents in the United States and overseas. In order to recruit and retain qualified educators in DOD dependents schools, Congress enacted personnel statutes that create separate personnel systems for overseas and domestic DOD school personnel. These statutes establish compensation and personnel practices for instructional personnel patterned after those usually encountered by the teaching profession rather than those which have been developed for the Federal service as a whole. Both statutes exempt DOD school personnel from civil service pay and classification laws. Within certain parameters established by these statutes, the FEA bargains over wages and other conditions of employment under the Federal Service Labor Management Relations Statute.

In 2005 the Secretary of Defense and Director of the Office of Personnel Management issued final regulations implementing the National Security Personnel System ("NSPS") authorized by the National Defense Authorization Act for Fiscal Year 2004 ("NDAA"). In these regulations, the Secretary and Director properly excluded the employees in the overseas schools from the Human Resources Management System ("HRMS") of the NSPS, recognizing that the "pay for performance" compensation scheme conflicted with the statute that governed employment of overseas educators. However, the Secretary and Director included the employees of the domestic dependents schools in the HRMS even though they were employed under a similar unique statute that pegs their compensation to that of public school teachers in the surrounding communities. The Secretary and Director also included both groups of educators in

the NSPS's Labor Relations System ("LRS"), thereby substantially curtailing (if not effectively eliminating) the educators' collective bargaining rights.

The FEA has brought this action to challenge the inclusion of the domestic school employees in the NSPS's Human Relations Management System, as well as the inclusion of both groups of educators in the NSPS's Labor Relations System. As will be discussed herein, the inclusion of the domestic educators in the HRS is incompatible with the unique personnel statute that governs their employment and which was *not* waived by the NDAA. The inclusion of DOD domestic school personnel in the NSPS is contrary to law because it conflicts with Section 351(c) of the National Defense Authorization Act for Fiscal Year 1995, 10 U.S.C. § 2164 note, which guarantees the right of DOD domestic school personnel "to negotiate or bargain collectively with the Secretary with respect to wages, hours, and other terms and conditions of employment." The FEA will also demonstrate that the inclusion of the domestic and overseas educators in the Labor Relations System is arbitrary and capricious because these educators are not involved in national security work, have no national security responsibilities, are hired under the authority of the unique personnel statutes to work only within the schools, and cannot be reassigned to substitute for uniformed personnel or to perform defense or national security related duties as intended by the NSPS. The inclusion of overseas educators in the Labor Relations System is also arbitrary and capricious because they are not covered by the Human Resources Management System and therefore there is no need to curtail their collective bargaining rights in order to freely implement the changes to personnel policies made by the HRMS. Similarly, since the domestic school personnel cannot legally be included in the HRMS, their inclusion in the Labor Relations System is likewise arbitrary and capricious.

The FEA does not attempt to litigate the same issues as the plaintiffs in *American Federation of Government Employees et al v. Rumsfeld*, case no. 1:05CV02183.   The FEA's allegations are unique in that they challenge the decision to include its members in the NSPS *ab initio* rather than the content of the NSPS as did the plaintiffs in *AFGE et al*.


**Statutory Background and Statement of the Case**

**A.    The Department of Defense School Systems.**

The Department of Defense Education Activity (DODEA) is a civilian agency within the Department of Defense. DODEA is organized into two separate school systems for the children of military service members:

The Department of Defense Dependents Schools (DODDS) educates approximately 68,000 students in 143 elementary and secondary schools at or near military bases in 12 foreign countries. http://www.dodea.edu/home/about.cfm?cId=facts (Last visited June 13, 2007). DODDS employs approximately 6,000 teachers. http://www.dodea.edu/communications/dodeafacts.htm (last visited June 13, 2007).

The Domestic Dependent Elementary and Secondary Schools (DDESS) educates approximately 24,000 students in 65 schools on military bases in Alabama, Georgia, Kentucky, New York, North Carolina, South Carolina, Virginia, Guam, and Puerto Rico. http://www.dodea.edu/home/about.cfm?cId=facts (last visited June 13, 2007). DDESS employs approximately 2,300 teachers.

http://www.am.dodea.edu/ASC/PublicAffairs/AboutDDESS.htm  (last visited June 13,

2007).

### 1.    DODDS and the overseas dependents schools.

#### a.    The Overseas Teachers Pay and Personnel Practices Act created a special personnel system for educators in DODDS.

Shortly after World War II, DOD established a school system to educate the military

dependents stationed overseas. Until 1959, the educators employed by DOD overseas were

subject to the same civil service laws and regulations applicable to other Federal employees.

The application of the standard civil service laws, designed for Federal civil servants who

worked a 12-month year, created a number of economic inequities for DOD teachers who

worked only during a nine-month school year.  Their salaries did not reflect their academic

background and qualifications, as did the salaries of teachers in public schools in the United

States. As a result, the salaries of DOD overseas teachers fell substantially below that of their

stateside counterparts.  Congress sought to correct this situation in 1959 by enacting the

Overseas Teachers Pay and Personnel Practices Act, 20 U.S.C. § 901 *et seq.  March v.

United States*, 506 F.2d 1306, 1311 (D.C. Cir. 1974).

 The act provides, *inter alia*, that notwithstanding other civil service laws, the

Secretary shall issue regulations that govern the terms and conditions of employment for

DODDS educators and fix the "basic compensation of teachers and teaching positions at rates

equal to the average of the range of rates of basic compensation for similar positions . . . in

urban school jurisdictions in the United States of 100,000 or more population." 20 U.S.C. §§

*4*

902(a), 903(c).  In order to comply with the Overseas Teachers Pay and Personnel Practices Act, the Secretary conducts an annual survey of salaries in major public school districts in the United States and constructs salary schedules based on level of education (BA, MA, etc.), each of which has numerous salary steps based on years of teaching experience, as is routine in public schools in the United States. *See generally March v. United States, supra* at 1317; *Overseas Federation of Teachers v. United States*, 674 F.2d 34, 37-38 (D.C. Cir. 1982). The act also allows the Secretary to establish a work day and work year, as well as leave policies, that are in tune with the academic year, notwithstanding provisions of Title 5, applicable to other Federal employees. 20 U.S.C. § 902(a)(7),(8). Although this act applies to "teachers," the term is broadly defined to include all school level professionals, such as counselors, school psychologists and nurses. 20 U.S.C. § 901(a).

> **b.    The Federal Education Association has collectively bargained on behalf of DODDS educators for nearly 40 years without interfering with DOD's ability to protect the nation's security.**

The Federal Education Association was originally organized as a professional association of teachers in DODDS in 1956. The FEA was known as the Overseas Education Association until 1995. The OEA began collective bargaining on behalf of DODDS teachers in Europe in 1967 and on behalf of DODDS teachers in the Pacific in 1969. It collectively bargained with DOD on behalf of teachers employed on military bases in Japan, Okinawa, South Korea and the Republic of the Philippines during the height of the Viet Nam War

without any adverse impact on the ability of DOD to prosecute the war from those bases.
Pearce decl. ¶ 2.

The FEA currently represents a bargaining unit of approximately 5,000 DODDS
teachers, counselors, school psychologists and nurses (who will be collectively referred to as
"overseas educators")  at U.S. bases in eight countries, including Germany, Great Britain,
Japan and South Korea.  Its current collective bargaining agreement with DODDS was
negotiated in 1989, but has been amended at various times. Pearce decl. ¶ 3. Although the
teachers' "basic compensation" is set by statute and is therefore beyond the purview of
collective bargaining, *Overseas Education Ass'n and U. S. Dep't of Defense Office of
Dependents Schools,* 45 FLRA 1185 (1992), the FEA has negotiated over the amount of
"extra-duty compensation" for after school activities such as athletic coaching and
supervision of extracurricular activities. *Eg., Dep't of Defense Dependents Schools.
Alexandria, Virginia and Overseas Education Ass'n, NEA*, 92 FSIP 17 (1992).

