**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FEDERAL EDUCATION ASSOCIATION, Inc.** :
plaintiff, :
v. :
: Case No. 1:05CV02324 EGS
**DONALD H. RUMSFELD,** Secretary,
United States Department of Defense, *et al.*, :
defendants. :

# APPENDIX TO PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

Volume I

RICHARD J. HIRN
5335 Wisconsin Ave NW
Suite 440
Washington, D.C. 20015
202-274-1812
richard@hirnlaw.com
DC Bar No. 291849

Attorney for the Federal Education Association, Inc.

**Table of Contents**

Volume I

Excerpts from A STUDY OF SCHOOLS SERVING MILITARY FAMILIES IN THE U.S., by the Defense Manpower Center (October 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Assistance to Schools in Federally Impacted Areas: Hearings before a Special Subcommittee of the House Committee on Education and Labor*, 82 Cong., 1st Sess., 127-134 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Comp. Gen. B-138773 (May 15, 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Volume II

Richard Murname & David Cohen, *Merit Pay and the Evaluation Problem: Why Most Merit Pay Plans Fail and a Few Survive,* 56 HARV. EDUC. REV. 1, 2 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

JAMES STEDMAN & GAIL MCCALLION, PERFORMANCE-BASED PAY FOR TEACHERS, 7-8 (Congressional Research Service, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

DMDC Report No. 97-013
October 1997

# A STUDY OF SCHOOLS SERVING MILITARY FAMILIES IN THE U.S.

## EDUCATION QUALITY, FEDERAL ADMINISTRATION, AND FUNDING

John Helmick, Westat, Inc. and
Lisa Hudson, Defense Manpower Data Center

**Defense Manpower Data Center**
Survey & Program Evaluation Division
1600 Wilson Boulevard, Suite 400, Arlington, VA 22209-2593

## Executive Summary

This report describes a study of two Federally funded programs that provide for the elementary and secondary education of military dependents who live in the United States. One program, the Department of Defense (DoD) Domestic Dependent Elementary and Secondary Schools (DDESS), provides education for children living on military installations that are adjacent to communities where the local schools had at one time been deemed unable to provide a "suitable" education. The other program complements the DDESS program; it supports the education of military dependents in communities where these children are educated in the local public schools. The second program is run by the U.S. Department of Education and provides Federal "Impact Aid" funds to local educational agencies (LEAs) that educate the children of military personnel. Impact Aid funding compensates LEAs for the loss of revenues resulting from the tax-exempt status of both Federal property and the personal property of military personnel.

The study was conducted in response to the Conference Report on the National Defense Authorization Act for Fiscal Year 1995 (Public Law No. 103-337). This report requested that the Secretary of Defense conduct a survey of DDESS to collect information concerning the possibility of transferring the DDESS schools to LEAs. In addition, the Secretary was requested to survey LEAs with over 30-percent military-connected student populations to determine the level and sources of funding for these LEAs. The report also asked that both surveys include an examination of military parents' perspectives on the quality of education provided by the DDESS or LEA schools.

### DDESS School Quality

Parents' opinions regarding the quality of DDESS schools were collected using a mailed survey. The *Survey of Parents' Opinions on Department of Defense Domestic Dependent Elementary and Secondary Schools* (the *DDESS Survey*) was sent to a random sample of parents with children attending, in school year 1995-96, any of the 59 DDESS schools located on 15 military installations within the United States.

Parents with children enrolled in the DDESS schools have a high opinion of the quality of education provided by these schools. Parents rated the schools most highly in terms of instructional quality, the safety and discipline provided by the schools, and the schools' encouragement of parent involvement in their child's learning. Relative to their opinions of U.S. public schools in general, DDESS parents had higher opinions of the quality of the DDESS schools. Moreover, DDESS parents rated these schools more highly than parents in other surveys rated their own child's public school. Part of the reason DDESS schools are rated so highly appears to be that they function as neighborhood schools that serve only military dependents, similar to "coterminous" LEAs (LEAs with boundaries that are the same as the boundaries of a military installation). These higher ratings also may reflect other quality advantages provided by DDESS schools. In addition, given parents' awareness of the potential for a transfer of the DDESS schools to LEAs, these ratings may partially reflect parents' opposition to a transfer.

### Transfer of DDESS Schools to LEAs

Opinions regarding the possible transfer of DDESS schools to LEAs were collected using a combination of methods. The *DDESS Survey* asked parents for their opinions regarding transferring DDESS schools to local public school districts. During on-site interviews, commanders of the 15 installations with DDESS schools and superintendents of the 15 DDESS systems were asked for their opinions on the transfer issue. Finally, superintendents of the 24 LEAs adjacent to a DDESS school and

their corresponding state education officials were also interviewed regarding (a) their opinions on transfer, (b) conditions that would need to be met to facilitate a transfer, and (c) their perceptions about who is responsible for the education of military-connected students.

Parents of DDESS students strongly and overwhelmingly oppose transferring DDESS schools to the local public school districts. Opposition increased with the parents' rank, the perceived relative quality of the DDESS schools compared to the local public schools, and parent concern over transfer issues other than educational quality (e.g., student safety and busing/loss of neighborhood schools). Parents whose children had not attended any public schools were also more opposed to a transfer than were parents whose children had attended public schools.

Parents have many concerns about a possible transfer. Student safety, inability of the local schools to meet the special needs of military children, and the possibility of busing or the loss of neighborhood schools topped the list, followed by concerns related to school quality (e.g., instructional quality). Among parents of special needs students, the availability of special education programs was also a major concern.

In their interviews, the installation command and DDESS personnel expressed similar views to those of DDESS parents. The interviewed personnel typically opposed a transfer; they believed that a transfer would sacrifice education quality, attention to the needs of military children, and the strong links between DDESS schools and both installation services and the chain of command. Further, installation commanders feared that the loss of DDESS schools would be viewed as a degradation of current quality-of-life programs at their installation.

Interviewed officials from all LEAs that are eligible to receive the DDESS students were willing to accept responsibility for these students, provided that adequate Federal funding is available. There was, however, widespread skepticism among LEA officials about the adequacy of Impact Aid funding. In the event of a transfer, all LEAs would require use of the existing DDESS facilities (or construction of new facilities). General transfer issues that would need to be addressed include LEA acquisition or ownership of DDESS facilities, the condition of DDESS facilities, and personnel issues related to the transition of Federal DDESS personnel to the state and LEA systems. Many LEA officials also requested that the Federal government provide transition funding to cover the initial costs of a transfer, as well as additional funding (beyond Impact Aid) to handle the increased student population that would result from a transfer and/or to cover capital outlays for the facilities that would house the new students. Additional logistical, administrative, or legal issues would need to be addressed at specific sites. For example, at five installations, more than one LEA could claim jurisdictional responsibility for the DDESS students. At installations with restricted access, LEA access to on-base school facilities may require special arrangements.

### Education Quality in Impact Aid LEAs

The Impact Aid portion of this study focused on LEAs in which over 30 percent of enrolled students are military connected. In school year 1995-96, 93 LEAs in 34 states met this criterion. Parents' opinions regarding the quality of education provided by schools in these LEAs were collected using a mailed survey. The *Department of Defense Survey of Parents' Opinions on Local Schools* (the *LEA Survey*) was administered to a random sample of military parents who (a) had a school-aged child and (b) lived in an area served by any of the 93 target LEAs.

Ratings given by military parents to the quality of education in the LEAs were generally favorable and in line with ratings given by parents of public school children in the nation as a whole. As in the

*DDESS Survey*, military parents in these LEAs rated the schools most highly in terms of instructional quality, safety and discipline, and encouragement of parent involvement in their child's learning. The *LEA Survey* found relatively low levels of satisfaction with schools' responsiveness to the needs of military students and with parents' voice in decisions regarding their child's educational programs. These findings suggest that these target LEAs provide a good general education, but lack the focus on military families that is provided by schools (such as DDESS) that serve exclusively military-connected students.

### Funding of Impact Aid LEAs

Information regarding LEA funding was obtained from the U.S. Department of Education's *Common Core of Data*. In addition, telephone interviews were conducted with superintendents of the 93 target LEAs and with their corresponding state education officials. These interviews focused on views regarding responsibility for educating military-connected students and on education funding issues.

States and their LEAs often disagree on who—local, state, and/or Federal governments—is responsible for the education of military-connected students. Most target LEAs and their states are ready to assume at least some of this responsibility. Nonetheless, one half of the target LEAs and over one third of the target states felt that the Federal government bears some responsibility for the education of students who live on military installations. These opinions were based primarily on financial rather than legal considerations. Both LEA and state officials viewed Federal Impact Aid as the appropriate program for the Federal government to meet this financial responsibility.

Since the early 1980s, the Impact Aid program has been funded well below the maximum authorized levels. In Fiscal Year 1995, the program was funded at 53 percent of the maximum authorized. Although recent Defense drawdowns and military base closures may have alleviated some of the Impact Aid funding shortfalls, many LEA officials felt that Impact Aid funding levels have failed to keep pace with the increasing costs of educating students. In addition to funding levels, nearly three fourths of the LEA officials expressed concern over the reliability and timing (non-forward funding) of Impact Aid funds.

The target LEAs in this study rely on Impact Aid to make up for reduced local contributions from military personnel. It is thus not surprising that these target LEAs receive proportionately more of their education funding from Federal sources and less from local sources, relative to other LEAs. These LEAs, however, receive proportionately less funding from Federal and local sources *combined* than do other LEAs, suggesting that Federal funding increases are not fully compensating these LEAs for local decreases. Also, the target LEAs' average per-pupil expenditure level is lower than both the national average and the average for their states. These findings are consistent with the view that the Federal government is not fully meeting its financial responsibility to assist with the public education of military-connected students.

### Conclusions

This study found strong support for the current DDESS system among the parents of DDESS students, installation commanders, and DDESS personnel. These strong endorsements and corresponding opposition to DDESS transfer can be easily understood in light of the (perceived) advantages provided by the DDESS system to military children and parents (e.g., an education system exclusively focused on military children, strong links to base services and command structure, a safe environment).