    **2.**    **DDESS and the domestic dependents schools.**

    **a.**    **Congress authorized a school system on military bases within the
continental United States so that military dependents could attend
integrated schools.**

Since the days of Army frontier posts, U.S. military installations established their own
schools when no public education was available in the local area. However, the DOD
domestic schools underwent a major expansion in the early 1950s as a result of the racial
integration of the U.S. military in order to allow DOD dependents stationed in the south to

attend integrated schools. DEFENSE MANPOWER DATA CENTER, A STUDY OF SCHOOLS

SERVING MILITARY FAMILIES IN THE U.S., 2 (1997).[1]

Legislative authority to operate the dependent schools was granted in 1950 by Section

6 of Pub. L. No. 81-874, 64 Stat. 1100, previously codified at 20 U.S.C. § 241. This statute

authorized the Commissioner of Education to "make arrangements" with DOD to operate

schools for children who reside on federal property when "no local educational agency is

able to provide suitable [i.e., integrated] free public education for such children." Such

education was to be "comparable to free public education provided for children in

comparable communities in the State." The DOD domestic dependents schools became

known as "Section 6" schools.

When Section 6 came up for reauthorization in 1953, most of the Section 6 schools  in

the continental United States operated by DOD were in states where the pubic schools were

segregated. There were numerous segregated schools operated on military bases by local

education agencies, but all DOD schools operated pursuant to Section 6 had been integrated

by the beginning of the 1953-54 school year. *Assistance to Schools in Federally Impacted*

*Areas: Hearings before a Special Subcommittee of the House Committee on Education and*

*Labor*, 82 Cong., 1st Sess., 127-134 (1953)(reproduced in the appendix to this memorandum).

The authority to operate Section 6 schools was expanded in 1960 because of local

communities' efforts to fight school desegregation.  As originally enacted, authority to

operate Section 6 schools was reserved "for children who reside on Federal property." Pub.

---

[1]  Relevant portions have been reproduced in the appendix to this memorandum.

L. No. 81-874, § 6, 64 Stat. 1107.  However, the Civil Rights Act of 1960, Pub. L. No. 86-449, Title V, § 501, 74 Stat. 909 (1960), expanded the authority of the Commissioner of Education and the military departments by authorizing the creation of Section 6 schools for military dependents who lived off base when public schools were closed by local authorities in order to avoid Federal court desegregation orders.  This amendment read:

> Such arrangements to provide free public education may also be made for children of members of the Armed Forces on active duty, if the schools in which free public education is usually provided for such children are made unavailable to them as a result of official action by State or local governmental authority . . .

The House Report that accompanied the Civil Rights Act of 1960 described the nature of the problem and why Section 6 was being amended.  The House Report included a letter from the Secretary of the Department of Health, Education, and Welfare, which read in part:

> When the public schools in a Federally affected area are closed as the result of State or local attempts to avoid compliance with Federal court decisions or decrees requiring desegregation, children of military personnel, like other children in the community, are deprived of their education.  The Federal Government has a particular responsibility for the large numbers of children of military personnel in such Federally affected areas, since armed services personnel are located there under military orders rather than by their own free choice.  Under the present law, the Commissioner of Education may provide for the education of children of military personnel only in the case of those who live on military reservations or other Federal properties.

> The proposed bill would amend the present laws to enable the Commissioner and the armed services concerned to provide for the education of children of military personnel, regardless of where they live, when the public schools are closed to them.

1960 U.S.C.C.A.N. 1950.  The House Report explained that the education of 2,500

dependents of military personnel on active duty in Norfolk, Virginia, had been interrupted

when that city closed its public secondary schools to avoid a desegregation order.  The House

Judiciary Committee estimated that "the proposed legislation could possibly affect the

education of some 70,000 children of military personnel situated in states where the closure

of schools is a possibility."  *Id.* at 1946.

      **b.**    **Congress enacted a special personnel system for the domestic dependents schools so that personnel practices for instructional personnel could be patterned after those usually encountered in the teaching profession rather than those which have been developed for the Federal service as a whole. This statute also gives dependents school personnel the right to collectively bargain over wages, hours and other conditions of employment.**

When Section 6 was re-authorized in 1953, the following language was added:

> . . . For the purposes of providing such comparable education, personnel may be employed without regard to the civil service or classification laws.

Pub. L. No. 82-248, §8(b), 67 Stat. 535. The Comptroller General later ruled that this

language did not authorize the Commissioner or DOD to make the pay and other terms and

conditions of employment in the Section 6 schools comparable to those in local public school

districts. Comp. Gen. B-138773 (May 15, 1959)(reproduced in appendix).

The Department of the Army subsequently requested and obtained an amendment to

Section 6 that specifically exempted Section 6 school personnel from the Federal Employees

Pay Act, the Annual and Sick Leave Act and the Performance Rating Act so that the terms

and conditions of employment of domestic school personnel could be made comparable to

that of instructional personnel in public schools. In correspondence to Congress, reprinted in

the Senate Report accompanying the amendment, the Secretary of the Army wrote:

> Section 6 of the act of September 30, 1950, supra, requires that the free public education provided thereunder for children residing on Federal property be, to the maximum extent practicable, comparable to free public education provided for children in comparable communities in the State. That section further states that "For the purpose of providing such comparable education, personnel may be employed without regard to the civil service or classification laws."
>
> The military services had considered that the present language of section 6 was sufficiently broad to permit the extension of the salary fixing system and pay and leave practices applicable in public schools' jurisdictions to its teachers in the dependents' schools. Employment practices and contract clauses have been established, therefore, to reflect the practices which exist in the public schools. However, they vary considerably from the provisions of statutes affecting Federal employees generally. The following are illustrative of some of these practices:
>
> (a)  Salary schedules are set up on the basis of a school year consisting of 9 or 10 months. The Federal Employees Pay Act of 1945, as amended (5 U.S.C. 944(c)(1), requires computation on a calendar year basis.
>
> (b)  Hours of work are established on the length of the schoolday plus time required to direct extracurricular activities, as opposed to the 40-hour week requirement of the Federal Employees Pay Act of 1945, as amended (5 U.S.C. 944(a)(1)).
>
> (c)  No provision is made for overtime pay since teachers are expected to devote whatever time is necessary to preparation for class sessions, grading of papers, and other customary curricular and extracurricular activities.
>
> (d)  Fixed amounts are added to the teacher's basic salary to compensate for extracurricular activities which they are assigned.

    (e)    Time off with pay and without charge to leave is authorized for traditional school holidays and recess periods, such as Thanksgiving, Christmas, and spring vacations.

    (f)    A system of sick and administrative leave is provided which varies from the leave authorized by the Annual and Sick Leave Act of 1951, as amended (5 U.S.C. 2061 et seq.).

The Comptroller General has ruled (Ms. Comp. Gen. B-138773, May 15, 1959) that the general language of section 6 exempts school personnel only from the Civil Service Act and rules, as amended, and the Classification Act of 1949, as amended, and that other laws which affect Federal employees continue to apply to personnel in the dependent's schools. In his letter to the Secretary of Defense, dated November 13, 1961 (Ms. Comp. Gen. B-146622), the Comptroller General stated further that the present practices could be continued temporarily with the understanding that clarifying legislation would be developed and presented for consideration during the 2d session of the 87th Congress. A legislative proposal was submitted to the Congress on June 7, 1962, and resubmitted on January 29, 1963; however, there was no action taken with respect to the proposal.