Although they do not actively seek a transfer of DDESS schools to LEAs, state and local education officials are open to a transfer, as long as the Federal government provides sufficient funding. Transferring the DDESS schools to LEAs would involve considerable cost to the LEAs and/or Federal government, both

for the short-term transition period, as well as for the long term. Logistical arrangements regarding facilities, personnel, and transportation, among others, would also need resolution. None of these factors pose insurmountable impediments to transfer.

Notwithstanding the strong opposition to transfer uncovered in this study, continuation of the current DDESS system is more difficult to justify now than in the past. Ultimately, the main arguments for and against a transfer involve a trade-off between financial considerations and the perceived value of the DDESS schools to military personnel. These two issues must be carefully weighed in the context of budgetary priorities and military quality-of-life decisions. Assuming that a transfer of the DDESS schools may eventually be required, this report suggests that such transfers be carefully and strategically planned.

The second major issue addressed in this study was funding for LEAs with enrollments that are over 30 percent military-connected students. These LEAs must rely on Federal Impact Aid to offset shortfalls in their education budgets resulting from the presence of military-connected students. Most LEA officials surveyed in this study felt that because Impact Aid was currently funded at less than maximum authorized levels, it did not provide sufficient reimbursement to offset this burden.

## Chapter 1: Introduction

This study focuses on two Federally funded programs that provide for the elementary and secondary education of military dependents living in the United States. One program, the Department of Defense (DoD) Domestic Dependent Elementary and Secondary Schools (DDESS), provides education for military dependents living on military installations in communities where the local schools had at one time been deemed unable to provide a "suitable" education.[1] The other program complements the DDESS program, by supporting the education of military dependents in localities where these children are educated in the local public schools. The second program is run by the U.S. Department of Education and provides "Impact Aid" funds to local educational agencies (LEAs).[2] Impact Aid funding compensates LEAs for the loss of revenues resulting from the tax-exempt status of military property.

This study was conducted in response to the House Conference Report on the National Defense Authorization Act for Fiscal Year 1995 (Public Law No. 103-337), H.R. REP. No 701, 103rd Cong., 2nd Sess (1994). The Conference Report requested that the Secretary of Defense collect information concerning the possibility of transferring the DDESS schools to LEAs. The Report asked that the data collection include:

> (1) the opinions and attitudes of the parents of the students enrolled in the schools regarding the quality of education programs and transfer of DoD domestic dependent schools to LEAs; (2) the positions of the LEAs and appropriate education officials of the state in which the school is located regarding the responsibility of LEAs to educate military-connected students who reside on military installations, including the financial and legal basis for those positions; and (3) the positions of the LEAs and appropriate educational officials of the state in which the school is located regarding the transfer of DoD domestic dependent schools to LEAs, including requirements of the LEAs and state education authorities for financial, military construction, and other support needed to facilitate transfer of the schools to the LEAs. (p. 693)

The Conference Report also requested that the Secretary gather data on school districts operated by LEAs with military-connected student populations of over 30 percent; these LEAs rely heavily on Impact Aid funding. This effort was to include:

> (1) the previous level of financial support of DoD and other Federal agencies, and the timing of political and fiscal decisions concerning the education of military-connected students; (2) the positions of the LEAs and education officials of the state in which the school district is located regarding the responsibility of LEAs to educate military-connected students who reside on military installations, including the financial and legal basis for those positions and the officials' awareness of differences in Federal contributions to dependent education between DoD domestic dependent schools and Department of Education impact aid; (3) an analysis of the funding sources of such school

---

[1] The DoD also operates the Department of Defense Dependents Schools (DoDDS), providing education for the dependents of military personnel stationed overseas.

[2] The terms "local educational agency" (or "LEA") and "school district" are used interchangeably. While the former is technically correct, "school district" is the more commonly used term. For example, both U.S. Department of Education publications and publications by the American Educational Research Association typically refer to "school districts."

districts, including comparisons with other school districts within the state that do not have a large percentage of military-connected students; and (4) the opinions and attitudes of military parents with children attending such school districts regarding the quality of education programs in the schools. (p. 694)

This report presents the findings of the study conducted to address these Congressional concerns. The remainder of this chapter provides a brief overview of the Federal programs examined in this study (i.e., DDESS and Impact Aid). Chapter 2 presents an overview of the methods used to gather and analyze the data. Chapter 3 presents DDESS parents' views on the quality of education in DDESS schools. Chapter 4 presents parents' views on a possible transfer of the education of DDESS students to local public schools. Chapter 5 examines each DDESS site separately, looking at DDESS parents' views on quality and transfer, and reviewing the positions of DDESS, LEA, and installation personnel regarding transfer. The quality of education in LEAs with greater-than-30-percent military-connected enrollments is examined in Chapter 6. A review of funding in these LEAs is presented in Chapter 7. Chapter 8 presents the study's conclusions, including recommendations on transferring the DDESS schools.

## The DDESS Schools

### History of the DDESS System

Since the days of Army frontier posts, U.S. military installations have established their own schools when no public education was available in the local area. Funding for these schools was often irregular and unsystematic. In 1950, Federal legislation alleviated this problem by consolidating the funding and operation of these installation-run schools under the authority of Section 6 of Public Law No. 81-874. This legislation enabled the Secretary of Education (then the Commissioner of Education) to operate and maintain what became known as Section 6 schools for children residing on Federal property if: (a) state laws prohibited tax revenues of the state or any political subdivision of the state to be expended for the free public education of children residing on Federal property; or (b) education systems within the local communities were judged unable to provide a suitable free public education for these children.[3] Public Law No. 81-874 also stated that the Secretary of Education, in consultation with the relevant state education agency, must determine that the local schools could provide a suitable public education for the children residing on Federal property before a Section 6 school could be transferred to an LEA.

In 1981, the Omnibus Budget Reconciliation Act (Public Law No. 97-35) transferred responsibility for the Section 6 schools to the Secretary of Defense. For the first year after this transfer, the military services funded the operation of the schools because budget authority had not been provided. While budget authority for operation and maintenance of the Section 6 schools was granted to DoD in 1982, responsibility for this DoD school system was not centralized in the Office of the Deputy Assistant Secretary of Defense for Personnel Support, Families and Education until 1990. In 1994, Public Law No. 103-337 replaced the Section 6 legislation, which was repealed that year, and renamed the school system the Department of Defense Domestic Dependent Elementary and Secondary Schools.

The Section 6/DDESS system has expanded and contracted over the years. After their initial consolidation in 1950, schools were added to the system as a result of the racial integration of the military. Establishing these Section 6 schools allowed military children to attend integrated schools where local schools remained segregated. Since that time, the trend has been for Section 6 schools to transfer to LEAs,

[3] The law did not define "suitable" education, and standards for this term have never been established.

largely as a result of: (a) pressure from the U.S. Department of Education on states and localities to acknowledge responsibility for the education of military dependents; (b) population growth near installations; and (c) the integration of the public schools. Thus, while at one point there were about 100 installations with Section 6 schools, by the early 1970s, most of these schools had been transferred to LEAs. The last transfer of a Section 6 school occurred in 1973. Three other Section 6/DDESS school systems have closed since then as a result of installation closures.[4] Those DDESS schools that remain tend to be in locations where a transfer is difficult to accomplish.

One prior transfer effort is of particular note. In the early 1950s, the DDESS schools on the Marine Corps base at Quantico, Virginia, were scheduled to be transferred to an LEA. Strong opposition to that transfer by Quantico personnel led to the passage, in 1955, of what is commonly known as the "Quantico Amendment." This amendment to the original Section 6 legislation required that the transfer of a Section 6 school to an LEA must be approved by the Secretary of Education *and* the Secretary of the relevant military service. Under this amendment, a transfer of the Quantico schools was blocked. The language of this amendment was carried over into the original legislation for the DDESS schools, but was dropped in 1990 when operation of the schools was centralized within DoD. Under today's legislation, a transfer of a DDESS school must be approved by the Secretary of Defense since these schools are now under DoD and not the Department of Education. The Secretary of Defense thus replaces both the Secretary of Education and the Secretary of the relevant military service.

## The Current DDESS System

DDESS schools are centrally administered by DoD's Education Activity, within the Office of the Deputy Assistant Secretary for Personnel Support, Families and Education. The present DDESS system consists of 16 installation-level school systems located in seven states and Puerto Rico. These schools are organized into 13 superintendencies, each consisting of all schools located on one or more installations within a state. Each installation-level DDESS system has an independently elected school board composed of military personnel and/or their spouses. The Fiscal Year 1995 budget for the DDESS system was $233 million (including the 7 schools in Puerto Rico). For an estimated 33,000 students, this budget yields a per-pupil expenditure of $6,809. In comparison, the estimated 1995-96 average per-pupil expenditure for public schools in the U.S. was $5,738.[5]

Because English is not the language of instruction in the Puerto Rican public schools, the DDESS schools in Puerto Rico are not being considered for transfer and are therefore not included in this study. The remaining DDESS schools consist of 59 schools located on 15 military installations in seven states.[6] While all 15 DDESS sites provide elementary education, only four sites provide a full elementary and secondary education program. Table 1.1 provides an overview of these DDESS sites. The table also lists

---

[4] The closed installations are Craig Air Force Base in Texas, England Air Force Base in Louisiana, and Myrtle Beach Air Force Base in South Carolina.

[5] Amounts in the text are current expenditures, as are all other per-pupil expenditures listed in this report. Using total expenditures, the DDESS PPE was $7,061 in Fiscal Year 1995, and the national average was an estimated $6,459. Both sets of DDESS and national figures are based on student enrollment counts, not average daily attendance. National per-pupil expenditures are based on data from the *Digest of Education Statistics* (Snyder, Hoffman, & Geddes, 1996), Table 166, p.166.