*Based upon the Department's experience in operating section 6 schools, it is highly desirable that the personnel practices for instructional personnel be patterned after those usually encountered in the teaching profession rather than those which have been developed for the Federal service as a whole.*

S. Rep. No. 311, 89th Cong., 1st Sess,  1965 U.S.C.C.A.N. 1910, 1913 (emphasis added).

The Supreme Court ruled in *Fort Stewart Schools v. Federal Labor Relations Authority*, 495 U.S. 641 (1990), that because of the latitude granted to the Secretary to set salaries in the domestic schools, the Fort Stewart Association of Educators (a part of the FEA's predecessor, the Overseas Education Association) could collectively bargain over wages and monetary fringe benefits for educators in the Section 6 schools. Following that decision, the OEA bargained over the salary schedules for Section 6 educators at Fort Stewart and elsewhere.

In 1994, Congress repealed 20 U.S.C. § 241. However, in Section 351 of the National

Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, Congress reauthorized

the Secretary to continue to operate the schools on domestic military installations. 10 U.S.C.

§ 2164. Section 351(a) authorized the Secretary to employ school personnel "without regard

to the provisions of any other law relating to the number, classification or compensation of

employees." In setting the compensation of school personnel, the Secretary is required to

consider the compensation of comparable employees in the public schools districts adjacent

to the military installation, in the capital of the state in which the installation is located, and

in not more than three other school districts in which the installation is located. 10 U.S.C. §

2164(e)(3)(A). Unlike the Overseas Teachers Pay and Personnel Practices Act, these

provisions apply to all employees of the domestic dependents schools, not just "teachers" or

professional educators. *Id.*

Congress also ensured that domestic school personnel could continue to bargain over

salary schedules. Section 351(c) of Pub. L. No. 103-337 states:

> SAVINGS PROVISION – Nothing in section 2164 of title 10, United States
> Code, as added by subsection (a) shall be construed as affecting the rights in
> existence on the date of the enactment of this Act of an employee of any
> school established under such section (or any other provision of law enacted
> before the date of enactment of this Act that established a similar school) to
> negotiate or bargain collectively with the Secretary with respect to wages,
> hours, and conditions of employment.

10 U.S.C.A. § 2164 note.

Following the enactment of Pub. L. No. 103-337, the FEA continued to bargain over

salary schedules for DDESS educators, using the salary rates of the public school districts in

the adjacent communities and elsewhere in the state as a basis. *E.g., Dep't of Defense, Domestic Dependents Elementary and Secondary Schools, Laurel Bay Dependents Schools, Laurel Bay, South Carolina and Laurel Bay Teachers' Ass'n, Federal Education Ass'n, NEA*, 96 FSIP 66 (1996) (relying on comparability data); *Dep't of Defense, Domestic Dependents Elementary and Secondary Schools, Fort Benning Schools, Fort Benning, Georgia and Benning Education Ass'n, Federal Education Ass'n, NEA*, 97 FSIP 103 (1997) (salary increase limited to 3% because larger increase unnecessary to maintain comparability with Georgia public schools); *Dep't of Defense, Domestic Dependents Elementary and Secondary Schools, Fort Stewart Schools, Fort Stewart, Georgia and Fort Stewart Ass'n of Educators, Federal Education Ass'n, NEA*, 98 FSIP 11 (1998) (3% pay increase warranted by comparability data).

DOD and the FEA have recently executed their most recent collective bargaining agreement in 2005. It covers all teachers, counselors, nurses and educational professionals in all of the domestic dependents schools with the exception of those in Puerto Rico (where the educators are represented by an independent union, the Antilles Consolidated Education Association). The parties have negotiated and agreed to four separate salary schedules for each job classification. Pearce decl. ¶ 4. One schedule covers all of the DDESS schools in Kentucky, North Carolina, South Carolina, Georgia and Alabama and is modeled on the salary schedules for the public school teachers in those states. There are eight separate pay lanes for teachers, depending on educational level (i.e., BA, BA plus 15 hours academic credits; BA plus 30 hours; MA, MA plus 15 hours, etc.), and 29 steps in each lane. Teachers advance one step for each year of service.  This compensation scheme is routine in public

schools across the country, including those school systems on which this schedule is based. For example, the North Carolina state teachers' salary schedule has six pay lanes, with 30 steps corresponding to years of service. The Georgia state salary schedule has seven pay lanes, and 20 steps. South Carolina's statewide minimum salary schedule has five pay lanes with salary steps for up to 22 years of service. See Pearce decl. exhibits B, C and D. Separate salary schedules have been negotiated for the two DOD schools in Northern Virginia (Quantico and Dahlgren) and for the West Point Elementary School because of the higher salaries received by public school teachers in Northern Virginia and New York. A fourth salary schedule covers teachers in Guam. [2] Pearce decl. exhibit A.

The FEA also bargains for DDESS educational support personnel - such as teacher aides, secretaries, custodians, and bus drivers - at DDESS schools on six bases. The educational support personnel presently have separate contracts at each of the individual bases and the FEA and DDESS are engaged in negotiations for a master agreement that covers all of the educational support personnel represented by the FEA. Pearce decl. ¶ 5. Since the educational support personnel at DDESS schools are also exempt from Title 5 pay statutes pursuant to 10 U.S.C. § 2164, FEA and DDESS have, and are continuing to negotiate over pay for these employees.

---

[2] Compensation of employees in schools in Puerto Rico and Guam are not tied to salaries in local school districts. The Secretary "shall determine the level of compensation required to attract qualified employees" and "may provide for the tenure, leave, hours of work and other incidents of employment to be similar to that provided for comparable positions in the public schools of the District of Columbia." 10 U.S.C. § 2164(e)(3)(B).

*14*

**B.    Congress granted the Secretary and the Director authority to establish an additional special personnel system for national security personnel.**

In 2003, the Secretary sought authority to exempt other DOD civilian employees from some of the pay and classification laws from which DOD school teachers were already exempt. In addition, the Secretary also sought to effectively exempt DOD civilian employees from the coverage of the Federal Service Labor Management Relations Statute so he would no longer have to collectively bargain with their unions. As explained by Secretary Rumsfeld in testimony to Congress, DOD ostensibly needed additional flexibility in personnel matters so that certain DOD civilian employees could be more fully integrated into national security operations:

> To deal with new threats we need military capabilities that are flexible, light and agile, so we can respond quickly and deal with surprise.
>
> The same is true of the men and women, and the systems in the Department of Defense that support them. They also need flexibility – so they can move money, shift people, design and buy new weapons more rapidly, and respond to the continuing changes in our security environment.
>
> Today, we do not have that kind of agility . . . DoD is bogged down in the bureaucratic processes of the industrial age – not the information age.
>
> The Department's civilian personnel system is a case in point. Consider a few examples:
>
> Today we have some 320,000 uniformed people performing non-military jobs. . . . More than two and one half times the number of troops that were on the ground in Iraq when Baghdad fell doing jobs that could and should be done by civilian personnel.  . . .
>
> The unwillingness to put civilians in the hundreds of thousands of jobs that do not need to be performed by uniformed personnel or by contractors puts a

serious strain on our uniformed personnel and added cost to the taxpayers.

*Testimony of Secretary Donald H. Rumsfeld before the Senate Governmental Affairs Committee*, 108th Cong., 1st Sess. (June 4, 2003).

Congress granted the Secretary some of the personnel flexibility he sought when it enacted § 1101(a)(1) of the National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, 117 Stat. 1621 (2003):

> Notwithstanding any other provision of this part, the Secretary may, in regulations prescribed jointly with the Director [of the Office of Personnel Management], establish, and from time to time adjust, a human resources management system for some or all of the organizational or functional units of the Department of Defense. The human resources management system established under authority of this section shall be referred to as the "National Security Personnel System."