[6] The DoD Education Activity lists 58 schools. This study includes 59 schools because the Quantico Middle School and High School were counted as two schools despite being housed in the same building.

the adjacent LEA(s) that could be involved in any potential transfer of DDESS schools, and the approximate number of DDESS students that would be affected by a transfer.

Table 1.1.
*Summary of 15 DDESS Sites*

| Installation | State | Grades | Number of schools | Enrollment (Sept. 95) | Adjacent LEA |
|---|---|---|---|---|---|
| Ft. McClellan | AL | K-6 | 1 | 383 | Calhoun County, Anniston City, Jacksonville City |
| Ft. Rucker | AL | PK-6 | 2 | 1,102 | Dale County, Coffee County, Daleville, Ozark, Enterprise |
| Maxwell Air Force Base (AFB) | AL | K-6 | 1 | 450 | Montgomery County |
| Ft. Benning | GA | K-8 | 7 | 3,164 | Muscogee County, Chattahoochee County |
| Ft. Stewart | GA | K-6 | 2 | 1,663 | Liberty County |
| Robins AFB | GA | K-6 | 2 | 890 | Houston County |
| Ft. Campbell | KY/TN[1] | PK-12 | 7 | 4,297 | Christian County, KY; Montgomery County, TN |
| Ft. Knox | KY | PK-12 | 9 | 3,677 | Hardin County, Meade County |
| West Point | NY | K-8 | 1 | 725 | Highland Falls |
| Ft. Bragg | NC | PK-9 | 8 | 4,719 | Cumberland County |
| Camp Lejeune | NC | K-12 | 8 | 3,505 | Onslow County |
| Ft. Jackson | SC | PK-6 | 3 | 1,034 | Richland County Two |
| Laurel Bay Marine Corps Base (MCB) | SC | PK-6 | 2 | 1,285 | Beaufort County |
| Dahlgren Naval Surface Warfare Center (NSWC) | VA | K-8 | 1 | 158 | King George County |
| Quantico MCB | VA | PK-12 | 5 | 1,301 | Prince William County |
| **Total** | | | **59** | **28,353** | |

*Source:* DoD Education Activity
*Note*: K stands for kindergarten and PK stands for pre-kindergarten.
[1] Fort Campbell is officially known as Fort Campbell, Kentucky, but the installation is located in both Kentucky and Tennessee.

## Previous Studies of DDESS Transfer[7]

Periodically, Congress has reviewed the status of the DDESS schools to determine if either individual transfers are appropriate, or Federal responsibility for the entire DDESS system can be shifted to state and local agencies.

In Section 823 of the Military Construction Authorization Act of 1985 (Public Law No. 98-407), Congress indicated that Federal responsibility for funding and operating the (then) Section 6 system may no longer be necessary. At the same time, Congress instructed the U.S. General Accounting Office (GAO) to determine the most suitable alternative for funding and operating these schools. GAO was also directed to

[7] Appendix A includes an annotated bibliography of previous studies examining the issue of transferring the DDESS schools to LEAs.

# Chapter 8: Findings and Conclusions

This chapter summarizes findings from the Congressionally requested study of (a) the DoD DDESS schools and (b) LEAs with enrollments consisting of over 30-percent military-connected students (Impact Aid LEAs). Previous studies of DDESS schools relied primarily on funding analyses (U.S. General Accounting Office, 1986) or intensive case study methodology (Bodilly et al., 1988; Purnell et al., 1991). In contrast, this DDESS investigation employed a multi-method approach, involving surveys of military parents with children enrolled in the DDESS system; on-site interviews with base commanders, DDESS superintendents, and LEA superintendents; and telephone interviews with state education officials. The LEA portion of the study also utilized a multi-method approach, consisting of surveys of military parents of LEA students, telephone interviews with local and state education officials, and extracts from published data on LEA funding.

This chapter is presented in two main sections. This chapter first reviews the main findings and conclusions of the DDESS portion of the study and then reviews the main findings and conclusions of the Impact Aid LEA portion of the study.,

## The DDESS Schools

### Findings Concerning Education Quality

DDESS parents have a very high opinion of the quality of education in the DDESS schools. A large majority of these parents gave their child's DDESS school high ratings in terms of the quality of specific education programs and the school itself. DDESS parents' ratings were substantially higher than those provided by a national sample of public-school parents.

DDESS parents appear to value both the quality of the DDESS educational programs and the additional benefits that these schools provide. These schools were viewed as an important part of the quality of installation life and as an extension of the military's family support system. The DDESS schools were viewed as providing safe and disciplined environments congruent with a military lifestyle and parental expectations. Parents' strong feelings about community ownership of the DDESS schools were reflected in high levels of parental involvement and volunteerism in these schools.

The DDESS schools offer a level of responsiveness to the needs of military children—particularly those due to high mobility and parents' short-notice deployment—that local schools cannot easily duplicate. DDESS schools provide more extensive services (e.g., counseling and testing for placement) to accommodate students who join the school in the middle of the school year. They provide additional support services for students experiencing the stresses of parental deployment. Links between the schools, other military service programs, and the installation chain of command create a partnership that supports military students in ways that could not be attained with a different school structure. These unique advantages of the DDESS schools appear to contribute to parents' high opinions of the quality of education provided by the schools.

Thus, some of the positive perceptions of DDESS school quality appear to result from the functioning of these schools as "installation" schools—i.e., as schools that are located on the installation and enroll only installation children. An installation-school structure, however, does not account for the full value placed on these schools' education quality. The remainder is likely due to some combination of true quality differences and other factors.

## Findings Concerning Transfer

***Opinions on transfer.*** This study's findings on the potential transfer of the DDESS schools echo those reported by its predecessors (Bodilly et al., 1988; Purnell et al. 1991)—Opposition to transferring the DDESS schools to the local public schools remains high. DDESS superintendents felt a transfer would sacrifice education quality. They noted that the unique benefits provided by the DDESS schools (discussed above) would be lost if a transfer occurred. Installation commanders noted that military quality-of-life benefits have been declining. These commanders believed that the loss of another benefit would have a negative effect on troop morale and could make assignments to their installations less desirable. DDESS parents also strongly opposed transfer of the schools. These parents had many concerns about a potential transfer. In addition to concerns about educational quality, parents were concerned about broader issues that indirectly affect educational quality, such as student safety, the unique needs of military students, and neighborhood schooling. In general, the more highly parents' rated the quality of the DDESS schools compared to the local schools, the more opposed they were to a transfer. Nonetheless, opposition existed even when the two types of school systems were viewed to be of equal quality. This opposition presumably resulted from parents' awareness of the additional advantages that DDESS schools provide for military students.

Most state and local education officials in locales with DDESS systems acknowledged their responsibility to provide an education for military-connected students who reside on military installations. Nevertheless, these officials viewed the issue of transfer with caution, anticipating a variety of problems that would result from a change in the status quo. For both state and local officials, the issue of funding was paramount in any consideration of transfer. Their concerns centered on the potential costs of a transfer: the increased financial burden on LEAs and local communities due to an increased student population without an increased tax base; costs of both initial and continuing facilities maintenance, construction, and renovation; and costs of administering the initial transition. In theory, Impact Aid should cover the first of these costs. LEA officials, however, saw an uncertain future for Impact Aid and were skeptical that appropriate levels of funding would be forthcoming. Their concerns have a basis in the funding history of this Federal program. Impact Aid has not been funded at the maximum authorized levels since before 1982; funding levels (at the time data for this report was compiled) were at 53 percent of the maximum authorized.

## Transfer Pros and Cons

Whether the DDESS schools should be transferred to state and local control is an issue that cannot be resolved by this study. Many of the issues central to a transfer decision (e.g., Federal funding implications) were examined here only at a broad, general level. Nonetheless, based on the cumulative findings of this study, past studies on the transfer issue, and recent Federal experiences with base closures, many of the factors that would argue for and against a transfer can be delineated.

*Arguments for a transfer.* Earlier studies (e.g., Bodilly et al., 1988) seem to have been prompted by the argument that a transfer of the DDESS schools could produce Federal cost savings, or at least eliminate the unwelcome possibility of trading defense priorities for education needs during DoD budget negotiations. Transfer of the DDESS schools would eliminate the conflict among defense priorities, but Federal cost savings resulting from transfer of the schools are difficult to evaluate. Initial costs could be high, but it is likely that a transfer would result in a Federal cost savings in the long-run. The cost savings would largely result from the Federal government paying for only the local share of the costs of educating the current DDESS students, rather than the full costs of their DDESS education. Thus, for example, the annual Impact Aid cost of $83 million (at full funding levels) would be less than the annual 15-site DDESS



A-11

budget of $198 million. (These cost savings could be reduced by other Federal costs that might be agreed to during transfer negotiations, such as supplemental funding for future capital outlays.)

One barrier to transfer that existed in the past was that some states and LEAs were not prepared to assume responsibility for the education of military-connected students who lived on military installations. This barrier is less a factor today. The states and LEAs that would receive the current DDESS students are mostly *willing* to accept the responsibility of educating these students (and are able to do so under certain conditions).

Legally, a transfer decision must be accompanied by a determination that the local schools to which the DDESS students would be transferred can provide an "appropriate" education. Although this term is not defined (and is extremely difficult to define), the fact that many students associated with the installations that have DDESS systems are currently educated by the local schools suggests that these local schools do provide an "appropriate" education. While this situation does not in itself prove that the local schools are "appropriate," it could be used with other evidence to support that argument.

Past studies on the transfer of the DDESS schools recommended a transfer of some or all of these school systems (Bodilly et al., 1988; Purnell et al., 1991; U.S. General Accounting Office, 1986). Conditions that existed at the time of those studies are mainly unchanged, suggesting that the conclusions of those studies still apply. The one major change that has occurred is that the local schools around the installations with DDESS systems have become more crowded. This change means that a transfer would have to involve a transfer of facilities as well as students. Thus, a transfer of some or all of the DDESS systems should still be feasible, as long as DDESS facilities can be transferred as well.