5 U.S.C. § 9902(a).  As part of the National Security Personnel System (NSPS), the Secretary and the Director were authorized to waive the provisions of Title 5 that pertain to the pay, classification, performance evaluation and reductions-in-force of Federal employees, and to establish an alternate "pay-for-performance evaluation system to better link individual pay to performance." 5 U.S.C. § 9902(b)(5),(6).

Congress mandated that the new National Security Personnel System "ensure that employees may organize, [and] bargain collectively as provided for in this chapter." 5 U.S.C. § 9902(b)(4).  The Secretary and the Director were authorized to "establish and from time to time adjust a labor relations system for the Department of Defense to address the unique role that the Department's civilian workforce plays in supporting the Department's national

security mission." 5 U.S.C. § 9902(m)(1).  Congress envisioned that it might be appropriate

to exclude certain employees from the coverage of the LRS. The Secretary was to determine

which DOD bargaining units would be included in this new "labor relations system" and

which bargaining units would remain under the existing labor relations system administered

solely by the Federal Labor Relations Authority. 5 U.S.C. § 9902(m)(8).


**C.    The Secretary and the Director issue regulations creating a personnel system
designed for national security personnel.  The Secretary and the Director
included the domestic school personnel in the NSPS human resource
management system and both the domestic and overseas educators in the NSPS
labor relations system.**

DOD developed a formal "requirements document" that was used as a guide for

developing the National Security Personnel System.  In this September 25, 2004

"requirements document," DOD stated that the NSPS was needed "to manage strategically its

civilian workforce based on a total force perspective" so that civilian employees could be

substituted for military personnel: "Given this global war on terrorism, the role of DoD's

civilian workforce is expanding to include more significant participation in combat support

functions that will allow military personnel to focus on war fighting duties."

http://www.cpms.osd.mil/nsps/Requirements_doc.html  at 3 (Last visited June 13, 2007).

On February 14, 2005 the Secretary and the Director of OPM proposed regulations to

implement the NSPS. 70 Fed. Reg. 7552. The proposed NSPS included major changes in the

way DOD civilian employees were compensated.  The traditional position classification

system applicable to the Federal civilian workforce was to be abolished so that employees

could be more easily assigned to different job responsibilities. The General Schedule pay

schedules, which are pegged to position classification and which reward employees with

higher pay steps based on longevity, were eliminated. The Secretary and the Director

proposed to establish "pay bands" made up of a broad range of minimum and maximum pay

rates. Pay raises within these bands would depend not on years of experience or academic

qualifications, but on the results of annual performance evaluations. The pay raises would,

however, be limited by the amount of funds available in "pay pools" regardless of the quality

of employees' performance.  The regulations also proposed to exclude DOD civilian

employees from the coverage of OPM's reduction-in-force regulations applicable to the

Federal civilian workforce as a whole. The proposed regulations would also authorize the

Secretary to establish "mandatory removal offenses" for disciplinary infractions that "have a

direct and substantial adverse impact on the Department's national security mission."

     Subpart I of the proposed regulations created a new labor relations system that

effectively eliminated collective bargaining over any matters of substance. Section 9901.903

of the proposed regulations specifically prohibited bargaining over pay. 70 Fed. Reg. 7595.

     In the justification for the proposed regulations, the Secretary and the Director

explained that the objective of the NSPS they had designed was to grant the Secretary the

flexibility he ostensibly needed to use the civilian workforce to fight evolving national

security threats. They wrote:

> DoD civilians are unique in government: they are an integral part of an
> organization that has a military function. DoD civilians must complement and
> support the military around the world in every time zone, ever day. Just as new
> threats, new missions, new technology and new tactics are changing the work

of the military, they are changing the work of our 700,000 civilians. To support the interests of the United States in today's national security environment . . . civilians must be an integrated, flexible and responsive part of the team.

At best, the current personnel system . . . cannot adequately address the 21st century national security environment . . . [C]ivilians are being asked to assume new and different responsibilities, take more risk, and be more innovative, agile and accountable than ever before. . .

. . . The Department sometimes uses military personnel or contractors when civilian employees could have and should have been the right answer. . . .

. . .[T]he country's national security demands a highly responsive civilian workforce.

70 Fed. Reg. 7552-54.

The justification accompanying the proposed regulations also stated that the new labor relations system eliminated the obligation to bargain over any matters of substance in order to "enabl[e] a swift response to ever-changing national security threats." The new labor relations system was ostensibly designed to "provide DoD with a workforce that is sufficiently agile and flexible to execute the current and future national security mission." 70 Fed. Reg. 7568. The Secretary and the Director explained that they curtailed DoD's responsibility to collectively bargain in order to allow DoD to more rapidly deploy civilian employees to fight national security threats:

To carry out its national security mission, the Department must have the authority to take actions quickly when circumstances demand; it must be able to develop and rapidly deploy resources to confront threats in an ever-changing national security environment; and it must be able to act without unnecessary delay.

70 Fed. Reg. 7570.

The Federal Education Association submitted comments in response to the proposed regulations. In these comments, the FEA objected to the inclusion of both the overseas and the domestic school educators in the proposed NSPS human resources management system because their pay and other terms and conditions of employment were covered by two separate personnel statutes, the Overseas Teachers Pay and Personnel Practices Act and 10 U.S.C. § 2164, neither of which were waived by 5 U.S.C. § 9902. As the FEA explained, the provisions of these two statutes linked teachers' pay to compensation schemes in comparable public school systems, which, because of the vagaries in evaluating teacher performance, uniformly link pay advancement to years of teaching experience and any increase in the teacher's academic qualifications.

In its comments, the FEA also objected to the inclusion of both overseas and domestic school personnel in the proposed NSPS labor relations system because their responsibilities do not involve "national security" any more than does the work of those who teach the overwhelming majority of military dependents who attend public schools. The FEA explained that the rationale given for the flexibilities in the new labor relations system is wholly inapplicable to school personnel. "[T]eachers do not play combat support roles in which they might be reassigned to perform duties of uniformed personnel who are deployed." The FEA also objected to the exclusion of pay from the matters that were subject to collective bargaining.

On November 1, 2005, the Secretary and the Director of OPM issued final regulations establishing the NSPS. The Secretary and the Director agreed to eliminate the overseas

dependents school educators from the new human resources management system, as requested by the FEA in its comments. However, the Secretary and the Director rejected the FEA's request to exclude the domestic school educators from the human resources management system. 70 Fed. Reg. 66131, 66132. The Secretary and the Director claimed authority to place domestic school personnel in the NSPS because coverage under 10 U.S.C. § 2164 was ostensibly "discretionary." In so arguing, the Secretary and the Director implicitly admitted that the provisions of 10 U.S.C. § 2164 and the NSPS were inconsistent. The Secretary and Director wrote:

> Commentors questioned whether [section 9901.102 "Eligibility and coverage"] paragraph (f) could be used to cover educators employed by the DOD Education Activity in a NSPS pay system. Since the pay system for those educators employed overseas (Department of Defense Dependents Schools) is established under nondiscretionary statutory provisions in title 20, they are not eligible for coverage under an NSPS pay system. However, the pay system for those educators employed in the Continental United States (Defense Domestic Elementary and Secondary Schools) is established under discretionary provisions in title 10. Therefore, they are eligible for coverage under an NSPS pay system.