Since the earlier studies were completed, DoD has been in a "drawdown" mode. Individual facilities and entire military installations have been closed. Military organizations have been completely restructured, and others have been relocated. This DoD drawdown experience could be applied to a transfer of DDESS schools. Transferring DDESS schools would not be easy. Although 75 DDESS schools have been transferred to local operation since 1950, the most recent transfer (not associated with a base closure) took place 24 years ago (in 1973) at Tyndall Air Force base, Florida. The 15 DDESS systems that remain today are in locations where the conditions for transfer had been most difficult to accomplish. Nonetheless, DoD has recent experience with difficult closures that should be helpful in planning and implementing DDESS transfers.

The loss of the DDESS schools would undoubtedly be viewed as another loss of a military quality-of-life benefit. But unlike many other benefit cuts (e.g., in retirement benefits) that affect all or most military service members, the loss of this benefit would affect a small proportion of military service members. DDESS students comprise only three percent of all school-aged children of active-duty service members, and parents of DDESS students are less than two percent of all active-duty service members.

*Arguments against a transfer.* Other factors argue against a transfer. First, as this and past studies have shown, no one who would be involved in or affected by a transfer unequivocally supports a transfer; most of the involved parties oppose a transfer. This opposition, particularly among military parents, could lead to efforts to prevent a transfer, at the installation level if not at the Federal level. Military personnel's level of opposition is difficult to predict or quantify, but the past transfer effort at Quantico suggests that opposition can be strong—strong enough to stop a transfer.

One reason DDESS parents oppose a transfer is a fear that they would lose their present degree of school governance. Currently the DDESS schools are run with input from an elected school board, composed primarily of military parents. In the event of a transfer, military parents typically could serve on

*local* school boards only if they were legal residents of the LEA's state/county. While there may be practical reasons why military members would prefer not to obtain local residency, military members' spouses (who are not covered by the Soldiers' and Sailors' Civil Relief Act) may be obliged to change their residency with each family move. These spouses, at least, should be eligible to run for or be appointed to local school boards. However, because of the frequency with which military members and their families move, serving on local school boards may be difficult for other reasons. Military families may not be in a location long enough to build the voter support necessary to win an elected position or to obtain the recognition needed to acquire an appointed position. In addition, few or no school board positions may become available (i.e., there may be no elections or appointments) during the relatively brief time a military family is stationed in an area. Military parents thus could be precluded from *any* opportunity to serve on the local school board.

The initial cost to the Federal government of a transfer is difficult to estimate, but is likely to be high. Two of these costs can be estimated. First, at the full funding level (which is desired by LEAs and recommended by this report), the total amount of Impact Aid funding that would be required to transfer all 15 DDESS systems is about $83 million. Second, the cost to correct current maintenance and construction backlogs at all 15 sites is estimated at $118 million. (Although a 5- to 10-year plan has been established to eliminate these backlogs, funding has yet to be provided.) There would also be additional costs, such as the administrative costs of transitioning DDESS personnel to LEA employment, reimbursement to local educational agencies for associated (initial and continuing) transfer costs, and the legal costs of negotiating a transfer at each of the 15 DDESS locations. In the face of pressure to reduce Federal spending levels, Congressional legislators may find it difficult to allocate sufficient funds to cover these initial transition costs.

Although this study was not asked to determine whether the DDESS schools provide a better education than do the adjacent public schools, it is clear that (a) parents of DDESS students perceive the DDESS schools to be better than the local schools and (b) the DDESS schools offer a number of programs and services specifically designed to meet the needs of military students. Thus, it would appear that a transfer would entail the loss of an important benefit to military families. Although this loss directly affects relatively few military personnel, *all* personnel could view the transfer of DDESS schools as another in a series of benefit losses that indicate a declining commitment to and concern for the military family. As such, the loss of the DDESS schools could negatively affect military morale.

While none of the impediments to a transfer identified in this (or previous) studies is insurmountable, many may be difficult to resolve at this time. Chief among these is the capacity of most local school districts to absorb DDESS students (with or without transfer of the DDESS facilities). Most LEAs adjacent to the installations with DDESS systems are currently experiencing rapid enrollment growth and are overcrowded. Adding the DDESS students to these public school systems at this time may exacerbate their growth problems. The addition of DDESS students would be even more problematic for those fast-growing districts that are not experiencing concomitant growth in their tax base. Assuming responsibility for military-connected students that do not contribute fully to the local tax base would be difficult for LEAs at any time, but particularly when their enrollment growth is not being met with an expansion in the tax base. On the other hand, a transfer could help some LEAs deal with enrollment growth, at least for the LEAs gaining more in facilities and staff than in students.

If a transfer occurs, the LEAs that accept the current DDESS students would be dependent on Impact Aid to compensate them for their inability to collect property taxes from these students' families. These LEAs and their states are already wary of the Federal government's willingness or ability to provide what they see as fair compensation for the education provided to military-connected students. If a transfer occurs and Impact Aid remains significantly under-funded, tensions will likely increase between

installations that now have DDESS systems and the local communities that would educate the DDESS students, and between local and state education agencies and the Federal government.

Another funding issue arises at the state level. Although most states with DDESS sites are willing to provide the state share of per-pupil funding to LEAs that accept the current DDESS students, it is unclear how this would be done. States would either have to raise tax revenues or decrease their per-pupil payments to all LEAs in the state. Both options have negative consequences for state residents and LEAs. (For example, LEAs would probably find it harder to raise local education revenues if the state had just raised its education revenues). As a result of the increased funding burdens a transfer would place on state and local governments, tensions between these government agencies and both the military and the Federal government could increase as a result of a transfer.

### Conditions for Transfer

According to state and local education officials, if the decision were made to transfer one or all DDESS systems, a number of conditions would have to be met before states and localities would accept the DDESS students. In addition, the Federal government would be expected to negotiate certain transfer issues. Although additional issues might be raised during transfer negotiations, the following list includes the most significant ones that states and localities believe would require Federal attention. Some of these issues apply to all 15 DDESS sites, others to selected sites. Interviews at all 15 sites raised the following conditions and issues.

- The Federal government would have to correct all DDESS construction backlogs and cover the costs to bring the DDESS facilities into compliance with relevant state and local building codes. With most local school facilities already at maximum capacity, a transfer of DDESS students would require the use of the current DDESS facilities at all installations. State and local officials expect the Federal government to provide them with facilities that are free of construction backlogs and that are in compliance with state and local building codes.
- LEAs are willing to consider hiring DDESS staff for positions that would be available after a transfer. Without Federal assistance, however, many of these staff members could lose significant tenure and seniority benefits. The Federal government would be expected to help negotiate adjustments in salaries, retirement, and other personnel benefits for the DDESS staff at each of the 15 sites.

Interviews at selected sites raised other transfer conditions and issues.

- The Federal government would have to provide higher levels of funding, and more reliable funding, than is currently provided by Impact Aid for the LEAs near Dahlgren, Fort Bragg, Fort Campbell, Fort Jackson, Fort Knox, Fort Stewart, Laurel Bay, Maxwell AFB, Robins AFB, and Quantico. LEA superintendents at these sites were not satisfied with the level of Impact Aid currently provided and/or with the reliability of this funding program. They do not want to assume the responsibility for educating more military-connected students until and unless more adequate funding is provided.
- The Federal government would have to provide up-front funding to cover LEAs' initial transition costs for the LEAs near Camp Lejeune, Fort Bragg, Fort Jackson, Fort Rucker, Fort Stewart, Laurel Bay, and Robins AFB. The LEA superintendents at these sites expect a transfer to entail significant costs for their agencies (for example, to cover transition planning

and staff hiring) and believe that these costs should be borne by the Federal government rather than by the LEA.

- The Federal government would have to provide additional funding to cover long-term facilities maintenance and capital improvement costs for the LEAs near Camp Lejeune, Fort Bragg, Fort Jackson, and Fort Stewart. Although funds for these costs are currently available under the current Impact Aid law, the LEAs apparently are not satisfied with the availability of these funds. They believe that annual Impact Aid payments (even at maximum amounts authorized) do not cover the costs of capital outlays. Thus, LEAs that accept additional facilities for the education of military-connected students believe the LEAs must pay for the upkeep of these facilities from their tax revenues. The LEAs at these sites believe that this cost should be a Federal responsibility, with guaranteed funding of facilities maintenance and capital improvements provided as part of a transfer agreement.
- The Federal government must be willing to negotiate a contractual funding arrangement for the LEA near West Point. This LEA currently has a contractual funding arrangement with the Federal government to provide education for the grade 9-12 students who live on West Point. The LEA would want the same type of arrangement (in lieu of Impact Aid) if it were to educate the West Point DDESS students. In order to educate these students in facilities on West Point, state laws would have to be amended to permit West Point to become part of the LEA's jurisdictional area.
- A physical transfer of students needs to be delayed five years at Dahlgren to allow the LEA to complete the construction of new school facilities. The level of overcrowding in this LEA is such that it cannot consider a transfer before that time.
- Potential jurisdictional conflicts would have to be resolved at the sites where more than one LEA has jurisdictional authority over students living on the installation. This situation exists at Fort Benning, Fort Campbell, Fort McClellan, and Fort Rucker. (Assuming Fort McClellan closes in 1999 as scheduled, the transfer is moot for that installation.)
- LEA access to facilities and/or students would have to be negotiated at sites where installations, or the area of the installation where the DDESS students or facilities are located, are secure. This situation applies at Camp Lejeune, Dahlgren, Fort Bragg (Pope AFB), Fort Campbell, Fort Knox, and Robins AFB.