70 Fed. Reg. 66131.

The Secretary and the Director also rejected the FEA's request to exclude the overseas and domestic educators from the coverage of the NSPS labor relations system:

> We also received comments that certain groups of employees were unique and therefore should not be covered by the labor relations system. Specifically, Commentors suggested that teachers should be excluded from coverage as they do not play a combat support role and already sign mobility agreements giving management all the flexibility it needs. We disagree. Their contributions in teaching the children of our service men and women and the

*21*

civilian employees who support them are absolutely critical to the successful accomplishment of the Department's national security mission. Thus, the final regulations continue to cover teachers in the labor relations system.

70 Fed. Reg. 66178.

The Secretary and the Director also rejected the FEA's objection to the blanket exclusion of pay from the matters which may be collectively bargained. The Secretary and the Director erroneously claimed that allowing the FEA to continue to bargain over pay would constitute an expansion of existing collective bargaining rights, which is prohibited by 5 U.S.C. § 9902:

> As a general matter, the classification or pay of Federal employees is not subject to negotiation today. This restriction is consistent with the prohibition on any expansion of the scope of bargaining in 5 U.S.C. 9902(m)(7). Therefore, we have not adopted this suggestion.

70 Fed. Reg. 66178.

**ARGUMENT**

I.    **The inclusion of DOD domestic school personnel in the NSPS human resources management system is contrary to law because the pay and other terms and conditions of employment of domestic school personnel are covered by 10 U.S.C. § 2164, the provisions of which were not waived by Congress in 5 U.S.C. § 9902.**

A.    **The provisions of 10 U.S.C. § 2164(e) are not discretionary and conflict with the NSPS.**

In 1965 Congress enacted a comprehensive statute governing the employment of personnel in DOD's domestic schools in order to make the "personnel practices for instructional personnel be patterned after those usually encountered in the teaching profession rather than those which have been developed for the Federal service as a whole." 1965 U.S.C.C.A.N. at 1913. This statute was re-enacted in 1995 with language that made it even more clear that school personnel were to be compensated based on comparable salaries received by employees in comparable school districts in the states surrounding the military bases where the teachers and other school personnel are employed. The statute specifically commanded that "in fixing the compensation of employees appointed for a school . . . the Secretary *shall* consider - the compensation of comparable employees" in neighboring public schools. 10 U.S.C. § 2164(e)(3) (emphasis added). "The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Ass'n of Civilian Technicians, Montana Air Chapter No. 29 v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994); *accord Alabama v. Bozeman*, 533 U.S. 146, 153 (2001); *City of Newburgh v. Richardson*, 435 F. Supp. 1049, 1060 (S.D. N.Y. 1977)(provision that states "the Secretary shall consider" amount of underemployment in proposed project area in

awarding assistance constitutes a "mandatory duty.") There is nothing "discretionary" about the requirement to consider local school salaries, and the pay-for-performance scheme in subpart C of the regulations makes no allowances for taking local school district pay rates into consideration.

The "pay-for-performance" pay-band scheme contained in the NSPS human resources management system is completely antithetical to the "personnel practices for instructional personnel . . . patterned after those usually encountered in the teaching profession" as well as to the pay schedules in the neighboring school districts. Each of the surrounding state school districts compensates professional school personnel based on their level of educational attainment and years of experience, rather than on an evaluation of individual performance. More than 99 percent of public school teachers work in districts that employ a uniform salary scale that pay all teachers with the same credentials and experience the same salary, irrespective of "perceived performance." Richard Murname & David Cohen, *Merit Pay and the Evaluation Problem: Why Most Merit Pay Plans Fail and a Few Survive,* 56 HARV. EDUC. REV. 1, 2 (1986) (reproduced in the appendix). According to a Congressional Research Service study for Congress on the performance-based pay for teachers:

> . . . For much of the 20th century, most elementary and secondary school teachers have worked under the so-called single salary schedule. This schedule bases a teacher's salary on two factors - the number of years of teaching experience the individual has and the number of educational credits and degrees the individual earned. Increases in both teaching experience and credits/degrees lead to increases in salary, up to the absolute limits imposed by the applicable pay schedule.

James Stedman & Gail McCallion, Performance-Based Pay for Teachers, 7-8

(Congressional Research Service, 2001) (reproduced in the appendix).

"[Mo]st attempts to implement merit pay for public school teachers over the past

seventy-five years have failed. . . [M]erit pay, even taken on its own terms, does not provide

a solution to the problem of motivating teachers." Murname & Cohen, *supra* at 1.

Implementation of teacher "pay-for-performance" has been problematic for many reasons.

"Measuring teacher output is quite difficult. Many highly valued activities by teachers are

qualitative, and as a consequence, hard to measure." Stedman & McCallion, *supra* at 10.

Evaluating teacher performance based on student test results has been rejected

> given the multitude of other factors, including family background and the
> quality of previous teachers, that are known to influence achievement . . . [I]f
> quantitative measures, like student test scores, are used to measure teacher
> performance, the teachers will be encouraged to emphasize teaching that will
> improve test scores, potentially at the expense of other teaching tasks, and at
> the expense of cooperation with other teachers. . . This would potentially be
> detrimental because much of the work of schools involves significant
> cooperation and teamwork among teachers. For example, some teachers
> monitor halls so others can teach; all teachers work together to encourage good
> citizenship, and to discourage drugs and violence.

*Id.* at 10-11. The Congressional Research Service concluded that "there is an absence of

evidence from previous research that financial incentives provided through performance-

based pay, in general, or merit-pay, in particular, change teacher behaviors in ways that lead

to increased student achievement." *Id.* at 11. "[M]ost school districts . . . drop this type of

compensation system after a brief trial." Murname & Cohen, *supra* at 8.

*25*

The Human Resources Management System and the domestic school personnel system are also inconsistent because the Secretary and the Director have exempted all employees covered by the HRMS from the reduction-in-force provisions of 5 U.S.C. §§ 3501-3503. See § 9901.602 at 70 Fed. Reg. 66203. However, Congress did not waive the applicability of 5 U.S.C. §§ 3501-3503 when it created the domestic school personnel system in 10 U.S.C. § 2164(e). *Hargrove v. Dep't of Defense*, 77 M.S.P.R. 266, 270 (1998). "[T]he current law [pertaining to domestic school personnel] only permits the disregard of laws relating to the number, classification or compensation of employees" and not all the provisions of Title 5 generally applicable to the Federal workforce. *Stewart v. Dep't of Defense*, 82 M.S.P.R. 649, 652 (1999). The waiver provisions of 10 U.S.C. § 2164(e) and 5 U.S.C. § 9902(a) are not coextensive.

Furthermore, Section 351(c) of the 1994 statute explicitly preserved the right of domestic school personnel "to negotiate or bargain collectively with the Secretary with respect to wages, hours and conditions of employment." 10 U.S.C. § 2164 (note).

**B.      Chapter 99 did not supersede or repeal the provisions of 10 U.S.C. § 2164(a) because a statute with more general applicability does not supercede a statute of more narrow applicability, regardless of the order of enactment.**

There is nothing in the language or legislative history of the NDAA that indicates that Congress intended to waive any provisions of 10 U.S.C. § 2164, or to again make the employment of personnel in the domestic schools similar to that of the DOD civilian workforce as a whole. The statute governing the employment of several thousand DOD

domestic school personnel cannot be subsumed by the broader statute governing the employment of nearly a million DOD civilian employees - even if the NDAA was enacted after the school personnel statute. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a more general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550 (1974). "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).