### Conclusions

This study uncovered many arguments against transfer, and no strong proponents for transfer at the current time. As in past studies, many general and site-specific conditions for transfer should be addressed before a transfer becomes feasible. In principle, none of these conditions pose insurmountable barriers to a transfer. Notwithstanding the position of DDESS superintendents, parents and military installation commanders, continuation of the current DDESS school system is much more difficult to justify than previously. Part of the rationale for establishing such schools (i.e., to avoid sending military students to local segregated schools) no longer applies. In addition, there is the continued philosophical argument that education is a state and local responsibility. Ultimately, the main arguments for or against a transfer come down to two major issues: Financial considerations and the perceived value of the DDESS schools to military personnel. The trade-off between these issues must be weighed in the context of budgetary priorities and military quality-of-life decisions.

## Impact Aid LEAs

### Findings Concerning Education Quality

Most military parents of children attending school in the 93 target Impact Aid (over 30% military-connected enrollment) LEAs seemed pleased with the quality of education in these schools. Parents' evaluations of LEA school quality were favorable, and generally comparable to those that public-school parents give about public schools in the nation at large. Since local education systems are geared to the civilian population, they may fall short of military parents' expectations in areas specific to the needs of military families. Military parents gave relatively low ratings to the LEA's responsiveness to the problems and needs of military students, and only a small proportion felt that they had an adequate voice in the decisions made about their children's educational programs.

It is difficult to gauge the level of satisfaction with these specific educational features since comparable data are available from only the *DDESS Survey*, but the relatively low ratings for these measures are consistent with two fears expressed by parents of DDESS students during the site visits and in the *DDESS Survey*. DDESS parents were concerned that a transfer to local public schools would mean that military students' needs would not be well-met and that their control over their child's education would diminish. It may be that the public schools, with their typically diverse student bodies, limited funding, and often large enrollments, are less able to provide the kind of individualized, personalized attention that military parents feel is warranted based on their experiences in a more close-knit community environment (the military).

### Findings Concerning the Responsibility to Educate Military-connected Students

States and LEAs seldom agreed on who is responsible for the education of military-connected students who reside on an installation. This disagreement may arise over confusion between *legal* (administrative) versus *financial* responsibility for the education of military-connected students. Regardless of the reason, LEAs were more likely than states to view this responsibility as a local responsibility, while states were more likely than LEAs to view it as a state responsibility. Most states and LEAs are ready to assume at least some of this responsibility, but many also felt the Federal government bears some *financial* responsibility for the education of these students. States and LEAs appreciated Federal Impact Aid funds for military-connected students, but often viewed that funding as inconsistent and unreliable. The LEAs expressed significant apprehensiveness about the Federal government's commitment to providing financial help for the education of military connected students.

In sum, it appears that the Federal government can count on the vast majority of states and LEAs to accept at least some responsibility for the education of military-connected students who reside on military installations. Both states and LEAs are acutely aware, however, that families who live on military installations contribute less than their "fair share" to the taxbase supporting education. Since this situation results from the Federal government's exemption from taxation, states and localities view the Federal government as the responsible agency for reimbursing LEAs for their shortfall. Although there is an *expectation* that the Federal government will assume financial responsibility for the education of military-connected students, there is also a *fear* that the Federal government will not.

### Findings Concerning Funding

LEA officials felt that educational funding in general has not kept pace with increasing costs and that it is increasingly difficult to obtain local support for education. Nearly all state and LEA officials felt

that Impact Aid funding is critical to the task of educating military-connected children. The fact that the program is no longer funded at the maximum amount allowable under current statute has placed additional financial burdens on LEAs and local communities and was of great concern to many education officials.

Most LEA officials interviewed for this study felt they must lobby Congress to ensure that Impact Aid funding remains adequate. The fact that the Impact Aid program is not forward-funded also causes budgeting difficulties for LEAs. As educational costs increase and other educational funding sources fail to keep pace with these costs, Impact Aid shortfalls become a more serious issue. Although DoD supplemental funds have provided a partial solution to some of these problems with Impact Aid funding, this supplemental program has also been erratically funded.

The Impact Aid program continues to be funded at levels below the maximum authorized. In Fiscal Year 1995, funding for the entire Impact Aid program was 53 percent of its maximum authorized level. In 1994, the 93 LEAs in this study (as a group) received no more than 63 percent of maximum Impact Aid payments. The Impact Aid allocation formula in effect in Fiscal Year 1994 was designed to distribute limited Impact Aid funds such that LEAs with greater reliance on Impact Aid funding receive a greater share of the funds. Funding analyses in this study suggest that this formula worked as intended. Nonetheless, even those LEAs with the greatest need (80%-100% reliance on Impact Aid) received no more than 73 percent of the maximum allowable payment. The new funding allocation formula (specified in Public Law No. 103-382) was designed to improve on this need-based distribution.

Relative to other LEAs, the 93 target LEAs received proportionately more of their funding from Federal sources and less from local sources. If the increases in Federal funding were fully compensating LEAs for their reduced local revenues, these LEAs would receive about the same share of their funding from state sources as do other LEAs; instead, these LEAs get proportionately more funding from state sources and less from local and Federal sources combined. On average, these target LEAs also have lower levels of per-pupil funding—lower than the national average and lower than the average for their respective states. These findings support the claims of organizations that represent Impact Aid LEAs: Current Impact Aid funding levels do not adequately compensate LEAs for the education of military-connected students.

Impact Aid funding levels are problematic for a number of reasons. First, the resulting shortfall in education funding can create tensions between the military installation, its personnel, and the local community. It also has the potential of lowering the quality of education received by both military and civilian children served by affected LEAs. Using Impact Aid to make Federal budget reductions at the expense of state and local educational agencies is also problematic. Unlike most Federal programs, Impact Aid does not provide a unique Federal "service." Instead, this program allows state and local governments to continue to provide an on-going public service (education) without detriment. Impact Aid meets a Federal obligation to states and localities, an obligation resulting from the Federal exemption from state and local taxation.

## Conclusions

Two major issues addressed in this study were the level and sources of funding for the target LEAs, including the role of Federal funding. These issues are important because these LEAs need to be compensated for the loss of revenue sources due to the Federal presence (be it military or otherwise). Current Impact Aid law is designed to provide LEAs with appropriate reimbursement levels for each type of Federally connected student. At present, under-funding prevents Impact Aid from providing sufficient reimbursement to offset this burden on localities.

Current Impact Aid funding levels have created tension between local communities and their neighboring military installations as localities must pay what they perceive to be a disproportionate share of the costs of educating Federally connected students. Moreover, these tensions are likely to escalate in communities where education costs are increasing and/or an installation's military population is growing at a faster pace than the local civilian population (e.g., as a result of BRAC). Although in some cases DoD supplementary funds have been provided, current DoD policy supports the Impact Aid program as the appropriate funding mechanism for compensating local communities for the costs of educating military-connected students. The current use of DoD supplemental funds for this purpose is problematic for two reasons. First, DoD opposes the use of Defense funding for other than Defense needs. Second, this funding is provided too inconsistently to allow LEAs to plan their budgets effectively.

1407-3

# ASSISTANCE TO SCHOOLS IN FEDERALLY IMPACTED AREAS

## HEARINGS

BEFORE A

SPECIAL SUBCOMMITTEE

OF THE

COMMITTEE ON EDUCATION AND LABOR
HOUSE OF REPRESENTATIVES

EIGHTY-THIRD CONGRESS

FIRST SESSION

PURSUANT TO

## H. Res. 115

A RESOLUTION AUTHORIZING THE COMMITTEE ON EDUCATION AND LABOR TO CONDUCT STUDIES AND INVESTIGATIONS RELATING TO MATTERS WITHIN ITS JURISDICTION

---

HEARINGS HELD AT WASHINGTON, D. C.
JUNE 10, 11, 12, 15, 16, 17, AND 24, 1953

---

Printed for the use of the Committee on Education and Labor



UNITED STATES
GOVERNMENT PRINTING OFFICE
34851 WASHINGTON : 1953

ire the only two wo

ty and set up a per-
impacted and there
Federal reservation
proposed, Congress-

vhole island is one
r the island because
ber of schools.
ison. Things are a
e was no way they
formula of the old
uild schools out in
properties.
r is, but they are
and planes can take
problem after they

the Puerto Rican
children up to the
y are so stacked up
e education.
r down there, he is
th about the worst
has the right ideas
almost impossible

1 and that is about

n estimated 231,000
fy for funds through

1 begins next Sep-

eveloped so far has
ho would have been
unt it is estimated

payment would not
0 children.

. But that is the
urvey questionnaire

it survey in last fall
2 years in advance
is data.
Grigsby, with your

he first paragraph,
blic Law 874 as im-



PROPOSED AMENDMENTS TO PUBLIC LAW 874

*Purpose of Public Law 874 and policy statement*

In enacting Public Law 874, the 81st Congress stated the policy of the United States with respect to the purpose of the act as follows:

"In recognition of the responsibility of the United States for the impact which certain Federal activities have on the local educational agencies in the areas in which such activities are carried on, the Congress hereby declares it to be the policy of the United States to provide financial assistance (as set forth in the following sections of this act) for those local educational agencies upon which the United States has placed financial burdens by reason of the fact that—

"1. The revenues available to such agencies from local sources have been reduced as the result of the acquisition of real property by the United States; or

"2. Such agencies provide education for children residing on Federal property; or

"3. Such agencies provide education for children whose parents are employed on Federal property; or

"4. There has been a sudden and substantial increase in school attendance as the result of Federal activities."

The provisions of the law also include as a Federal responsibility the provision of free public education for children living on Federal property through Federal operation of schools on such property where no local agency can accept responsibility for the education of such children (sec. 6).

Mr. POWELL. May I ask a question here?

Chairman McCONNELL. Yes.

Mr. POWELL. First I want to thank the committee for letting an interloper sit in this morning, but it is in reference to the part Mr. Grigsby omitted that I would like to ask a few questions because this problem is so much before us now after our President's directive to study the problem.

Now, under section 6 which you omitted reading, that first part, that authorizes the Commissioner of Education to make arrangements providing for free public education for children who live on Federal property when no tax revenues of the State or any political subdivision thereof may be expended for free-public education of such children; or if it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children.