The Court of Appeals for the Federal Circuit has held that the Civil Service Due Process Amendments of 1991, which expanded appeal rights for excepted service employees throughout the Federal government, was not applicable to Section 6 school personnel because the statute with broader applicability affecting the civil service did not implicitly repeal conflicting provisions of § 2164's predecessor. That statute, 20 U.S.C.§ 241, allowed the Secretary to employ domestic school personnel without the appeal rights of Chapter 75 of Title 5.  In 1992, Congress extended Chapter 75 appeal rights to all excepted service employees who had two years of service. The Federal Circuit held that this later statute did not extend MSPB jurisdiction to Section 6 school personnel even though they were in the excepted service and fell within the literal coverage of the recently enacted Due Process Amendments:

> This is a case of conflict between a specific statute which addresses a narrow category of activity and a generally applicable statute that covers a broad range of activity. Although [the appellant] Todd falls within the literal scope of both statutes, they are in conflict and only one can properly be applied

to her. The conflict is properly resolved by applying the longstanding principle of statutory construction that "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." . . .Todd's argument that the general provisions of section 7511(a)(1)( C ) trump the specific exceptions of section 241(a), under which she was hired, is unavailing. . . .The Civil Service Due Process Amendments did not address, much less cover, the specific circumstances and considerations that were the impetus for enacting section 241(a).

*Todd v. MSPB,* 55 F.3d 1574, 1578 (1995). Similarly, Chapter 99, the NSPS, "does not address, much less cover the specific circumstances and considerations that were the impetus for enacting section 241(a)" or its successor, 10 U.S.C. § 2164.

Similarly, the District of Columbia Circuit has held that the 1978 Federal Service Labor Management Relations Statute did not entitle nurses to negotiate terms and conditions of employment which were established by the VA Administrator under an earlier statute that created an alternative personnel system for VA medical employees. Relying on *Radzanower, supra.,* the Court of Appeals concluded that the subsequently enacted collective bargaining statute, generally applicable to the Federal workforce, did not grant bargaining rights to the narrow group of employees covered by the 1948 VA statute:

. . . Section 4108 is a part of the comprehensive personnel system provided by Congress when it created the Department of Medicine and Surgery in 1946 . . . Thus, section 4108 is an integral part of an independent personnel system that Congress has placed under the direct control of the Administrator. As such, it is exempt from all laws governing the terms and conditions of federal employment except as otherwise explicitly provided in the DM & S Statute.

*Colorado Nurses Ass'n v. FLRA*, 851 F.2d 1486, 1489 (D.C. Cir. 1988).  Following *Colorado Nurses,* the Court of Appeals held that the National Guard Technicians Act, which

granted the Secretary of the Army unfettered discretion to prescribe the hours of duty of National Guard Technicians, preserved a narrow exception to the subsequently enacted Federal Employees Compressed Work Schedules Act, which granted Federal employees the right to collectively bargain for alternative work schedules. *Illinois National Guard v. FLRA*, 854 F.2d 1396, 1404-5 (D.C. 1988); *accord New Jersey Air Nat'l Guard v. FLRA*, 677 F.2d 276, 285-86 (3 rd Cir.), *cert. denied sub nom. Amer. Federation of Government Employees Local 3486 v. New Jersey Air Nat'l Guard,* 459 U.S. 988 (1992).

   The Secretary and the Director cannot presume that Congress intended that the domestic school personnel were to be covered by the alternative personnel system for DOD employees who were otherwise covered by Title 5, when Congress had previously created a more narrowly tailored alternative personnel system for domestic school personnel that responded to the specific need to make the conditions of those personnel comparable to public school teachers.  By exempting the overseas educators from the final version of the NSPS regulations,  Secretary and the Director conceded Congress intended that the overseas teachers were to remain under their alternative personnel system which make their terms and conditions of employment comparable to public school teachers. There is no basis to conclude that Congress intended a different result with respect to the educators in DOD's domestic schools.  The Overseas Teachers Pay and Personnel Practices Act and 10 U.S.C. § 2164 should be read in *pari materia* because they were both enacted to address the same problems facing individuals who are indistinguishable. Statutory provisions are to be construed in *pari materia* where they share a common purpose, *FAIC Securities Inc. v. U.S.*, 768 F.2d 352, 363 (D.C. Cir. 1985); *Firstar Bank N.A. v. Faul*, 253 F.3d 982, 996 (7 th Cir.

2001); *Buffalo Bills, Inc. v. United States*,  31 Fed.Cl. 794, 800 (1994), or apply to the same class of persons. *Wachovia Bank v.* Schmidt, 388 F.3d 414, 423 (4th Cir. 2004), *cert. granted*, 125 S.Ct. 2904 (2005); *In Re Robinson*, 665 F.2d 166, 171 (7th 1981). In fact, § 2164(e)(4) envisions that the Secretary will freely transfer employees from the domestic dependents school system to the overseas schools and vice versa.

II.    **The inclusion of DOD domestic school personnel in the NSPS human resources management system, while the teachers in the overseas schools are excluded, is arbitrary and capricious and an abuse of discretion.**

Even assuming that the inclusion of domestic school personnel in the NSPS was not contrary to 10 U.S.C. § 2164, there is no rational basis to include one group of DOD teachers in the Human Resources Management System while the other group is excluded. Not all DOD employees who are eligible for inclusion in the HRMS need be included. The NDAA gave the Secretary and the Director the authority to establish a HRMS "for some or all of the organizational or functional units of the Department of Defense."    5 U.S.C. § 9902(a). This discretion must be exercised reasonably. It is no answer to say, as the Secretary and Director have, that the domestic teachers should be included simply because the Secretary and the Director have the discretion to include them (a premise which, as noted in the previous section of this brief, the FEA disputes). There must be an affirmative reason to include the domestic school personnel that is something more than simply - "because we can."  Why shouldn't all DOD teachers be treated the same, especially when they can be

freely transferred between the domestic and overseas schools under the authority of 10

U.S.C. § 2164(e)(4)?

**III.    The inclusion of DOD domestic school personnel in the NSPS human resources management system is arbitrary and capricious and an abuse of discretion because DOD domestic school personnel are not involved in national security work, have no national security responsibilities, are hired under the authority 10 U.S.C. § 2164 to work only within the schools, and cannot be reassigned to substitute for uniformed personnel or to perform defense or national security related duties.**

"A 'reasonable' explanation of how an agency's interpretation serves the statute's

objectives is the stuff of which a permissible construction is made." *Northpoint Technology,*

*Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 1995). The inclusion of DOD domestic school

personnel in the NSPS human resources management system does not advance, and is

unrelated to, the avowed purpose of the statute and the personnel system it authorized. While

testifying before Congress and in the justification for the regulations he issued, Secretary

Rumsfeld repeatedly stated that the NSPS was needed to enable DOD's civilian workforce to

more fully participate in the DOD's national security operations. The NSPS will ostensibly

enable civilians "to support the interests of the United States in today's national security

environment" and "to participat[e] in combat support functions that will allow military

personnel to focus on war fighting duties." But the domestic school personnel are *not*

involved in "national security" and cannot be assigned to combat support roles, and therefore

there is no basis to include them in a "*national security* personnel system.*"*

The Secretary and the Director have included teachers in the NSPS ostensibly because "[t]heir contributions in teaching the children of our service men and women and the civilian employees who support them are absolutely critical to the successful accomplishment of the Department's national security mission." 70 Fed. Reg. 66178. However, the educators in the DOD domestic schools are no more "critical to the successful accomplishment of the Department's national security mission" than are the educators who teach the overwhelming majority of military dependents who attend public schools across the nation. In fact, "DDESS students comprise only three percent of all school-aged children of active-duty service members, and parents of DDESS students are less than two percent of all active-duty service members." DEFENSE MANPOWER DATA CENTER, A STUDY OF SCHOOLS SERVING MILITARY FAMILIES IN THE U.S., *supra.* at 85. By comparison, in the 1995-96 school year, military dependents made up 30% or more of the student enrollment in 93 school districts in 34 states. *Id.* at iv, 89. The Secretary and Director explained that the NSPS was needed because "DOD civilians are unique in government: They are in integral part of an organization that has a military function." 70 Fed. Reg. 66117. But there are three million or more teachers and school support personnel employed by local governments, tens if not hundreds of thousands of who also educate military dependents.