Now, that is the law there.

Now, the question I want to ask is this:

A letter around the middle of January of this year was sent from the Office of the Commissioner of Education to the former Assistant Secretary of Defense, then Mrs. Anna Rosenberg, in which this was stated:

> In the case of children who are being educated by the local authorities, it is sometimes found necessary for the convenience of the children that their education be conducted on the Federal property. In such situations, the local educational agency, if otherwise eligible, would be entitled to receive a payment under section 3 of Public Law 874, but the Commissioner of Education has neither authority nor repsonsibility to direct the type of education which is provided. If the policy of the Federal agency in control of the Federal property does not allow segration on the property, it may be that some local educational agencies will be unable by reason of their own State law to educate the children living thereon.

That is the letter which came out of your office.

(The letter referred to follows:)

A-20

FEDERAL SECURITY AGENCY,
OFFICE OF COMMISSIONER OF EDUCATION,
*Washington, D. C., January 15, 1953.*

Mrs. ANNA ROSENBERG,
*Assistant Secretary of Defense,*
*Department of Defense, Washington, D. C.*

DEAR MRS. ROSENBERG: I have received your letter of January 10, 1953, with respect to the education of Negro children who reside on Federal military reservations. It seems to me that we might profitably discuss this matter as did our staffs in the early days of the program when the present policies were established. Pending such a discussion, however, it may be well to set forth my understanding of the situation since your letter would indicate that you have not been fully advised of all the aspects involved.

It is proper under Public Law 874 to provide Federal assistance to school districts for burdens imposed upon them by the Federal Government represented primarily by children who resided on nontaxable Federal property or whose parents were employed on such property. It is made very clear both in the act and the committee's reports thereon that wherever possible education should be provided by the State and local school authorities under section 3 in accordance with State laws and that only in exceptional cases does the Commissioner have authority to make arrangements under section 6 for providing free public education for children living on Federal property.

Section 6 of Public Law 874 authorizes the Commissioner of Education to make arrangements for providing free public education for children living on Federal property when and only when "no tax revenues of the State or any political subdivision thereof may be expended for the free public education of such children; or if it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children."

In the case of children who are being educated by the local authorities, it is sometimes found necessary for the convenience of the children that their education be conducted on the Federal property. In such situations, the local educational agency, if otherwise eligible, would be entitled to receive a payment under section 3 of Public Law 874, but the Commissioner of Education has neither authority nor responsibility to direct the type of education which is provided. If the policy of the Federal agency in control of the Federal property does not allow segregation on the property, it may be that some local educational agencies will be unable by reason of their own State law to educate the children living thereon.

In the event no local educational agency is able to provide free public education for the children residing on Federal property, the Commissioner then has the responsibility of making arrangements to provide education for the children as a Federal responsibility. In these cases, of course, the policy of the Office of Education is to conduct the schools, insofar as practicable, in accordance with the policy established by the agency in control of the property.

The Commissioner has found it necessary to make arrangements for providing free public education under section 6 in 18 cases in the United States and Territories. In all but two cases, these are military, naval, and Air Force installations. In these instances, funds are transferred to the Department of Defense for the operation of on-base schools under the supervision of the post commander and a committee selected from the personnel of the post acting as a local board of education. In all but three instances, the on-post schools thus operated by the post commander as agent for the United States Commissioner of Education are integrated schools, the determination being made by the post commander whether or not it is practicable to operate racially integrated on-post schools based on the conditions existing on the posts.

If it is the policy of the Department of Defense not to permit segregated education on any property within its control, whether that education be by local school agencies under section 3 or by the Commissioner of Education operating under section 6, this agency would, of course, be guided by such a policy. It would be necessary in that event to determine in each case whether any local educational agency which is now providing education on a segregated basis is able to provide such education on an integrated basis. In any case in which the local educational agency is not able to provide education on an integrated basis, the Commissioner would then be under the necessity of making other arrangements for education of such children.

I trust that this explanation will make clear my desire to cooperate with the Department of Defense in every respect.

EARL J. MCGRATH,
*United States Commissioner of Education.*

Mr. POWELL. Now, on page 2 of that letter, and this is the part I am getting to:

> In the event no local educational agency is able to provide free public education for the children residing on Federal property, the Commissioner then has the responsibility of making arrangements to provide education for the children as a Federal responsibility. In these cases, of course, the policy of the Office of Education is to conduct the schools, insofar as practicable, in accordance with the policy established by the agency in control of the property.

That still stands as the feeling of your office?

Dr. GRIGSBY. Yes.

Mr. POWELL. That means then under the effort being put forth by the President to remove segregation in these schools that if the local authorities cannot see their way clear to do so, then you interpret it as being the duty of the Commissioner of Education to do so, is that right?

Dr. GRIGSBY. I think the law states the Commissioner shall make such arrangements as may be necessary to provide free public education for such children. The arrangement ordinarily which has been made in those situations is to transfer money to the Department of Defense or rather to the Department of the Army, the Navy or the Air Force in charge of the installation and they proceed to operate the school on base as a Federal operation in terms of the payment of the full cost by the Federal Government under section 6.

Mr. POWELL. How many schools are there being operated in such manner?

Mr. LILLYWHITE. I think it is 21.

Mr. POWELL. I do not want to confuse the two types of schools.

Dr. GRIGSBY. These are on-base schools operated by the Government under section 6.

Mr. LILLYWHITE. There are 24 section 6 operations. On the question of how many different projects, in Alaska we had one section 6 and you had Fort Richardson and Fort Elmore.

Mr. POWELL. I am trying to get the division between the schools. There are 24 projects, altogether, is that right?

Mr. LILLYWHITE. Yes.

Mr. POWELL. There are just a handful that are operated on an integrated basis on the Army posts by the Federal authorities. Then there is a larger group that is operated on Federal property by local school authorities on a segregated basis, is that correct?

Mr. LILLYWHITE. I think this should be said with respect to the first statement: All of the schools operated by the Federal agencies under section 6 on Federal property, federally operated schools, are operated on an integrated basis, that being the determination of the commanding officer in charge of the base that that is the way they should be operated.

Mr. POWELL. It is the determination of the commanding officer?

Mr. LILLYWHITE. That is correct, sir.

Now, there are a large number of areas in which a school was constructed under this act or had already been there. There were approximately 95 such projects for construction on Federal property and most of them are operated by the local school districts under State law. There are 21 such schools according to our best information now, in States that require segregation by statute or constitution.

Mr. POWELL. Now, would you be kind enough to furnish the committee a list of those schools, the integrated ones and segregated ones?

Mr. LILLYWHITE. We can do that very quickly, sir.

(The information referred to was subsequently supplied.)

Mr. POWELL. Are there any schools being operated on Federal property under the commanding officer that are being operated on a segregated basis?

Mr. LILLYWHITE. There was the one school this last year.

Mr. POWELL. That is the one that President Eisenhower ordered changed?

Mr. LILLYWHITE. It was not a question of ordering a change. The installation had declared a policy of nonsegregation. It was a question of completing a school building to make nonsegregation feasible because of location of housing where the children lived.

Now, it is our understanding from the statement of the commanding officer that that school will be operated on an integrated basis this fall, which would make all federally operated schools nonsegregated.

Chairman MCCONNELL. Mr. Powell, there seems to be a question in your mind about figures. Have you straightened it out here? You thought there were only 2 or 3 and he said 21.

Mr. POWELL. That is right.

Mr. BARDEN. There are two in North Carolina.

Mr. POWELL. On an integrated basis?

Mr. BARDEN. Yes.

Mr. POWELL. I have one more question. The Department of Defense therefore would not be correct when they state that they are holding up integration in schools on military posts because your office has requested the delay. That would not be correct, would it?

Dr. GRIGSBY. I had no knowledge of their making any such statement.

Mr. POWELL. It has been made.

Now, as regards the problem of the school built on Federal property, operated by local authority, you do not feel that under this law, any laws governing your office, that there is anything that can be done there as regards integration, even though Federal funds are indirectly being used?

Dr. GRIGSBY. I give it simply as a horseback opinion that if a school facility is built on Federal property, a military base under the jurisdiction of the Defense Department, they have control of the property. Before a local school district can come on and operate that school under section 3, they give us a use permit, permitting access to the property on behalf of the school district.

Now, if they choose to deny access to the property except for the operation of an integrated school, I suppose the school district would then have to say, "Sorry, we cannot come on if by State law it requires the segregation of the races." In which case the Commissioner would have responsibility under this act of making other arrangements. The only feasible arrangement to make would be to transfer funds to the military.

Mr. POWELL. In the event local authorities cannot see their way to do it, the Commissioner of Education has power to proceed?

Mr. LILLYWHITE. If under the State law the State has accepted responsibility for all of these children, regardless of where they are located, the school district concerned submits an application to us. We approve the application and they operate the school. We have

no authority whatever under that law to dictate to that State how it operates its schools or runs its educational program. I think that point ought to be made very clear. The Office of Education is prohibited by the law from interfering or dictating whatever.

Now, it is a question of State law as far as we are concerned. Once they submit that application to us, we approve it in accordance with any other application that comes in under the program.

Mr. BARDEN. Would the gentleman let me interrupt right there?

That was the unfair thing that Mrs. Rosenberg did to Dr. McGrath. She either did not know what the law was or did not want to know what the law was and gave out news releases that were not in accord with the law and it happens that I read Dr. McGrath's letter and his letter was absolutely in accord with the law, and to make a complete picture, I think the gentleman should put the whole letter of Dr. McGrath in the record at this point and let it speak the truth.

No one can find any flaws with Dr. McGrath's letter because it is written strictly in accordance with the law and Mrs. Rosenberg's news releases were not.

I do not know whether she ever did offer an apology, but it was certainly in order.

Mr. HOLT. Do you want to put that whole letter in the record?