DDESS does *not* have a military function. Most domestic schools were created so that military dependents did not have to attend segregated schools, rather than to advance any national security mission. For many decades, they were operated under the auspices of the Commissioner of Education. The responsibility for operating the schools was not transferred to the Secretary of DOD until 1961. A STUDY OF SCHOOLS SERVING MILITARY FAMILIES at

2. At one time, approximately 100 military installations had Section 6 schools. By the early 1970's, operation of most of these schools or the responsibility to educate military dependents had been transferred to local education agencies. *Id.* at 3, 85.

Domestic school personnel cannot be used interchangeably with military personnel to perform combat support roles, or to perform any duties other than to work in the schools. These employees are appointed under the authority of a unique statute which authorizes the Secretary to "establish positions for civilian employees in schools established under this section [and] appoint individuals to such positions." 10 U.S.C. § 2164(e)(2)(A),(B). As noted, specific statutory authority was granted to the Secretary to transfer domestic school personnel to the overseas schools, but no authority was granted to transfer domestic school personnel to other assignments within DOD. 10 U.S.C. § 2164(e)(4). *Expressio unius est exclusio alterius.* See *Independent Insurance Agents of America v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000).

DDESS employees cannot be "an integrated, flexible, and responsive part of the team," 70 FED. REG. 66118, and there is no indication that DOD actually contemplates assigning school employees to combat support tasks, which, after all, is the avowed purpose of the HRMS:

> The current system limits opportunities for civilians at a time when the role of DoD's civilian workforce is expanding to include more significant participation in Total Force effectiveness. NSPS will generate more opportunities for DoD civilians by easing the administrative burden routinely required by the current system. It will provide an incentive for managers to (1) identify military positions that can be converted to civilian and (2) to turn to civilians first when certain vital tasks need doing. This will free military men and women to focus on matters unique to the military, while greatly increasing

the role of the Department's civilian employees. The need for a flexible and
contemporary system to support the Department's national security mission is
nothing less than an absolute requirement and it must become the foundation
of DoD civilian human resources management.

70 Fed. Reg. 66123. The flexibilities created by the HRMS, such as the establishment of

broad pay bands and job classifications that will facilitate rapid reassignment of civilians to

combat support roles, have no purpose if applied to school personnel. "With broad pay bands,

the Department will be able to move employees more freely across a range of work

opportunities without being bound by narrowly described work definitions."

70 Fed. Reg. 66119. Unless DOD has the legal authority and actual intent to assign

classroom teachers to combat support roles during the middle of the school year, there is no

need for these teachers to be covered by the HRMS.


**IV.    The inclusion of both the overseas educators and domestic school personnel in
the NSPS labor relations system is arbitrary, capricious and an abuse of
discretion because they cannot be covered by the NSPS human resources
management system, are not involved in national security work, have no national
security responsibilities, are hired under the authority of the Overseas Teachers
Pay and Personnel Practices Act or 10 U.S.C. § 2164 to work only within the
schools, and cannot be reassigned to substitute for uniformed personnel or to
perform defense or national security related duties.**

The Secretary abused the discretion granted under 5 U.S.C. § 9902(m)(8) to determine

whether or not to include DDESS school personnel and DODDS teachers in the NSPS labor

relations system. There are only two conceivable purposes for curtailing collective

bargaining right under the NSPS, and neither is applicable to dependent school personnel.

Collective bargaining rights were reduced in order to allow DOD to implement the

human resources management system:

> Significant differences with many of the labor organizations remain
> over such issues as the scope of bargaining, implementing issuances that
> supersede conflicting provisions of collective bargaining agreements, the
> specificity of the regulations, the ability to grieve pay decisions, the use of
> behavior as part of performance evaluation and the use of performance in a
> reduction in force. These differences cannot be reconciled with the need for a
> contemporary and flexible system of human resources management as DoD
> seeks to transform the civilian part of the Total Force of military personnel,
> civilian employees, and DoD contractors.

70 Fed. Reg. 66123. However, DOD overseas educators are not covered by the NSPS human

resources management system and therefore there is no need to curtail their collective

bargaining rights in order to freely implement the changes to personnel policies made by the

human resources management system.  Similarly, since the DOD domestic school personnel

cannot legally be included in the NSPS human resources management system, their inclusion

in the NSPS labor relations system is similarly arbitrary and capricious and an abuse of

discretion because there is no need to curtail their collective bargaining rights in order to

freely implement the changes to personnel policies made by the NSPS human resources

management system.

The Secretary and the Director also claimed that it was necessary to curtail collective

bargaining rights in order to use civilian employees to fight terrorism and to carry out other

military missions:

> [T]he scope of bargaining is reduced in some areas, such as
> management rights, to enable the Department to better utilize its civilian
> workforce to support rapidly changing national security challenges, such as the
> Global War on Terrorism and supporting humanitarian assistance missions
> here and abroad . . .

70 Fed. Reg. 66176.

> We expanded the list of management rights that are excluded from
> bargaining, including the numbers, types, and grades of employees or positions
> assigned to any organizational subdivision, work project, or tour of duty; and
> the technology, methods, and means of performing work--rights that deal
> directly with the Department's national security operations.

70 Fed. Reg. 66128.

But, as demonstrated above, the domestic school personnel are not involved in

national security operations and cannot be reassigned to combat support activities. They may

only be reassigned to positions in the overseas dependents schools, and vice versa. The same

is true for teachers in DODDS.      Overseas educators are also appointed to "teaching

positions" under Overseas Teachers Pay and Personnel Practices Act and are statutorily

entitled to compensation "equal to the range of rates of basic compensation for similar

positions of comparable level of duties and responsibilities in urban school jurisdictions in

the United States of 100,000 or more population." 20 U.S.C. §§ 902(a)(2), 903 ( c ). The

duties to which these appointees can be assigned are limited by the Act to:

> those duties and responsibilities which - -
>
> (A)    are performed on a school-year basis principally in a school operated by
>        the Department of Defense in an overseas area for dependents of

*36*

members of the Armed Forces and dependents of civilian employees of the Department of Defense, or are performed by an individual who carried out certain teaching activities identified in regulations prescribed by the Secretary of Defense;  and

(B)    involve–

(i)    classroom or other instruction or the supervision or direction of classroom or other instruction;  or

(ii)    any activity (other than teaching) which requires academic credits in educational theory and practice equal to the academic credits in educational theory and practice required for a bachelor's degree in education from an accredited institution of higher education;  or

(iii)    any activity in or related to the field of education notwithstanding that academic credits in educational theory and practice are not a formal requirement for the conduct of such activity.

20 U.S.C. § 901(1).

According to DOD's own Armed Forces Information Service, DOD domestic and overseas educators combined teach less than 12% of all military dependents.  Jim Garamone, "Education Summit Focuses on Military Kids" (August 8, 2000) (http://www.defenselink.mil/news/Aug2000/n08082000_20008084.html (last visited June 13, 2007). Congress intended that the NSPS labor relations system would apply to those portions of the DOD civilian workforce that have a "unique role . . . in supporting the Department's national security mission." 5 U.S.C. § 9902(m)(1). There is nothing unique about the role that DOD educators play in educating military dependents not shared by public school teachers around the country. Therefore, the Secretary abused the discretion granted under § 9902(m)(8) when he included DOD educators in the NSPS labor relations system.