Mr. POWELL. Yes; but there is a little difference I would like to clear up between the Acting Commissioner and Dr. Lillywhite. Do you agree with the Acting Commissioner and with the Commissioner of Education, Mr. Lillywhite, that integrated schools can be set up under this act if local authorities because of State law do not choose to do so?

Mr. LILLYWHITE. I think there is no disagreement whatever. I think what Dr. Grigsby said is, if one of these base commanders says to the State or local school district, "You cannot enter on this post to operate a segregated school system," then I take it it comes, as Dr. Grigsby said, within the purview of section 6 where the Commissioner is required to make arrangements.

I think there is no disagreement whatever. I simply said in the first instance we simply accept the applications and act on them in accordance with the State law and practice.

Mr. POWELL. The reason why I am asking all this, as you know, is because the President is asking a study be made and this to me is the whole key to the situation, that as the commander in chief the base commanders are under him, and if the base commanders choose to provide the integrated school system, then under the act they can do so. That is right, is it not?

Mr. LILLYWHITE. That is the way it has worked, sir.

Dr. GRIGSBY. What I intended to imply, I think, concerns a legal question on which I am no authority; I would suppose that control of the property and exclusive jurisdiction by the Federal Government and control of the property on which the facility is located would carry with it authority to deny access to that property.

Now, whether they would care to deny access to the property for the use of the school facility to be operated on any basis other than a school has operated under the laws of the State is a question. I mean this law says nothing on that score as to whether the base commander has authority to deny access to the property for the operation of any except an integrated school. I do not know whether he has that authority or not under other laws.

Mr. POWELL. If the base commander has authority to deny access to any Federal property, he would act under a directive of his commander in chief, I am sure, or he would not be base commander very long. That is beyond the law. That is a question of the Department of Defense. That is all I have.

Mr. HOLT. Mr. Powell and Mr. Lillywhite, are you clear what figures and specific data Mr. Powell wants to put in the record?

Mr. POWELL. That is right, and I ask consent to put this letter in the record.

Mr. HOLT. Will you provide the reporter later on with specific details and we will put them in the record at this point.

Mr. LILLYWHITE. Yes.

(The information referred to follows:)

FEDERAL SECURITY AGENCY, OFFICE OF EDUCATION

SCHOOL ASSISTANCE PROGRAM

MARCH 27, 1953.

Attached is a list of Army, Navy, and Air Force installations upon which free public education is provided by a local educational agency under section 3 of Public Law 874 in school facilities located on Federal property. The list is arranged by States with notations (1) as to which branch of the military service has jurisdiction, (2) whether the school is operated on a segregated or nonsegregated basis, and (3) the legal basis in State law for segregation. Installations in all States requiring segregation by constitution or statute have been listed as segregated although there are 1 or 2 instances in which there is no separate facility on the installation, probably because of the lack of colored children required to be educated on the post.

The information in this list was reported to the Office of Education on March 26, 1953, by the Departments of the Army, Navy, and Air Force. There is also a recapitulation of the total number of military installations by departments in accordance with the number of programs which provide for segregation and nonsegregation.

| | Installations | |
|---|---|---|
| | Segregated | Non-segregated |
| Army | 8 | 16 |
| Navy | 3 | 7 |
| Air Force | 10 | 19 |
| Total | 21 | 42 |

A-25

ASSISTANCE TO SCHO

*Military installations, upon whi... education for the children resi... segregated basis*

| State | In... |
|---|---|
| Alabama [1] | Maxwell Air Force B... |
| Arizona [2] | Fort Huachuca |
| | Davis Monthan Air ... |
| | Williams Air Force B... |
| Arkansas [3] | Pine Bluff Arsenal |
| California | Fort Ord |
| | Sierra Ordnance Depo... |
| | Mare Island Shipyard... |
| | Camp Joseph H. Pen... |
| | Edwards Air Force B... |
| | Mather Air Force Ba... |
| | Parks Air Force Base |
| | Travis Air Force Base |
| Colorado | Camp Carson |
| Florida [3] | MacDill Air Force Ba... |
| | Eglin Air Force Base |
| | Tyndall Air Force Ba... |
| | Naval Air Station, Pe... |
| Hawaii | Schofield Barracks |
| | Hickman Air Force Ba... |
| | Naval Air Station, Pe... |
| | Naval Air Station, Ba... |
| Illinois | Chanute Air Force Ba... |
| | Scott Air Force Base |
| | Naval Training Station |
| Kansas [2] | Fort Leavenworth |
| | Fort Riley |
| | Smoky Hill Air Force ... |
| Maryland [3] | Andrews Air Force Ba... |
| | Naval Air Station, Pat... |
| | Naval Powder Factory |
| Massachusetts | Fort Devens |
| Maine | Presque Isle Air Force ... |
| Michigan | Selfridge Air Force Base |
| Nevada | Nellis Air Force Base |
| New Jersey | Fort Dix |
| | Fort Monmouth |
| New Mexico [2] | Sandia Basin |
| | White Sands Proving G... |
| | Holloman Air Force Ba... |
| | Walker Air Force Base |
| New York | Sampson Air Force Base |
| Oklahoma [1] | Fort Sill |
| Rhode Island | U. S. Naval Station, Ne... |
| South Carolina [1] | Fort Jackson |
| | Shaw Air Force Base |
| South Dakota | Black Hills Ordnance D... |
| | Rapid City Air Force B... |
| Texas [1] | Fort Bliss |
| | Fort Hood |
| | Fort Sam Houston |
| | Randolph Air Force Base |
| | Reese Air Force Base |
| | Sheppard Air Force Base |
| Utah | Deseret Chemical Depot |
| | Dugway Proving Ground |
| | Tooele Ordnance Depot |
| Virginia [1] | Fort Belvoir |
| | Langley Air Force Base |
| | Fort Monroe |
| Washington | Larson Air Force Base |
| | Fairchild Air Force Base |
| | U. S. Naval Base, Breme... |
| Army | |
| Navy | |
| Air Force | |
| Total [4] | |

[1] Segregation required by State constitution...
[2] Segregation permitted by State statute.
[3] Segregation required by State statute.
[4] The total number of installations on this list ... tion necessitated removal of Alexandria Air Force ... is no school on either installation. Ramey Air For...

Free public education has been pro... provisions of section 6 of Public Law...

der has authority to deny access ict under a directive of his com- uld not be base commander very t is a question of the Department

Lillywhite, are you clear what wants to put in the record? ask consent to put this letter in

reporter later on with specific ecord at this point.

s:)

OFFICE OF EDUCATION

E PROGRAM

MARCH 27, 1953.

ir Force installations upon which free lucational agency under section 3 of d on Federal property. The list is which branch of the military service perated on a segregated or nonsegre- law for segregation. Installations in ution or statute have been listed as s in which there is no separate facility lack of colored children required to be

the Office of Education on March 26, avy, and Air Force. There is also a tary installations by departments in which provide for segregation and

| | Installations | |
|---|---|---|
| | Segregated | Non-segregated |
| | 8 | 16 |
| | 3 | 7 |
| | 10 | 19 |
| | 21 | 42 |



*Military installations upon which a local educational agency provides free public education for the children residing thereon on a segregated basis and on a nonsegregated basis*

| State | Installation | Military department | Segregated | Nonsegregated |
|---|---|---|---|---|
| Alabama¹ | Maxwell Air Force Base | Air Force | Yes | |
| Arizona¹ | Fort Huachuca | Army | | Yes |
| | Davis-Monthan Air Force Base | Air Force | | Yes |
| | Williams Air Force Base | do | | Yes |
| Arkansas³ | Pine Bluff Arsenal | Army | Yes | |
| California | Fort Ord | do | | Yes |
| | Sierra Ordnance Depot | do | | Yes |
| | Mare Island Shipyard | Navy | | Yes |
| | Camp Joseph H. Pendleton | do | | Yes |
| | Edwards Air Force Base | Air Force | | Yes |
| | Mather Air Force Base | do | | Yes |
| | Parks Air Force Base | do | | Yes |
| | Travis Air Force Base | do | | Yes |
| Colorado | Camp Carson | Army | | Yes |
| Florida¹ | MacDill Air Force Base | Air Force | Yes | |
| | Eglin Air Force Base | do | Yes | |
| | Tyndall Air Force Base | do | Yes | |
| | Naval Air Station, Pensacola | Navy | Yes | |
| Hawaii | Schofield Barracks | Army | | Yes |
| | Hickam Air Force Base | Air Force | | Yes |
| | Naval Air Station, Pearl Harbor | Navy | | Yes |
| | Naval Air Station, Barbers Point | do | | Yes |
| Illinois | Chanute Air Force Base | Air Force | | Yes |
| | Scott Air Force Base | do | | Yes |
| | Naval Training Station, Great Lakes | Navy | | Yes |
| Kansas² | Fort Leavenworth | Army | | Yes |
| | Fort Riley | do | | Yes |
| | Smoky Hill Air Force Base | Air Force | | Yes |
| Maryland³ | Andrews Air Force Base | do | Yes | |
| | Naval Air Station, Patuxent | Navy | Yes | |
| | Naval Powder Factory, Indian Head | do | Yes | |
| Massachusetts | Fort Devens | Army | | Yes |
| Maine | Presque Isle Air Force Base | Air Force | | Yes |
| Michigan | Selfridge Air Force Base | do | | Yes |
| Nevada | Nellis Air Force Base | do | | Yes |
| New Jersey | Fort Dix | Army | | Yes |
| | Fort Monmouth | do | | Yes |
| New Mexico² | Sandia Base | do | | Yes |
| | White Sands Proving Ground | do | | Yes |
| | Holloman Air Force Base | Air Force | | Yes |
| | Walker Air Force Base | do | | Yes |
| New York | Sampson Air Force Base | do | | Yes |
| Oklahoma¹ | Fort Sill | Army | Yes | |
| Rhode Island | U. S. Naval Station, Newport | Navy | | Yes |
| South Carolina | Fort Jackson | Army | Yes | |
| | Shaw Air Force Base | Air Force | Yes | |
| South Dakota² | Black Hills Ordnance Depot | Army | | Yes. |
| | Rapid City Air Force Base | Air Force | | Yes. |
| Texas³ | Fort Bliss | Army | Yes | |
| | Fort Hood | do | Yes | |
| | Fort Sam Houston | do | Yes | |
| | Randolph Air Force Base | Air Force | Yes | |
| | Reese Air Force Base | do | Yes | |
| | Sheppard Air Force Base | do | Yes | |
| Utah | Deseret Chemical Depot | Army | | Yes. |
| | Dugway Proving Ground | do | | Yes |
| | Tooele Ordnance Depot | do | | Yes. |
| Virginia¹ | Fort Belvoir | do | Yes | |
| | Langley Air Force Base | Air Force | Yes | |
| | Fort Monroe | Army | Yes | |
| Washington | Larson Air Force Base | Air Force | | Yes. |
| | Fairchild Air Force Base | do | | Yes. |
| | U. S. Naval Base, Bremerton | Navy | | Yes |
| Army | | | 8 | 16 |
| Navy | | | 3 | 7 |
| Air Force | | | 10 | 19 |
| Total⁴ | | | 21 | 42 |