**V.  The inclusion of DOD domestic school personnel in the NSPS labor relations system is contrary to law because it conflicts with Section 351(c) of the National Defense Authorization Act for Fiscal Year 1995, 10 U.S.C. § 2164 note, which guarantees the right of DOD domestic school personnel "to negotiate or bargain collectively with the Secretary with respect to wages, hours, and other terms and conditions of employment."**

If the Court determines that domestic school personnel can't be included in the human resources management system because of 10 U.S.C. § 2164, then they can't legally be included in the labor relations system, either. The Secretary and the Director have precluded all bargaining over pay under the LRS. The Final Rule excludes "the pay of any employee or for any position" from the definition of "conditions of employment" over which the Secretary will be required to bargain. § 9901.903, 70 Fed. Reg. 66211. However, Section 351 ( c ) of the National Defense Authorization Act of 1995, 10 U.S.C. § 2164 note, explicitly requires the Secretary to bargain with domestic school personnel "with respect to wages, hours, and other terms and conditions of employment." As discussed above (pages 28-32), whatever latitude the Secretary has under Chapter 99 to establish a new labor relations system for the DOD workforce as a whole cannot supercede the requirements of a statute that specifically addresses the rights of a narrow group of unique employees.

**VI.  Assuming that the overseas and domestic school personnel may legally be included in the NSPS labor relations system, the Secretary's and the Director's reason for denying domestic dependent school personnel the right to continue to collectively bargain over pay, and for denying the overseas educators the right to continue to collectively bargain over extra duty compensation, is arbitrary and capricious because it would not constitute, as the defendants claim, an expansion of the right to collectively bargain which is prohibited by 5 U.S.C. § 9902.**

The Secretary and Director's rationale for a blanket exclusion of negotiations over pay is based on an incorrect premise and the blanket exclusion is therefore arbitrary and capricious. In their response to public comments, the Secretary and Director noted that "[a] number of commentators, including labor organizations participating in the meet-and-confer process," which included the FEA, "also recommended that we modify the definition of employment to eliminate the exclusion of pay." The Secretary and Director rejected this request ostensibly because:

> As a general matter, the classification or pay of Federal employees is not subject to negotiation today. This restriction is consistent with the prohibition on any expansion of the scope of bargaining in 5 U.S.C. 9902(m)(7). Therefore, we have not adopted this suggestion.

70 Fed. Reg. 66178.  Section 9902(m)(7) did, indeed, provide that nothing in Chapter 99 "shall be construed to expand the scope of bargaining under chapter 71." However, the Supreme Court held in *Fort Stewart Schools, supra,* that domestic school personnel had the right to bargain over pay under Chapter 71, and the FLRA has ruled that DODDS educators have the right under Chapter 71 to bargain over extra-duty compensation because the Overseas Teachers Pay and Personnel Practices Act only sets rates of "basic compensation." *Overseas Education Ass'n and U. S. Dep't of Defense Office of Dependents Schools,* 45 FLRA 1185 (1992).  As Judge Tatel noted in his dissent in *AFGE v. Rumsfled*, at 20, "[t]he Secretary never explains how Chapter 99 permits him to prohibit collective bargaining over compensation by employees whose pay is *not* set by statute."

Since the Secretary and Director have excluded overseas educators from the pay-for-performance pay scheme contained in HRMS, there is no reason why the FEA shouldn't be able to continue to negotiate over extra-duty compensation if the Court determines that they should be included in the labor relations system. Conversely, this further illustrates why the overseas educators shouldn't be included in the NSPS labor relations system since the bargaining restrictions contained therein are too broad to serve any purpose if applied to overseas educators.

Similarly, if the Court determines that DDESS employees cannot be included in the HRMS, there is no basis to restrict their ability to negotiate over pay under the LRS, or to include them in such a labor relations system that prohibits bargaining over pay.

### Conclusion

For the foregoing reasons, summary judgment should be granted in favor of the Federal Education Association, and the Court should issue the proposed order filed with this motion.

Respectfully submitted,

/s/

_____
RICHARD J. HIRN
5335 Wisconsin Ave NW
Suite 440
Washington, D.C. 20015
202-274-1812
DC Bar no. 291849

*40*

Attorney for the
Federal Education Association, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


**FEDERAL EDUCATION ASSOCIATION, Inc.** :
 :
    plaintiff, :
 :
  v. :
 : Case No. 1:05CV02324 EGS
 :
**ROBERT M. GATES,** Secretary, :
United States Department of Defense, *et al.,* :
 :
 :
    defendants. :


**STATEMENT OF MATERIAL FACTS
TO WHICH THERE IS NO GENUINE DISPUTE**

The plaintiff Federal Education Association hereby submits the following Statement of Material Facts to which it avers there is no genuine dispute:

1. The Federal Education Association was originally organized as a professional association of teachers in the Department of Defense Dependents Schools in 1956. The FEA was known as the Overseas Education Association until 1995. Peace decl. ¶2.

2. The OEA began collective bargaining on behalf of DODDS teachers in Europe in 1967 and on behalf of DODSS teachers in the Pacific in 1969. It collectively bargained with DOD on behalf of teachers employed on military bases in Japan, Okinawa, South Korea and the Republic of the Philippines during the height of the Viet Nam War without any adverse impact on the ability of DOD to prosecute the war from those bases. Pearce decl. ¶ 2.

3.      The FEA currently represents a bargaining unit of approximately 5,000 DODDS teachers, counselors, school psychologists and nurses at U.S. bases in eight countries, including Germany, Great Britain, Japan and South Korea.  Its current collective bargaining agreement with DODDS was negotiated in 1989, but has been amended at various times. Pearce decl. ¶ 3

4.      The FEA also represents all teachers, counselors, nurses and educational professionals in all of the DOD domestic dependents schools (DDESS) with the exception of those in Puerto Rico (where the educators are represented by an independent union, the Antilles Consolidated Education Association).  Article 20 of the 2005 DDESS/FEA collective bargaining agreement covers pay and benefits for these employees. Pearce decl. ¶ 4

5.      FEA and DDESS have negotiated and agreed to four separate salary schedules for each teachers. One schedule covers all of the DDESS schools in Kentucky, North Carolina, South Carolina, Georgia and Alabama and is modeled on the salary schedule for the public school teachers in those states. There are eight separate pay lanes for teachers, depending on educational level (i.e., BA, BA plus 15 hours graduate work; BA plus 30 hours; MA, MA plus 15 hours, etc), and 29 steps in each lane. Teachers advance one step for each year of service.  This compensation scheme is routine in public schools across the country, including those school systems on which this schedule is based. Separate salary schedules have been negotiated for the two DOD schools in Northern Virginia (Quantico and Dahlgren) and for the West Point Elementary School because of the higher salaries received by public school teachers in Northern Virginia and New York. A fourth salary schedule covers teachers in Guam. Pearce decl. ¶ 4.

*2*

5.      The FEA also bargains for the education support staff - such as teacher aides,

secretaries, custodians, and bus drivers - at DDESS schools on six bases - Fort Stewart, Fort

Knox, Camp Lejune, Fort Campbell, West Point and Robbins Air Force Base. The

educational support personnel presently have separate contracts at the individual bases and

the FEA and DDESS are engaged in negotiations for a master agreement that covers all of the

DDESS educational support personnel represented by the FEA. The FEA and DDESS have

in the past, and are continuing to negotiate over pay for these employees. Pearce decl. ¶ 5.


                            Respectfully submitted,

                                /s/
                            _____
                            RICHARD J. HIRN
                            5335 Wisconsin Ave NW
                            Suite 440
                            Washington, D.C. 20015
                            202-274-1812
                            DC Bar no. 291849

                            Attorney for the
                            Federal Education Association, Inc.