¹ Segregation required by State constitution.
² Segregation permitted by State statute.
³ Segregation required by State statute.
⁴ The total number of installations on this list differs from that released yesterday. More recent information necessitated removal of Alexandria Air Force Base, La., and Pope Air Force Base, N. C., because there is no school on either installation. Ramey Air Force Base, P. R., was removed because it is a section 6 school.

Free public education has been provided by the Federal Government under the provisions of section 6 of Public Law 874 for children residing on the following

list of Federal installations which indicates the type of educational program in operation at each installation during the school year 1952-53.

Of the 22 programs in operation 12 are located in States which, by statute or constitutional authority, require racial segregation of school children. All of the educational programs operated on post by the Federal Government are on a nonsegregated basis except the program at Fort Benning, Ga., and it is reported by the Adjutant General of the Army that such program will be nonsegregated beginning with the school year 1953-54. The offpost programs operated by local agencies under contract with the Federal Government in the States of Georgia, Kentucky, Missouri, North Carolina, South Carolina, and Virginia are operated on a segregated basis in accordance with State constitution.

*Federal installations by States and Territories for which free public education is provided for children residing thereon, under the provisions of sec. 6 of Public Law 874, by types of operation*

| State or Territory | Installation | Agency responsible for operation | Type of operation: On post by— Federal agency: Elementary | On post by— Federal agency: High school | On post by— Local agency: Elementary | On post by— Local agency: High school | Off post by— Local agency: Elementary | Off post by— Local agency: High school |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| Alaska | Adak Naval Station | Territorial commissioner of education. | | | X [2] | X | | |
| | Big Delta, Army | do | | | X | | | |
| | Eielson Air Force Base | do | | | X | X | | |
| | Elmendorf Air Force Base | do | | | X | | | |
| | Ladd Air Force Base | do | | | X | | | |
| | Fort Richardson, Army | do | | | X | | | |
| | Kodiak, Navy | do | | | X | X | | |
| | Whittier, Army | do | | | X | | | |
| Georgia | Fort Benning [1] | Army | X | | | | | X |
| Kentucky | Fort Knox [2] | do | X | X | | | | |
| | Fort Campbell | do | X | | | | | X |
| | Camp Breckinridge | do | | | | | X | X |
| | Blue Grass Ordnance Depot | do | | | | | X | X |
| | Fort Thomas | do | | | | | X | X |
| Michigan | Fort Custer | do | | | | | X | X |
| | Selfridge Air Force Base | Air Force | (3) | (3) | (3) | (3) | X | X |
| | Union School District No. 1, fractional townships, Clinton and Harrison. | LEA [4] | | | X | | X | X |
| Missouri | Fort Leonard Wood | Army | | | | | X | X |
| New York | West Point Military Academy. | do | X | | | | | X |
| | Fort Jay | do | | | X | | | |
| North Carolina | Fort Bragg [5] | do | X | | | | | X |
| | Camp Lejeune | Navy | X | X | | | | |
| Oregon | Tongue Point Naval Station (Astoria School District). | LEA [4] | | | | | X | X |
| | Chemawa Indian School | Interior | | | | | X | |
| | Crater Lake National Park | do | X | | | | | |
| Puerto Rico | Ramey Air Force Base | Air Force | X | X | | | | |
| | Naval Air Station, San Juan | Army | X | | | | | X |
| | Fort Buchanan | do | (6) | | | | | X |
| | Fort Brook | do | (6) | | | | | X |
| | Naval Air Station, Roosevelt Roads. | do | X | | | | | |
| | Camp Losey | do | | | | | X | |
| | Henry Barracks | do | | | | | X | |
| South Carolina | Parris Island Marine Base | Navy | X | | | | | |
| Virginia | Quantico Marine Corps School. | do | X | X | | | | |
| | Dahlgren Naval Base | do | X | | | | | X |

[1] Segregated program (nonsegregated beginning school year 1953-54).
[2] Includes children residing on Godman Air Force Base.
[3] Transportation only.
[4] LEA means local educational agency.
[5] Includes children residing on Pope Air Force Base.
[6] Pupils transferred to Naval Air Station, San Juan, Puerto Rico.



ASSISTANCE

Mr. HOLT. Will
Dr. GRIGSBY. A
toward which Pub
but attempts at s
in duration, and i
It has become incr
and its solution ca
the various agenc
segments encounte
Public Law 874
by Federal activiti
in relation to the
the tax-exempt sta
lowers school reve
Government of sul
the normal scho
workers are built
both the place of
fewer local tax d
education for all c
Where a Federa
private property, a
of employment are
from a sudden and
temporary. If ass
properties are bein
which large initial
furniture, equipmen
be adequate therea
That is to say ca
ment.
Of course, the p
benefits only to th
districts may have
the properties of t
Public Law 874
owned property, si
connected with such
free public educati
in which the proper
The Congress en
intensive investigat
of defining the natu
responsibility in c
written into the la
equitable in applica
be directed to the p
proportion to the b
However, experience
the need for some
limit the Federal
resulting from Fede
the act. The Cong

## ADDENDUM

[SEAL]

COMPTROLLER GENERAL
OF THE UNITED STATES

Washington 25

B-138773 May 15, 1959

Dear Mr. Secretary:

On February 12, 1959, your Deputy Assistant Secretary requested our decision concerning a proposal now under consideration by your Department to effect a change in the method of procuring teachers and other suitable personnel for the operation of the dependents' school at the United States Military Academy, West Point, New York.

At the present time all employees of the depedents' school at West Point are serving under Civil Service competitive appointments in positions subject to the Classification Act of 1949 (5 U.S.C. 1071), as amended. If and when the proposed change is effected, all new employees are to be given excepted appointments without specific time limitation. The positions of all employees are to be exempted from the Classification Act of 1949 (5 U.S.C. 1081), as amended, and salary rates are to be established, subject to the approval of the Commissioner of Education, Department of Health, Education, and Welfare, on the basis of rates of pay and conditions of employment prescribed for teachers in public school systems in the area—in this case the City of Newburgh, New York.

Your proposal to change the method of effecting employment by prescribing rates of pay and hours of duty for employees of the dependents' school is to conform with the authority provided in section 6 of the act of September 30, 1950, Public Law 874, 64 Stat. 1100, as amended (20 U.S.C. 237). Section 6 of that act author-

izes the Commissioner of Education to make arrangements for the provision of free public education for children residing on Federal property when no legal agency is able to provide suitable free public education for them. Specifically, your Department, on page 2 of the letter, requests our views as to whether the procedural changes hereinafter described, which are not fully in accord with Federal employment legislation—particularly the Federal Employees Pay Act of 1945, 59 Stat. 295, as amended, and the Annual and Sick Leave Act of 1951, 65 Stat. 679, as amended—properly may be effected.

The changes referred to are as follows:

"a. School-year salary schedules for teachers are established on a 10-month basis.

"b. Experience and training factors are considered in determining the salary rate payable upon initial employment.

"c. Fixed amounts are added to the yearly rate to recognize educational acquirements; for example, $300 is added to the yearly rate for persons having either an M.A. degree or a Bachelor's Degree plus 30 semester hours in approved courses.

"d. Fixed amounts are added to the yearly salary rate in payment for extra-curricular activities; for example, $100 is added to the yearly rate for each coaching assignment, limited to a total of $300 for all such activities.

"e. Salary schedules are reviewed annually and adjusted to reflect rates prevailing in the area.

"f. The occurrence of school holidays, such as Thanksgiving, Christmas and spring vacations, has no effect on the amount of salary payable for the period involved.

"g. Hours of work are determined by the duration of the school day plus time required to direct

extra-curricular activities, as distinguished from a regularly scheduled weekly tour consisting of a prescribed number of hours per day for a set number of days per week.

"h. Aside from the increased salary rate provided for extra-curricular activities (d above), no provision is made for overtime pay."

Your request appears to be based on implied authority thought to be contained in section 6 of Public Law 874 and express authority appearing in section 8(b) of Public Law 248.

Section 8(b) of Public Law 248, approved August 8, 1953, amends the earlier statute to provide in pertinent part as follows:

"* * * For the purpose of providing such comparable education, personnel may be employed without regard to the civil service or classification laws."

That language has not been construed as exempting employees from other statutes pertaining to Government employment. As pointed out above, some provisions of the Federal Employees Pay Act of 1945, as amended, still would be applicable as would be the Uniform Annual and Sick Leave Act of 1951; the Veterans Preference Act and certain other statutes. Some of these would not be compatible with the objectives outlined in the Deputy Assistant Secretary's letter.

We are aware of no way, other than by legislative means, of waiving the application of those statutes to Government employees. Thus, our answer to the specific question on page 2 of the letter must be in the negative.

Sincerely yours,

/s/ Joseph Campbell
Comptroller General
of the United States

The Honorable