# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL EDUCATION ASSOCIATION, Inc.**  :
:
plaintiff,    :
:
v.    :
:    Case No. 1:05CV02324 EGS
:
**DONALD H. RUMSFELD,** Secretary,    :
United States Department of Defense, *et al.,*    :
:
:
defendants.    :

## APPENDIX TO PLAINTIFF'S
## MEMORANDUM OF POINTS AND AUTHORITIES

Volume II

RICHARD J. HIRN
5335 Wisconsin Ave NW
Suite 440
Washington, D.C. 20015
202-274-1812
richard@hirnlaw.com
DC Bar No. 291849

Attorney for the Federal Education
Association, Inc.

**Table of Contents**

Volume I

Excerpts from A STUDY OF SCHOOLS SERVING MILITARY FAMILIES IN THE U.S.,
by the Defense Manpower Center (October 1997) ............................ 1


*Assistance to Schools in Federally Impacted Areas: Hearings before a Special
Subcommittee of the House Committee on Education and Labor*, 82 Cong.,
1st Sess., 127-134 (1953) ...................................................... 19


Comp. Gen. B-138773 (May 15, 1959) ...................................... 28

Volume II

Richard Murname & David Cohen, *Merit Pay and the Evaluation Problem:
Why Most Merit Pay Plans Fail and a Few Survive,* 56 HARV. EDUC. REV.
1, 2 (1986) ................................................................ 31


JAMES STEDMAN & GAIL MCCALLION, PERFORMANCE-BASED PAY FOR TEACHERS, 7-8
(Congressional Research Service, 2001) ................................... 48

# Merit Pay and the Evaluation Problem: Why Most Merit Pay Plans Fail and a Few Survive

RICHARD J. MURNANE
*Harvard University*

DAVID K. COHEN
*Michigan State University and Harvard University (on leave)*

*Richard J. Murnane and David K. Cohen use the framework of microeconomics to account for the short lives of most merit pay plans. They demonstrate that teaching is not an activity that satisfies the conditions under which performance-based pay is an efficient method of compensating workers. They then show that merit pay plans survive in a few school districts, in part because the districts are special and in part because the merit pay plans are quite different from conventional notions of performance-based pay.*

Designing a compensation system that provides strong incentives for employees to pursue organizational goals is a challenge every organization faces. Merit pay for teachers is often suggested as a compensation system that will enable public school systems to meet this challenge. Yet the promise of merit pay is dimmed by knowledge of its history; most attempts to implement merit pay for public school teachers over the last seventy-five years have failed.

The first part of this paper uses microeconomics, the intellectual home of merit pay, to explain the failures of most merit pay plans. We show that merit pay, even taken on its own terms, does not provide a solution to the problem of motivating teachers. The second part of the paper investigates why merit pay survives in a very few school districts in the United States. The analysis is based on interviews we conducted with a great many teachers and administrators in six school districts with enduring merit pay plans. We explain that in these special districts, merit pay contributes to the solution of problems quite different from the problem of motivating teachers.

*Harvard Educational Review*   Vol. 56   No. 1   February 1986
Copyright © by President and Fellows of Harvard College
0017-8055/86/0200-0001$01.25/0

1

Compensation of Public School Teachers

More than 99 percent of public school teachers in the United States work in districts that employ uniform salary scales.[1] Under such contracts, a teacher's salary is determined exclusively by educational credentials and years of teaching experience. All teachers with the same credentials and experience receive the same salary, irrespective of subject specialty or perceived performance. Typically, each school district sets its own salary scale or negotiates it with the local teachers' union through collective bargaining.

The limitations of uniform salary scales have been well documented; there is no financial reward for superior performance and no financial penalty, short of dismissal, for inferior performance (Hanushek, 1981). Many critics of uniform salary schedules argue that improving the quality of education offered by public schools requires a change from uniform salary schedules to a compensation scheme that bases a teacher's compensation on performance, as measured either by gains in student test scores or by supervisors' evaluations of the teacher's actions in the classroom. Such performance-based compensation plans are typically called merit pay.

Merit pay is an old idea. In 1918, 48 percent of U.S. school districts sampled in one study used compensation systems that they called merit pay (Evendon, 1918, as reported in Johnson, 1984). Little is known about these early plans, except that most did not last. In 1923 the National Education Association (NEA) reported that 33 percent of sampled districts used merit pay (NEA, 1923, p. 52), and a subsequent NEA survey reported that 18 percent of districts surveyed awarded merit pay (NEA, 1928, pp. 230-240).

Interest in merit pay waned during the 1940s and early 1950s as the vast majority of public school districts in the United States adopted uniform salary schedules. Between 1939 and 1953 the number of school systems in cities with populations of more than 30,000 that used merit pay fell from 20 to 4 percent (Porwoll, 1979, p. 26).

Sputnik rekindled interest in merit pay by raising questions about the effectiveness of American schools. During the 1960s approximately 10 percent of U.S. school districts had merit pay plans, most of which fared no better than their predecessors. By 1972 the number of districts using merit pay had fallen to 5.5 percent (Porwoll, 1979). A 1978 survey of the 11,500 U.S. school districts with enrollments of 300 or more found only 115 with merit pay plans (that is, 4 percent of the districts that responded to the survey and 1 percent of the districts to whom the questionnaire was sent). Moreover, the majority of districts that reported having tried and dropped merit pay indicated that their plans lasted less than five years (Porwoll, 1979, p. 41).

Thus, the history of merit pay suggests that while interest in paying teachers according to merit endures, attempts to use merit pay do not. Moreover, teacher union resistance cannot account for the demise of most merit pay plans, for most plans predated unions or failed in nonunion districts. We must search for other

---

[1] The 99 percent figure was derived from data presented by Calhoun & Protheroe (1983).

A-32

explanations. We believe that the most powerful ideas for understanding why merit pay plans fail can be found in the literature of economics. Specifically, we turn to economic analyses of employment contracts, a growing field within microeconomics.

## Why Most Merit Pay Plans Fail

### The Contracts Literature: A Framework for Analysis

One branch of microeconomics, which we will call the contracts literature, examines the costs and benefits associated with using different types of employment contracts to compensate workers engaged in particular kinds of production activities. The following assumptions underlie this literature:

1. Workers' preferences are not completely consonant with the employing organization's goals. Workers prefer to work less hard than the organization would like if there are no adverse consequences for them.

2. Monitoring the output or actions of individual workers is costly.

3. Imperfect monitoring will induce workers to attempt behavior that makes them appear productive relative to other workers but in fact is contrary to the goals of the organization. Williamson (1975, p. 9), an important contributor to the contracts literature, labels this behavior "opportunistic" and defines it as "self-interest seeking with guile."

As seen from the perspective of the contracts literature, the type of employment contract an organization should adopt depends on the type of work employees perform. This is because the cost of evaluating workers' output, the cost of evaluating workers' actions, and the potential for opportunistic behavior all depend on the nature of the production activity.

The perspective provided by the contracts literature is helpful in analyzing merit pay for three reasons. First, this literature takes seriously the evaluation problem. It explicitly acknowledges that evaluating worker performance is costly for management and that imperfect evaluations—defined as less than perfect knowledge of all worker actions—may elicit unpredicted and potentially destructive responses from workers. It is this evaluation problem that has plagued most attempts to introduce merit pay into public education.

Second, the contracts literature emphasizes the importance of trade-offs between the gains from providing incentives for employees to work hard and the costs of various ways of evaluating workers' contributions. Implicit in this emphasis on trade-offs is the often neglected recognition that a merit pay system that brings about modest increases in teachers' effort levels might not be worthwhile if the costs of the measures taken to evaluate teacher performance are extremely high.

Third, the contracts literature focuses attention on the nature of the production activity in which workers are engaged. It explains why an analysis of the production activity provides the best clues to the responses that particular compensation plans will elicit. We will argue that compelling explanations for the failure of most merit pay plans must focus on the nature of teachers' work. In the following

sections we use the framework provided by the contracts literature to explain why neither "new style merit pay" nor "old style merit pay" is an effective strategy for motivating teachers to achieve high performance levels.

*New Style Merit Pay: A Piece-Rate Compensation System*
"New style merit pay" (Bacharach, Lipsky, & Shedd, 1984), also called "payment by results" (Coltham, 1972), bases individual teachers' merit pay bonuses on their students' test score gains. The attractiveness of this strategy is that the evaluation problem is solved by actually measuring certain dimensions of each teacher's output, thereby avoiding the subjective quality of evaluations conducted under old style merit pay, in which bonuses are based on supervisors' evaluations of teachers' performance. There are only a few documented cases of school districts that have used new style merit pay, although merit pay plans that compensate teachers on the basis of student test score gains have recently been supported by several state legislatures.[2] In this section we show that new style merit pay is very much like what economists know as a piece-rate compensation system, and that teaching does not satisfy the conditions under which this type of compensation is efficient.

Approximately 30 percent of U.S. workers in manufacturing are employed under piece-rate contracts, the most common form of payment by results (Pencaval, 1977; Seiler, 1984). Piece-rate contracts work well when the actual contribution of the individual worker to the firm's output can be measured at relatively low cost. Commercial laundries' contracts with workers who iron shirts provide an example. The number of shirts ironed is a relatively accurate measure of the worker's contribution to the firm. Consumer complaints provide a check on quality. Multiple dimensions of output can be managed by providing a schedule of piece rates for different types of clothing.

Piece-rate contracts do sometimes elicit opportunistic behavior. For example, workers may neglect the maintenance of the machines on which they work since they are not rewarded for machine maintenance (see Pencaval, 1977). For many types of work, however, the costs of such opportunism are outweighed by the advantages that piece-rate contracts have over contracts that attempt to control opportunism by monitoring worker actions. In particular, piece-rate contracts provide a strong incentive for workers to find the most rapid way to iron shirts. High productivity results in immediate rewards; a drop in output results in immediate penalty.

Why haven't merit pay plans that compensate teachers on the basis of their output, as measured by student test score gains, become popular? One reason concerns the nature of the incentives that such a compensation system provides. Any explicit list of pay rates for specific levels of student test score gains (economists would refer to such a list as a payment algorithm) creates a specific price — a piece rate — for each student's test score gain in each subject area. For example, an algorithm that bases compensation solely on gains in average reading scores implicitly places a zero price on student gains in other subject areas. Moreover, it places an equal weight on each student's gain. If teacher time is viewed as a private good

[2] See U.S. Department of Education, 1984, p. 4, for a reference to legislation that provides state funds to districts that adopt new style merit pay plans.

(time spent with one student reduces time available for other students), then this algorithm creates incentives for teachers to allocate time so that the last minute of time spent with any child yields the same expected test score gain. This means that there are incentives for teachers to minimize the time they spend with children whose test scores will not respond to modest increases in attention.

There is limited evidence that teachers do respond to payment by results by allocating their time to specific subject areas and individual children. For example, in the middle of the nineteenth century in England, elementary school teachers worked under a payment-by-results plan that based their compensation on the number of children who acquired a set of narrowly defined skills. This led to a narrowing of the curriculum to exclude all nontested subjects, including many that were perceived to be important—for example, history and geography—but were difficult to test (Coltham, 1972, p. 24).

Other evidence comes from the experiments sponsored by the Office of Economic Opportunity in the early 1970s, in which private firms provided reading instruction to public school children, with the firms' compensation dependent on student test score gains. In at least one of the sites, teachers concentrated their time on children in the middle of the test score distribution, neglecting those at the top who would advance well on their own (test score gains above a threshold were not rewarded), and those at the bottom, whose test scores would not respond to modest additional amounts of teacher time (Gramlich & Koshel, 1975).

Several readers of early drafts of this paper argued that the evidence presented above, in fact, provides support for the usefulness of new style merit pay as a strategy for motivating teachers. They pointed out that the evidence demonstrates that teachers do change their behavior in order to respond to the incentives they face. All that is needed, these readers argue, is to fine-tune the payment algorithm, for example, by giving weight to skill development in more subject areas and perhaps by weighting achievement gains of some children more than those of others. We believe that the proposed technical solution of fine-tuning the payment algorithm neglects two critical problems: the lack of consensus about the appropriate weights, and the nature of teachers' work. We consider each problem in turn.

Most policy debates about public education avoid the divisive topic of weights, which is, at its core, a discussion about whose education, or what sort of education, matters the most. Instead of explicitly debating what the weights should be, it is common in public education to delegate decisions on resource allocation to teachers and administrators, with the inoperable admonition that they provide every student with the opportunity to fulfill his or her potential. Such delegation is not consistent with the design of contracts that pay teachers on the basis of their output, for teachers' different decisions about weights mean that they are each trying to produce a somewhat different mix of outputs.

If the public schools' lack of consensus on weights were the only problem in paying teachers on the basis of their students' progress, one would expect to see more extensive use of such compensation schemes in private schools, where, according to Erickson (1982), family choice leads to greater agreement on school goals. The limited available evidence suggests, however, that performance-based pay for teachers is relatively rare in private schools. In 1983 only 7 percent of Catholic high schools reported that they used any form of merit pay, and none of those

A-35

schools based pay differentials on student test score gains (National Catholic Education Association, 1985).

Why aren't teachers paid on the basis of their students' test score gains, even in organizations where there is relatively high consensus on goals, union power is negligible, and management can unilaterally decide how teachers will be compensated? We believe that the answer lies in the nature of the work in schools. Even where there is a high level of consensus on goals, the goals are multidimensional—for example, raise the average reading level in each class, teach all students to embrace democratic values, help each student realize his or her own potential, and eliminate drugs and violence from the school. While it may be reasonable to attribute progress toward certain goals, such as raising reading scores, to individual teachers working behind closed classroom doors, it is not possible to measure each teacher's contribution to the attainment of other school goals. For example, eliminating violence and drugs from a school requires that teachers open their classroom doors and work *as a team* to monitor students' actions outside the classroom. If teachers really do work as a team, it is not possible to measure each teacher's contribution to the group output—in this case, a lower level of drugs and violence in the school (Alchian & Demsetz, 1972). Consequently, individual teachers' contributions to achieving this school goal cannot play a role in determining their compensation under new style merit pay.

If teachers' pay is based solely on success in raising reading scores, there are strong incentives for teachers to keep their classroom doors closed and neglect the teamwork that contributes to the accomplishment of other school goals. Moreover, the strategy used by some firms to combat this form of opportunism—hiring workers to perform the tasks neglected by piece-rate workers (maintaining the machinery, for instance, in our laundry example)—does not work well in schools. Teachers, who work with students every day in class and know students' names and personalities, are likely to be more effective in eliminating drugs and violence from a school than are specialized security officers.

School principals as well as teachers realize that much of the important work in schools must be done by teachers working together—for example, some maintain quiet in halls and libraries while others teach. Compensation algorithms that reward only those dimensions of performance for which each teacher's contribution can be measured could create perverse incentives, inducing teachers to abandon hall and library duty, for instance. This may explain why paying teachers on the basis of their students' test scores is extraordinarily rare in American education.

It is important to note that our discussion of the problems posed by merit pay rests on the nature of teachers' work and the incentives that piece-rate compensation schemes provide. This is quite different from the typical objection to new style merit pay, which emphasizes the inadequacies of standardized tests. While it is true that standardized tests of, say, students' reading skills often do not provide an accurate measure of students' skills, and consequently of the fruits of teachers' work, the inadequacy of tests is not the fundamental problem with new style merit pay. Even if tests were developed that provided accurate measures of students' skills in particular subject areas, incentives to allocate time strategically to particular students and particular subject areas and to neglect aspects of the job not measurable by standardized tests would still remain.

6

### Old Style Merit Pay

The significance of teamwork and the presence of school principals who have direct supervisory functions suggest the feasibility of basing teachers' compensation on principals' evaluations. In fact, such old style merit pay is the common model. In this section we explore the extent to which the contracts literature helps us understand why most experiments with old style merit pay have failed.

The lessons from the contracts literature (see Alchian & Demsetz, 1972; Williamson, 1975) regarding the conditions under which it is efficient to base the compensation of individual workers on supervisors' assessments of their performance can be easily summarized. Merit pay is efficient when the nature of the activity in which workers are engaged is such that supervisors can provide relatively convincing answers to these two questions posed by workers:

1. Why does worker X get merit pay and I don't?
2. What can I do to get merit pay?

Unloading boxes from a truck is often suggested as an activity where supervisors can answer workers' questions about performance-based pay differentials. Supervisors can state that worker X was paid more than other workers because he carried two boxes at a time, while other workers carried one at a time. Workers are likely to accept this answer because they recognize that carrying two boxes at a time is, in fact, productive. They also recognize that the nature of the activity gives worker X few possibilities for opportunistic behavior—that is, for actions that make him appear productive but in fact do not contribute to the work at hand. Supervisors can answer workers' second question by stating that they too can earn higher pay by carrying two boxes at a time. Workers are likely to find this answer acceptable because the required action is something they can do if they so choose.

Teachers' work is, by its nature, very different from work such as unloading a truck. As is true for workers in any field, some teachers are more effective than others—hence the call for merit pay. Most analysts agree, however, that effective teaching cannot be characterized as the consistent use of particular well-defined techniques.[3] In other words, there is no analog to carrying two boxes on every trip.

One consequence of the imprecise nature of the activity of teaching—where this expression denotes the loose relationship between particular teacher actions and student learning—is that supervisors cannot answer convincingly when teachers ask why teacher X received merit pay and they did not. As one of the administrators we interviewed commented: "I know who the good teachers are. They're so and so, so and so, and so and so. Why are they good teachers? Well, I don't know, they are just good teachers; but I know who they are." Many teachers who are denied merit pay find this answer unsatisfactory. One reason is that they are aware that the nature of teaching, with its closed classroom doors and its network of relationships among teachers and between teachers and parents, provides great potential for opportunistic behavior. In other words, there are many things that a teacher could do to impress a principal and to suggest that he or she was more

---

[3] See Wise et al. (1984, p. 10) for a discussion of the claims and refutations concerning the role of specific teacher actions in fostering student learning.

A-37

*Harvard Educational Review*

effective than his or her colleagues. Examples might include using friendships with parents to spread rumors about other teachers' incompetence, and refusing to share materials that could help other teachers. Thus, teachers have reason to question whether merit pay is awarded to teachers who are in fact the most productive or to those who are most facile in impressing supervisors.

A second consequence of the imprecise nature of teaching is that supervisors cannot answer convincingly the teacher's second question, What can I do to earn merit pay? In other words, supervisors cannot suggest specific actions that the teacher can undertake which both teacher and supervisor recognize will enhance the teacher's effectiveness. Without an unequivocal answer to this second question, teachers may have little incentive to change their behavior in pursuit of higher income. What is worse, teachers may learn that concealing their problems and playing up to evaluators is what the organization rewards—dramatically complicating managers' evaluation problem.

In effect, the lesson from the contracts literature is that the problems with old style merit pay are more fundamental than careless implementation or inadequate training of evaluators—to name but two of the explanations often given for the failure of merit pay plans. The problem lies in the nature of the teaching activity itself. Specifically, it is the lack of a blueprint for effective teaching that prevents supervisors from providing convincing answers to teachers' two primary questions about merit pay.

What the contracts literature does not reveal is exactly what problems arise under merit pay that have led most school districts to drop this type of compensation system after a brief trial. While our research was not designed to address this question, we did learn some interesting facts about the problems caused by merit pay, particularly from teachers and administrators in two districts that have had merit pay for more than twenty years and have altered their plans several times to deal with perceived problems. The comments of these participants are informative in understanding what happens when supervisors cannot answer teachers' questions about why some teachers receive merit pay and others do not.

One theme that ran through our interviews was a perception on the part of administrators that merit pay could easily backfire, since teachers who received evaluation ratings lower than they felt were fair might respond by working less hard. This theme is exemplified in the story one former principal told about a fine teacher whose work he rated "excellent." Unfortunately, excellent was the second highest rating in the system, and the teacher firmly believed she deserved the top rating, "outstanding." She responded to the principal with, "If that's all you care, then that's all you'll get," and, indeed, he reported that her work "fell off."

Another theme we discerned from our field notes was that past experiences conditioned teachers' expectations about their evaluations. No teacher expected to be given a rating lower than the one he or she had received in the previous rating period. Rarely do discussions of merit pay focus on the *repetitive* nature of the evaluation process. Yet teachers see their "merit" ratings in terms of what they and others have been told by supervisors in the past. Being demoted is difficult for anyone, but it would be particularly hard if supervisors could not pinpoint what was wrong and explain how the situation could be remedied.

8

A-38

Several administrators cited negative consequences that arose from giving a teacher a lower rating than the teacher had received in the past. One principal mentioned a teacher with no better than adequate performance to whom he gave a rating lower than the rating given by his predecessor. The teacher, who had planned to retire at the end of the year, was so infuriated by this rating that she postponed her retirement for two years. The principal was left with a teacher he did not want; moreover, the teacher had become angry and recalcitrant as a result of her evaluation rating. The key point here is that even an evaluation system that produces valid and reliable performance ratings is not enough to guarantee the success of merit pay. If teachers feel that the ratings are unjust, and evaluators cannot convince them to the contrary, their reactions to the ratings may undermine the education students receive.

A third theme in our interviews was that merit pay tended to interfere with school principals' efforts to build effective instructional teams in their schools. Several school principals commented that, prior to the introduction of merit pay, they often gave teachers ratings higher than they actually deserved and then encouraged them to live up to the high ratings. The principals reported that this was the most effective strategy for stimulating many teachers to improve their performance, because it built teachers' confidence and established trust in the principals. While this evaluation strategy produced ratings that were not objectively valid, the principals felt it promoted teacher morale and better teaching performance. Principals felt that this approach allowed them to focus on the specific problems a teacher was struggling with, whereas more objective evaluations produced an adversarial atmosphere and could create incentives for teachers to conceal problems.

Many of these same principals worried that the use of merit pay would restrict their ability to pursue the strategy of encouraging teachers through the use of high ratings. One reason they worried was that the school district administration was pressing principals to be objective in their ratings and to standardize ratings across schools. A second cause for concern had to do with school board complaints of an excessive number of high ratings; administrators were being pressed to lower ratings and to provide a stronger defense of the top ratings they did give. At the same time, principals felt pressure from teachers to explain why they had not been given the top rating while the teacher in the next classroom had. As one principal stated, "Merit pay turns my job from being a coach into being a referee." He further implied that his teachers no longer saw him as a helpful coach but as a critical referee — and this threatened his ability to motivate the teachers to higher levels of effort.

Some readers may conclude that one of the *benefits* of merit pay is that it pressures principals into actually evaluating teachers objectively, one of the most important parts of their job. There is some truth to this argument; certainly, many of the principals we interviewed felt this pressure. There is more to be said, however. The principal's primary job is to ensure that the children who pass through his or her school learn as much as possible. Yet the principal doesn't teach students; teachers do that work. The principal's success, therefore, depends to a large extent on his or her success in encouraging teachers to work hard and work together. When a principal gives a lower evaluation to a teacher than he or she had previously received, the teacher may lose some money, but the principal may lose

A-39

the cooperation needed to make the school work. Our field notes contain many stories from principals describing the distressing consequences of giving lower ratings than the teachers expected.

Many principals saw merit pay as making their job more difficult by increasing both the tensions surrounding the formal evaluation process and the intensity with which teachers asked why they did not get the top rating and what they could do to receive a better rating—questions that principals could not answer convincingly. In fact, the general thrust of the principals' comments, with a few notable exceptions, is quite consistent with the survey evidence indicating that low morale and "problems of administration" are the primary reasons school districts drop merit pay (see Calhoun & Protheroe, 1983).

Our evidence leads us to emphasize the importance of the imprecise nature of teachers' work as a factor contributing to the demise of old style merit pay. One of the readers of an early draft of this paper commented that, if we were correct and the problem were not simply poor public sector management, we should expect that old style merit pay would not be common in for-profit educational institutions. While an in-depth exploration of this proposition was beyond our resources, we did attempt to respond to this comment by learning about the compensation policies of the Stanley H. Kaplan Educational Center, a large, nationwide for-profit firm specializing in preparing students to take standardized tests such as the SAT.

Stanley Kaplan does monitor the performance of its teachers closely, in part by observing them in the classroom and, to an even greater extent, by soliciting student evaluations of each teacher's performance. In fact, Kaplan's students are quick to complain when the quality of instruction does not justify the cost of the course. Kaplan uses the feedback from students in deciding which teachers to dismiss, but does not use this information in determining individual teacher's compensation. In fact, teachers who work for Kaplan are paid in much the same manner that public school teachers are paid. All teachers are paid according to a salary scale that bases compensation on experience, that is, on the number of courses taught. There are no bonuses for superior performance.

We asked the personnel director of Kaplan why the firm does not use performance-based pay. Her answer included these points: all Stanley Kaplan teachers are effective; those who are not are dismissed. There are some teachers who are superstars, and the firm has considered paying bonuses to them. This plan was rejected because of management's perception that the positive impact of bonuses on the performances of the superstars would be more than offset by negative effects on the performances of effective teachers who do not receive bonuses, do not know why they were passed over, and cannot be told how to become superstars.

In the context of this paper, the Kaplan evidence can be interpreted as implying that even when management feels it can make relatively accurate, fine-tuned distinctions among teachers, it would not be able to convince the merely good teachers of the superior performance of some of their coworkers. As a result, the responses to the pay differentials would not further the goals of the organization. Thus, the imprecise nature of teaching prohibits evaluators from answering the hard questions teachers pose about old style merit pay and leads a successful profit-making firm to base compensation on experience. It is important to add that

A-40

Stanley Kaplan uses evaluation aggressively, even without merit pay, both to dismiss ineffective teachers and to offer useful advice to effective teachers. This approach is obviously similar to that taken by administrators in many public schools.

## Why Some Merit Pay Plans Survive

If merit pay is not an effective strategy for improving teachers' performance, why do merit pay plans survive in a few districts? Are the districts atypical? Are the provisions of the merit pay plans atypical? Did merit pay in these districts help to solve problems other than that of motivating teachers?

We began our search for the answers to these questions by identifying school districts that have used merit pay for a number of years. Two Educational Research Service publications were helpful in this regard. The first (Porwoll, 1979) identified 115 school districts in the United States that used merit pay in 1978. The second (Calhoun & Protheroe, 1983) reported the results of a survey that inquired whether each of these 115 districts was still using merit pay in 1983, and if not, why not. The 47 districts that reported in the 1983 survey that they were still using merit pay formed the population from which we selected districts for study.

Within the population we looked first for urban districts with ongoing merit pay plans. Since many urban districts are thought to have particularly serious problems with poor teaching quality and low teacher morale, an analysis of enduring merit pay plans in such districts might provide important insights into the factors that contribute to the success of performance-based contracts. However, we found no urban districts with long-lived merit pay plans. In fact, we could not find even one documented case of a large, once-troubled school district that had successfully used merit pay to improve its performance. On the contrary, one of the striking aspects of the list of districts with enduring merit pay was the large percentage of very small districts serving relatively homogeneous student populations. Moreover, these districts tended to use very small amounts of money as merit pay bonuses.

We then looked for districts that had used merit pay for at least five years and had either used pay differentials of at least $1,000 or served more than 10,000 students. We found seven districts that met these criteria. We spent several days in six of these districts interviewing teachers and administrators with the goal of learning how each merit pay plan worked and how teachers and administrators reacted to these plans.

### Characteristics of the Six Districts

The six districts we studied vary in size from 2,500 to 60,000 students. Three are located in the Southwest, one in the Northeast, one in the Mid-Atlantic region, and one in the North Central region of the country. Two districts have collective bargaining; the union role in the other four is insignificant.

Part of the reason merit pay plans persist in the six districts has to do with their unusual working conditions. All of the six districts are considered to be among the best in their geographical areas — places where teachers like to work and where high housing prices reflect, in part, the desirability of the public schools. In eval-

A-41

uating the role merit pay plays in contributing to these districts' accomplishments, it is important to focus first on attributes other than merit pay that these districts have in common.

All of the districts have salary schedules, to which merit pay is added, that are above average for their geographical areas. The high salaries and good working conditions permit these districts to be selective in choosing applicants for teaching positions. None of these districts adopted merit pay as a response to the idea that there was not enough money to pay all teachers well so they would at least pay a few good teachers well. In fact, several administrators made comments such as, "No merit pay system would ever work without salaries at a point that teachers can live on."

None of these districts use merit pay as a strategy to give negative signals to teachers perceived to be ineffective. However, using evaluation practices that are in principle unrelated to merit pay, they do dismiss teachers judged to be incompetent and are pressured by parents to do so. These practices have not been resisted by teachers' unions in the two districts with relatively powerful unions. The union leaders in these districts stated that they made sure due process was observed but that it was not in the union's interest to protect incompetent teachers. One lesson to be learned from examining the characteristics of school districts with long-lived merit pay plans is that attractive working conditions may be a prerequisite for the survival of merit pay.

*Characteristics of the Enduring Merit Pay Plans*

Working conditions do not provide the whole answer to why merit pay survives in a few districts. In fact, merit pay has been dropped by a great many districts that appear similar to the six we studied. Thus to explain the survival of merit pay in our districts we must look at the plans themselves.

The six merit pay plans that we analyzed differ in many respects. However, in every case the plan incorporates a strategy for dealing with the two questions, already noted, that many teachers ask about merit pay. The strategies consist of varying combinations of four themes: extra pay for extra work, making everyone feel special, making the program inconspicuous, and legitimation through participation. These strategies represent adaptations of the merit pay idea that eliminated those conflicts between merit pay and the nature of teachers' work that we discussed above. However, they turn merit pay into something else. In fact, we regard each of these adaptations as evidence supporting the theme developed in the first part of this essay, namely, that teachers' work does not satisfy the conditions under which performance-based compensation is an effective means of motivating workers to high performance levels. In the analysis that follows, we stress the ways in which each district changed one or more crucial aspects of the merit pay idea. While these districts still refer to their plans as merit pay, economists would not view them as examples of performance-based compensation.

*Extra pay for extra work.* One common element in the long-lived merit pay plans is that the definition of performance is altered so as to reduce emphasis on classroom teaching and increase emphasis on completion of tasks outside the classroom. For example, the numerical rating system used by one district to determine merit pay awards gives school and community service the same weight as class-

A-42

room performance. Another district requires that a teacher complete six outside activities to be eligible for merit pay. As one teacher commented, "This isn't merit pay; it's how you get the yearbook done."

A complementary practice is to make the *teacher* responsible for documenting that he or she is worthy of merit pay. As part of the merit pay application process in several districts, teachers had to prepare lengthy documents describing their accomplishments and providing evidence in the form of testimonials from colleagues and parents. One teacher commented, "When I finished this last time, I had a volume no less than three inches thick of evidence, arguments, and materials."

These practices, which we call extra pay for extra work, provide one set of relatively convincing answers to the two questions teachers raise about merit pay. Administrators can clearly state that teacher X received merit pay because he or she devoted time to organizing a variety of activities and to documenting his or her accomplishments, both in and out of the classroom. If another teacher wants merit pay, he or she can do these same things.

This approach to merit pay relieves administrators of the impossible task of discerning and defending differences in the quality of teachers' classroom instruction. But this approach also means that the school districts using it have effectively given up any effort to relate financial rewards to the core of the teacher's job—namely, classroom instruction. The use of this approach underscores our earlier argument that merit pay is ill-suited to teaching.

*Make everyone feel special.* A second theme is to quietly award merit pay to almost all teachers. This strategy is most pronounced in one district in which a numerical rating system is used to determine whether teachers receive no award or an award of $500, $1,000, $1,500, or $2,000. Only teachers who had worked in this district for at least six years were eligible for merit pay. Eligible teachers could choose not to participate in the merit pay plan, and this choice spared them from documenting their accomplishments and undergoing the merit pay review process. Only a very few teachers chose not to participate in this merit pay plan, however.

Teachers whom we interviewed in this district were unaware of the distribution of actual awards but typically were pleased that they each received a substantial award. In fact, every teacher who participated in the voluntary merit pay program (over 90 percent of eligible teachers in the district) received an award; 85 percent of the teachers received either $1,500 or $2,000. We suspect that the bunching of the ratings at the top of the scale and the relatively small monetary differential between the top two awards is important in minimizing ill feeling on the part of teachers in schools headed by hard-grading principals. In this district, if a principal is a hard grader, the effective teacher receives an annual bonus of $1,500 instead of $2,000.

In effect, the "make everyone feel special" strategy deals with teachers' potentially destructive questions about merit pay by reducing the number of teachers who ask. We find it interesting that this theme was particularly evident in the two districts in our sample that have had merit pay for more than twenty years. But if this approach deals effectively with teachers' questions, it does so by rewarding everyone, cutting off questions by cutting off the reasons for asking them. One idea behind merit pay, however, is to use differential financial rewards to improve worker performance. If most teachers receive the top reward or an amount close

A-43

to it, then there will be little difference in the incentives and thus little chance that the differences will affect teacher performance. Once again, this approach to implementing merit pay provides additional evidence of the poor fit between this type of compensation scheme and teachers' work.

*Make merit pay inconspicuous.* In several districts, the design of the merit pay system is such that the incentives are of little interest to a large percentage of the teachers. For example, in one district, eligibility for merit pay requires ten years of service, completion of six activities outside the classroom, and satisfactory performance evaluations. The reward for fulfilling these requirements is $600 (somewhat more if coupled with advanced degrees). Only 40 percent of the teachers in this district who do fulfill the length of service requirement choose to participate in the voluntary merit pay plan. In another district, teachers can apply for one of four different award levels, each level having different requirements. While the award levels are sizable — $1,000 for level one, $4,000 for level four — the requirements are so demanding that only 12 percent of the teachers apply for any level (two-thirds of these teachers receive awards). The level four requirements include a master's degree and thirty hours of graduate credits, superior teaching skills as demonstrated, for example, by "representing the district at the state or national level as a resource person, chairperson, or committee member," and superior professional contributions, as demonstrated, for example, by serving "in an official capacity in the management of the professional associations or organizations related to a specific field of study."[4] For the vast majority of the teachers in this school district, the financial awards do not justify the extra work.

In all six districts, merit pay has a low profile. In part, this stems from the perception that merit pay is something almost any teacher could earn but that the financial rewards do not justify the extra work. Another element is that, in five of the six districts, teachers are urged not to discuss with colleagues either who receives merit pay or the amount of the awards. In these districts, where most teachers like their jobs, the primary effect of secrecy seems to be to reduce teachers' interest in merit pay and thereby to reduce the number of teachers who ask the hard questions about why some teachers get merit pay and others do not. But whatever the reasons for the low profile, this common approach to implementation is further evidence that our districts tended to turn merit pay into something else. If the aim of a differential compensation system is to stimulate better performance, then it would be important for workers to know who did the better job, and why. But the districts we visited built barriers against the acquisition of this information.

*Legitimation through participation.* The final attribute of merit pay uncovered in our districts concerns the process by which the programs were designed. In all of the districts, teachers played a significant role in the design of the merit pay plans. Moreover, in each of the two districts that have had merit pay for more than twenty years, the system has been revised several times in response to teacher complaints. We believe that teachers' participation in the design and redesign of the plans contributes to the plans' longevity. One reason for this effect is that the

process of participation reveals information about teachers' preferences that is extremely difficult to collect unless teachers volunteer it. This information, moreover, is critical in enabling supervisors to predict teachers' responses to incentives. Participation gives teachers a reason to volunteer information and a mechanism for doing so. A second reason that participation contributes to the longevity of merit pay plans is that it creates the impression that merit pay is not a system thrust upon teachers but rather one they helped to create. Seen as such, teachers may still ask why some teachers get merit pay and others do not, but the intensity with which they ask is diminished. Teachers recognize that if many of them find the program objectionable, they can change it.[5]

One could view teachers' participation as an example of workers' self-protective behavior. In this case, however, workers' objections to merit pay were shared by management. We therefore view worker participation as yet another effort by management and workers to redefine a compensation system that has great potential for doing damage.

## Is There a Role for Merit Pay?

The schemes we studied, then, were not merit pay, at least if this term denotes performance-based compensation. But the six districts nonetheless seemed quite convinced that their compensation plans were useful. We wondered why. Did these plans have some desirable effect on the scholastic performance of students in these districts? Did the plans help the districts to resolve problems that they faced?

On the first question, merit pay in the districts we studied does not appear to have affected the quality of teaching; neither administrators nor teachers offered any evidence that merit pay had a significant impact on the way teachers teach. This is not surprising given the attributes of the enduring plans. This conclusion is also compatible with the theme developed above: the nature of teachers' work is such that basing individual teachers' pay on assessments of their performance is unlikely to motivate teachers to work harder.

If merit pay does not motivate teachers to work harder, why do a very few districts retain it? Our interviews with teachers and administrators suggest that merit pay has helped these six districts solve problems quite different from the problem of motivating teachers. These problems include (1) how to support good teachers who differ in their relative needs for income and free time, (2) how to encourage meaningful dialogue between teachers and administrators about difficult issues, such as the quality of the evaluation process, (3) and how to build community support for the public schools.

In the districts we visited, merit pay contributes to solutions to these problems in the following ways:

1. Extra pay for extra work provides opportunities for teachers with greater financial needs to augment their incomes by spending time on school-related activities.

[5] The importance of voice as a mechanism for improving the performance of organizations is elegantly developed by Hirschman (1970).

A-45

2. The ongoing discussions of how merit pay works, what its problems are, and what changes are needed provide forums for meaningful dialogue between teachers and administrators concerning difficult issues, such as the nature of the evaluation process.

3. The merit pay plans contribute to the perception that teachers are accountable. As one teacher commented on why members of the community supported merit pay for teachers, "The people out there who are paying taxes want to make sure that in the area of teacher pay, those who are doing the real work are the ones who get the rewards, above and beyond the standard." This perception of accountability increased the willingness of communities to pay teachers well. One administrator remarked that merit pay "has meant a lot of money for a lot of teachers that would otherwise not have been provided, knowing the Board of Education."

We do not mean to imply that merit pay is necessary to solve the problems of satisfying teachers' varied needs, encouraging dialogue, and promoting community support for the schools. In fact, a far greater number of school districts solve these problems without merit pay. For example, many districts meet some teachers' needs for additional income through extra pay for extra work without calling this merit pay, or through small grants competitions.[6] Many districts use the collective bargaining process to promote meaningful dialogue between teachers and administrators (see Freeman & Medoff, 1984). Others promote community support through volunteer programs, public/private partnerships, and outreach activities.

What we do want to suggest is a different way of looking at merit pay. This is useful because, if the past is any guide to the future, the current, perhaps waning wave of interest in merit pay will not be the last time that educators feel pressure to adopt this type of compensation plan. In thinking about merit pay in the future, it is useful to ask whether it can play a modest role in satisfying teachers' varied needs, encouraging meaningful dialogue between teachers and administrators, and promoting community support for the schools. In most school districts, the answer to this question will be an emphatic "no." But in a few districts the answer could be a tentative "yes." We hope that our work provides some clues to the types of districts where an answer of "maybe" makes sense and what types of merit pay plans hold some promise.

There is one final theme in our evidence that seems to apply to districts both with and without merit pay: improving teachers' performance through evaluation. If evaluation is to contribute to the goal of helping teachers improve, it must be carried out by skilled and knowledgeable supervisors in an atmosphere that rewards honesty and cooperation. When teachers who conceal their failings receive higher pay than those who do not, the atmosphere for useful evaluation and advice is poisoned. If supervisors are to engage in a productive dialogue with teachers, they must act in a way that is consistent with the sustained nature of their relationship with teachers. Evaluation is a repetitive sequence which creates expectations, memories, and sensitivities that can either contribute to improved performance or, if treated insensitively, undermine it. It was the goal of merit pay's advocates to put the power of money into the evaluation process as a way to improve teach-

---

[6] See, for example, *Small Grants for Teachers* (n.d.).

A-46

ers' performance. That goal is misguided. But the broader lesson — that school administrators must work to create relationships with teachers in which evaluations contribute to improvement, change, and cooperative problem solving — is one that must not be forgotten even after the pressures for merit pay dissipate.

## References

Alchian, A. A., & Demsetz, H. (1972). Production, information costs, and economic organization. *American Economic Review, 62*, 777-795.

Bacharach, S. B., Lipsky, D. B., & Shedd, J. B. (1984). *Paying for better teaching.* Ithaca, NY: Organizational Analysis and Practice.

Calhoun, F. S., & Protheroe, N. J. (1983). *Merit pay plans for teachers: Status and descriptions.* Arlington, VA: Educational Research Service.

Coltham, J. B. (1972). Educational accountability: An English experiment and its outcome. *School Review, 81*, 15-34.

Erickson, D. A. (1982). Disturbing evidence about the "one best system." In R. B. Everhart (Ed.), *The public school monopoly* (pp. 393-422). Cambridge, MA: Ballinger.

Evendon, E.S. (1918). *Teachers' salaries and salary schedules in the United States, 1918-19.* Washington, DC: National Education Association.

Freeman, R. B., & Medoff, J. L. (1984). *What do unions do?* New York: Basic Books.

Gramlich, E., & Koshel, P. (1975). *Educational performance contracting.* Washington, DC: Brookings Institution.

Hanushek, E. (1981). Throwing money at schools. *Journal of Policy Analysis and Management, 1*, 19-41.

Hirschman, A. O. (1970). *Exit, voice, and loyalty.* Cambridge: Harvard University Press.

Johnson, S. M. (1984). Merit pay for teachers: A poor prescription for reform. *Harvard Educational Review, 54*, 175-185.

National Catholic Education Association. (1985). *The Catholic high school: A national portrait.* Washington, DC: Author.

National Education Association. (1923). *Report of the salary committee, teachers' salaries and salary trends in 1923.* Washington, DC: Author.

National Education Association. (1928). Practices affecting teacher personnel. *Research Bulletin, 6.* Washington, DC: Author.

Pencavel, J. H. (1977). Work effort, on-the-job screening, and alternative methods of remuneration. In R. Ehrenberg (Ed.), *Research in labor economics* (Vol. 1, pp. 225-258). Greenwich, CT: JAI Press.

Porwoll, P. J. (1979). *Merit pay for teachers.* Arlington, VA: Educational Research Service.

Seiler, E. (1984). Piece rate vs. time rate: The effect of incentives on earnings. *Review of Economics and Statistics, 66*, 363-375.

*Small grants for teachers.* (n.d.). Pittsburgh: Allegheny Conference on Community Development.

U.S. Department of Education. (1984). *The nation responds: Recent efforts to improve education.* Washington, DC: Author.

Williamson, O. E. (1975). *Markets and hierarchies: Analysis and antitrust implications.* New York: Free Press.

Wise, A. E., Darling-Hammond, L., McLaughlin, M. W., & Bernstein, H. T. (1984). *Teacher evaluation: A study of effective practices.* Santa Monica: Rand Corporation.

The research on which this paper is based was supported by the Institute for Finance and Governance, School of Education, Stanford University. We would like to thank Katherine Jamentz, Patrick Murnane, and Niall Nelson for able research assistance; and Chris Argyris, Estelle James, Susan Johnson, Charles Lindblom, Giandomenico Majone, Richard Nelson, Robert Pollak, David Stern, Dvora Yanow, and participants in workshops at Boston University, Harvard University, and the University of Pennsylvania for helpful comments on earlier drafts. We would especially like to thank Edward Pauly, who read several drafts of the paper and provided many important ideas.

17

A-47

# CRS Report for Congress

## Received through the CRS Web

# Performance-Based Pay for Teachers

Updated January 11, 2001

James B. Stedman and Gail McCallion
Specialists in Social Legislation and Labor Economics
Domestic Social Policy Division

A-48

Performance-Based Pay for Teachers

## Summary

Policymakers at all levels are considering and implementing policies that link elementary and secondary school teachers' salaries or financial awards to their performance or to the performance of their students. These performance-based pay plans include a broad array of different kinds of efforts, ranging from merit-pay plans for individual teachers to school-based performance award plans that may reward teachers for the overall performance of their schools. These plans are being implemented in an effort to improve the quality of elementary and secondary school teaching.

Among the key findings regarding performance-based pay plans for teachers are the following:

- Interest in performance-based pay for teachers arises, in part, from a basic dissatisfaction with the traditional salary schedule.
- There is no single model of performance-based pay plans. These plans can vary markedly.
- Successful implementation of performance-based pay plans depends on a host of factors, many of which may be complex and difficult to achieve. Many of these plans have been short-lived.
- There is little unequivocal evidence of enhanced teacher performance as a result of merit-pay plans, the most studied of performance-based pay plans for teachers.
- Performance-based pay for teachers is evolving. Policymakers are considering various alternative approaches that may address shortcomings of previous efforts. Increasing attention is being directed to school-based performance awards that reward groups of teachers for the increased academic performance of their students.

Initiatives to reform teacher compensation are emerging in federal legislation. For example, the Teacher Quality Enhancement Grants program, added to the Higher Education Act in 1998, authorizes participating states to provide financial awards to teachers and principals when their students make significant academic improvement; such awards may be part of "performance-based compensation systems." Efforts by federal policymakers to fashion legislative action to support performance-based pay plans for teachers may be complicated by the wide variety of such plans being considered and implemented at the state and local level, and by the evolution of these plans.

A-49

## Contents

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Federal Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Performance-Based Pay in General  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    What Is Pay-for-Performance? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        Individual Incentive Pay Plans  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        Group Incentive Pay Plans  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Performance-Based Pay Plans for Teachers  . . . . . . . . . . . . . . . . . . . . . . .  7
    Traditional Pay Schedule  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
    Types of Performance-Based Pay for Teachers . . . . . . . . . . . . . . . . . . . .  9
        Teacher-Based Merit-Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        School-Based Performance Awards  . . . . . . . . . . . . . . . . . . . . . . . . .  9
    Implementation Issues for Performance-Based Pay in Education  . . . . . . . .  9
        Measuring Output or Performance  . . . . . . . . . . . . . . . . . . . . . . . . .  10
        Generating Desired Teacher Behavior  . . . . . . . . . . . . . . . . . . . . . . .  10
    Evidence of Success . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    Examples of Performance-Based Pay Plans  . . . . . . . . . . . . . . . . . . . . .  12
        Seiling School District  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
        Douglas County School District . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
        Los Angeles Unified School District . . . . . . . . . . . . . . . . . . . . . . . .  14
        Georgia Pay-for-Performance Program . . . . . . . . . . . . . . . . . . . . . . .  14

Implications for Federal Policymaking  . . . . . . . . . . . . . . . . . . . . . . . . . .  15

# Performance-Based Pay for Teachers

## Introduction

Policymakers at the federal, state, and local levels are considering and often implementing policies that link elementary and secondary school teachers' salaries or financial awards to their performance or to the performance of their students. These performance-based pay plans include a broad array of different kinds of efforts, ranging from merit-pay plans for individual teachers to school-based performance award plans that may reward teachers for the overall performance of their schools.[1]

This report is intended to provide background on performance-based pay that may be useful as legislative efforts in this area are considered by the Congress. It defines pay-for-performance plans and summarizes criteria that are important to the success of such plans. Implementation hurdles that may arise in merit-pay plans, one of the most widely-studied types of individual performance-based pay plans, are summarized. The relative strengths and weaknesses of individual pay-for-performance plans versus group incentive pay plans are also discussed. Throughout, the report emphasizes the experience of performance-based pay plans for teachers, by examining both the potential, and the limitations, of such plans in an educational setting. This is a background report and will not track legislative action in this area.

Based on a review of the research on performance-based pay in general and for teachers in particular, several key issues emerge:

- *Interest in performance-based pay for teachers arises, in part, from a basic dissatisfaction with the traditional salary schedule.* Many policymakers believe that the traditional salary schedule provides no incentive for teachers to demonstrate subject matter competence, improve teaching, or increase academic performance by students.
- *There is no single model of performance-based pay plans.* These plans can vary markedly in terms of such features as their measures of performance, the size of the financial awards provided, and the portion of the teaching force the plans might benefit.
- *Successful implementation of performance-based pay plans depends on a host of factors, many of which may be complex and difficult to achieve.* Among the most important of these factors is development of a process for evaluating performance that is considered fair and reliable, and that has desirable effects on the teaching force. Other important factors include ensuring that the

---

[1] In practice, terminology in this area is used loosely. Terms, such as *merit-pay*, are often used to describe a wide range of pay options with different characteristics. In this report, the term *performance-based pay* encompasses any pay that is linked to measures of performance.

portion of the teaching force that can receive the financial incentives, and the size of the financial incentives provided, are sufficient to provide appropriate incentives for teacher improvement. Many past plans appear to have been short-lived.

- *There is little unequivocal evidence of enhanced teacher performance as a result of merit-pay plans, the most studied of performance-based pay plans for teachers.*[2]
- *Performance-based pay for teachers is evolving.* Policymakers are considering various alternative approaches that may address shortcomings of previous efforts. In particular, districts and states are looking to performance-based pay plans that reward teachers for the overall performance of their schools.

# Federal Interest

Interest by the Congress in changes to teacher compensation policies arises because of concern about the academic performance of this country's elementary and secondary school students, and a growing recognition that the quality of the teaching force is critical to the success of any educational reforms undertaken. This interest focuses on utilizing the salary schedule to improve teacher quality by leveraging changes in teachers' behavior, knowledge, and skills, and by making teaching more attractive financially to successful teachers and to highly able individuals outside of teaching.

Traditionally, federal involvement in precollege teaching has not addressed the nature of the compensation. Instead, it has focused on improving professional development or inservice training (training for current teachers), preservice training (training for prospective teachers), and teacher recruitment. Nevertheless, significant amounts of funding from several federal programs support the salaries of specific kinds of teachers, including teachers and paraprofessionals serving educationally disadvantaged students under the compensatory education program (Title I of the Elementary and Secondary Education Act), and newly hired teachers under the Class Size Reduction program (FY1999 omnibus appropriations legislation).

Reform of teacher compensation is emerging in federal legislation. The recently enacted (1998) Teacher Quality Enhancement Grants program (Title II of the Higher Education Act) authorizes participating states to provide financial awards to teachers and principals when their students make significant academic improvement; such awards may be part of "performance-based compensation systems." The 106th Congress actively considered legislation that would have supported merit-pay for teachers, but, as of the date of this report, had not enacted such legislation. Further, in 1999, the U.S. Secretary of Education Richard Riley called on school districts to

---

[2] Merit-pay provides compensation to individual teachers based on certain activities they undertake or on demonstrated results of teaching performance.

"take a serious look at a new and developing concept called knowledge and skills-based pay."[3]

# Performance-Based Pay in General

This section first considers performance-based pay as it is applied to employees in general, not just those in the teaching ranks. This helps set the context for the remainder of the report which address performance-based pay for teachers specifically.

## What Is Pay-for-Performance?

Pay-for-performance plans attempt to correlate employee pay directly with employee output. Pay-for-performance plans may take the form of individual incentive plans or group incentive plans. Performance-based pay is consistent with widely held beliefs that employees should be rewarded based on effort and with theories of human motivation which contend that effective motivation is predicated on a close relationship between performance and rewards.

**Individual Incentive Pay Plans.** Most employers rely principally on time-based pay (paying employees on an hourly or salaried basis) but incorporate some form of performance-based pay on an adjunct basis. Implementation of performance-based pay requires supervisory time and consequently entails costs for employee monitoring (especially for merit-pay which also requires regular performance evaluations). However, it is presumed that because of the additional incentives to individual performance, less supervision will be required than under strictly time-based pay.

Merit-pay is an individual incentive plan that rewards productive workers with larger annual wage increases.[4] The term merit-pay is also frequently used to describe incentive bonuses which are awarded to individuals on the basis of performance but are not added to base pay. Because merit-pay may be used in workplaces where output is not readily measurable (unlike individual incentive plans such as piece-work pay and commission pay which are generally only used when output is readily measurable), and because it can entail more supervisory time for performance evaluation than other individual incentive pay plans, it may be the most complex of the individual incentive pay plans to administer. Merit-pay (or some variation thereof, such as merit bonuses) is widely used throughout the private and public sector. For these reasons this section focuses on merit-pay to illustrate the potential conceptual

---

[3] Riley, Richard W. *New Challenges, A New Resolve: Moving American Education in the 21st Century.* The Sixth Annual State of American Education Speech. February 16, 1999. Remarks as prepared for delivery. Online: [www.edgov/speeches]. For this report, knowledge and skills-based pay is considered to be a kind of performance-based pay. It is provided to teachers when they have successfully acquired specific knowledge and skills, often aligned with district educational standards or objectives.

[4] Other types of individual incentive plans include: (1) piece rate pay — the employee receives a fixed amount for each item produced; (2) commission pay — the employee receives a percentage of the value of the output sold.

A-53

and implementation problems that may arise with individual performance-based pay plans.

Much of the literature on merit-pay has focused on whether it serves as an effective inducement to greater employee productivity, and whether one can accurately measure employee performance, a central component of all merit-pay plans. In a survey of the empirical evidence on merit-pay plans, Robert Heneman found that merit-pay can increase employee motivation and performance. However, Heneman contends that in order for a merit-pay plan to be successful, all of the following criteria must be met:

> employees value merit-pay, performance can be measured accurately, employees trust management, and the merit-pay budget is adequate. ... even if these conditions are present, a merit-pay plan may fail when it is not properly administered. Careful attention must be given to the introduction of the program, the total compensation package, the performance-appraisal system, the formulas used to determine merit, the method by which merit-pay decisions are communicated to employees, and the monitoring of the outcomes associated with merit-pay.[5]

Accurately assessing employee performance in jobs where individual output is not readily measurable is quite difficult in practice. This is because a large number of variables affect the relationship between pay and performance.[6] The issue of appropriately evaluating individual performance is also complicated by the fact that so much performance is affected by factors outside a worker's control, for example, whether or not necessary equipment is in good working order. An employer may decide to award merit-pay based on relative performance among employees who face similar external constraints. However, this may discourage group cooperation and might even lead to undercutting others or politicking instead of producing, in order to improve one's apparent relative performance, to the detriment of the employer. In addition, accurate measurement of individual performance is frequently limited by the practical difficulty of apportioning the "output" among the workers who contributed to it. Thus, from the employer's perspective, finding good measures of individual output and setting rates are difficult.

One solution is compensating workers for output that can be measured objectively. However, this de-emphasizes aspects of the job that cannot be measured, or less easily lend themselves to measurement. For example, some argue that measuring teacher performance on the basis of pupil test scores encourages teachers to exclusively focus on 'teaching the test' to the detriment of students in other areas.[7]

---

[5] Heneman, Robert. *Pay for Performance: Exploring the Merit System*. 1984. p. 21.

[6] Heneman, Robert. *Merit Pay: Linking Pay Increases to Performance Ratings*. 1992. Examples of these variables include: the overall environment in which the employer operates, such as whether or not there is a union (unions typically oppose merit-pay measures, instead arguing for objective measure for pay increases like seniority); the characteristics and culture of the firm; as well as of the characteristics and background of the evaluator and the employee.

[7] Output is more easily measured in some occupations such as manufacturing or sales, but

(continued...)

Addressing these issues, and ensuring fairness in the performance evaluation process itself, are critical to the employer's success in convincing employees that a merit-pay plan is fair. In order for a merit-pay plan to be effective, an employer must be able to provide answers to the following two questions that arise among employees:

> (1) Why does worker X get merit-pay and I don't?
> (2) What can I do to get merit-pay?[8]

Murnane and Cohen conclude that most plans that are truly merit-pay plans fail to provide good answers to these questions. Other authors argue that these questions can be answered satisfactorily by a well-designed plan. Cohn, for example, uses the illustration of a specific merit-based bonus plan for teachers to argue that a merit-pay plan that: (1) provides explicit criteria that a teacher must meet in order to receive merit-pay (including attendance, performance evaluation, self-improvement and student achievement); and, (2) that is administered by a committee composed mainly by teachers, can adequately address Murnane and Cohen's two questions.

> The answer to question (1) is: Worker X got the award because she met the criteria and you didn't. And the answer to question (2) is: if you, too, will work to meet the criteria, e.g., attendance or self-improvement, then you, too, will receive an award.[9]

Furthermore, Cohn argues that a merit-pay plan need not influence all employees to be effective, so long as it influences the behavior of many employees.[10]

Some authors have suggested adaptations to traditional merit-pay plans that would counter some of their shortcomings. Traditional merit-pay plans are based on an annual pay increase that is incorporated into an employee's base pay. Because the increase is then a permanent part of base pay, and because employee pay is rarely reduced for subsequent low performance, merit-pay raises effectively create: "an annuity that can be an expensive fixed cost to an organization during economic downturns."[11]

---

[7](...continued)
workers paid on a piece rate or on a commission basis have an incentive to emphasize quantity over quality, and to put their own interests ahead of other workers in the firm (to the potential detriment of the firm).

[8] Murnane, Richard, and David Cohen. Merit Pay and the Evaluation Problem: Why Most Merit Pay Plans Fail and a Few Survive. *Harvard Education Review*, v. 56, no. 1, February, 1996.

[9] Cohn, Elchanan. Methods of Teacher Remuneration: Merit Pay and Career Ladders. *Assessing Education Practices: The Contribution of Economics*. Edited by William Becker and William Baumol. 1996.

[10] *Ibid.*, p. 221.

[11] Fisher, Cynthia, Lyle Schoenfeldt, and James Shaw. *Human Resource Management*. 1996.

Most organizations employ merit-pay raises in an overall compensation context that includes pay ranges for specific jobs. As a consequence, it can be difficult for merit-pay to achieve both goals of rewarding and retaining high performing employees. New employees are usually hired near the bottom of their pay range. Even with merit-pay increases that are in the high range, new hires who are excellent performers may feel underpaid and seek other employment. Senior employees, who are excellent performers, on the other hand, may receive virtually no merit-pay increases because they have bumped up against the ceiling of their pay range. In both instances, merit-pay increases will not have the intended effect: "The result is a lose-lose situation — an expensive annuity for the organization and a top-performing employee who does not feel rewarded."[12]

Furthermore, it is *significant changes* in pay (in the context of adequate overall compensation), rather than total compensation, that have been found to motivate current employee performance. Consequently, one method employers have adopted, in lieu of traditional merit-pay plans is to reward excellent performers with lump-sum bonuses rather than with a permanent salary increase. Because employees respond to changes in pay, a 5% one time bonus of $1,000 to an employee earning $20,000 a year, may be more motivating than the same 5% increase incorporated into salary at $19.25 a week. Bonuses also give employers more flexibility to be generous in good years, because they are not incurring a permanent annuity. However, if employers choose to adopt merit bonuses rather than merit-based salary increases, they must first assure that current base salaries are equitable based on employee performance.[13]

**Group Incentive Pay Plans.** Group incentive plans reward organization-wide effort. Because group incentive plans ideally foster cooperation and teamwork rather than competition among coworkers, they overcome one of the potential limitations of individual incentive plans. Group incentive plans, in contrast, are sometimes criticized for not sufficiently recognizing individual effort. In practice, many employers rely on both group and individual incentives to try and enhance individual performance and teamwork.

Gainsharing plans, which tie part of pay to some measure of group effort, combine some components of individual performance plans in addition to potentially enhancing group effort.[14] Gainsharing rewards are tied to improvements in organizational performance attributable to factors controllable by employees. Thus, gainsharing plans affect performance by influencing employee motivation and organizational culture. Gainsharing plans do not, however, eliminate the difficulty of appropriately measuring performance. For example, gainsharing rewards may be tied

---

[12] *Ibid.*

[13] Dessler, Gary. *Human Resource Management.* 1997. p. 481.

[14] In addition to gainsharing, other group incentive pay plans are profit-sharing and ESOPS. The most often employed group incentive plan is profit-sharing, used in at least one-third of U.S. organizations, see: Lawler, Edward. *Strategic Pay.* 1990. For more on ESOPS see: CRS Report RL30038, *Employee Stock Ownership Plans (ESOPS): A Description and Economic Analysis*, by Gerald Mayer.

to easily measurable costs, like labor costs, but if labor costs are not the only significant factor in organizational performance, then the success of the gainsharing plan will be thwarted. Employees may speed up their work (pushing labor costs down) by being more careless with supplies and machinery (pushing supply costs up). Gainsharing is more difficult to successfully implement in situations where adequately measuring performance is complicated.

# Performance-Based Pay Plans for Teachers

Performance-based pay for teachers has a long history, particularly in the form of merit-pay which has fallen into and out of favor in public schools repeatedly throughout the 20th century.[15] This ebb and flow is reflected in the fact that merit-pay programs in school districts typically have a life span of less than 5 years.[16] Relatively few teachers currently report receiving any form of performance-based pay. A 1996 survey found that only slightly more than 5% of all public school teachers received some form of performance-based pay.[17] The average amount of such compensation for those who did receive it was $1,335. The extent to which teachers currently have the opportunity to participate in such plans is not known. Over the long term, interest in performance-based pay plans has been sparked by dissatisfaction with the traditional pay schedule for teachers.

This section begins with consideration of the traditional pay schedule. Following that are a description of different kinds of performance-based pay plans, a delineation of several implementation issues that arise with these plans, and a review of several specific examples of these plans implemented by different states and districts.

## Traditional Pay Schedule

Teacher salary schedules are primarily determined at the level of the individual school district.[18] They are often the subject of negotiation between local school boards and teacher unions where applicable. For much of the 20th century, most

---

[15] Murnane, Richard J., and David K. Cohen. *Merit Pay and the Evaluation Problem: Understanding Why Most Merit Pay Plans Fail and a Few Survive.* Institute for Research on Educational Finance and Governance. Stanford University. November 1985. (Hereafter cited as Murnane and Cohn, *Merit Pay and the Evaluation Problem.*)

[16] There is a significant amount of literature on the history of merit-pay programs among teachers and the difficulties many of these plans have encountered. The discussion below highlights a number of problems that have arisen with merit-pay.

[17] National Education Association. *Status of the American Public School Teacher 1995-1996.* 1997. p. 70. These data are derived from a sample survey. Respondents were asked to identify "sources of additional income." "Performance-based or incentive pay" was one of the choices offered.

[18] Nearly half (23) of all states have a statewide salary schedule that generally sets **minimum** salary levels. Usually, local districts can exceed these minimum levels when fashioning salary schedules for their teachers. (Education Commission of the States. *Teacher Salary Schedules.* ECS Information Clearinghouse. September 1997.)

elementary and secondary school teachers have worked under the so-called single salary schedule.[19] This schedule bases a teacher's salary on two factors — the number of years of teaching experience the individual has and the number of educational credits and degrees the individual has earned. Increases in both teaching experience and credits/degrees lead to increases in salary, up to absolute limits imposed by the applicable pay schedule. The single salary schedule emerged as a response to equity concerns about previous pay systems that often based salary on such factors as a teacher's gender, race, level (elementary or secondary), or marital and family situation.

Although starting salaries for teachers have become more competitive with salaries for other college graduates, the dispersion of teachers' salaries are not commensurate with those available to other college graduates.[20] The relatively low maximum potential salary for teachers, in combination with the single salary schedule which is currently used in the vast majority of districts, is argued by some to fail to: draw the highest caliber of potential teachers into the field; reward teachers who are exceptionally productive; or allocate the supply of teachers to fields where they are most needed (like math and science). Criticism of the single salary schedule has undergirded efforts to implement performance-based pay plans in elementary and secondary education.

Disenchantment with the single salary schedule focuses on the two central factors it uses to allocate wages — more years of experience and higher levels of education. Critics view it as largely rewarding longevity and the accumulation of college credits, not classroom effectiveness. Some researchers have found that these two factors — experience and level of education — have relatively little beneficial impact on classroom effectiveness as measured by the achievement of a teacher's students. Eric A. Hanushek has concluded: "The results [of a review of the available research] are startlingly consistent in finding no strong evidence that teacher-student ratios, teacher education, or teacher experience have an expected positive effect on student achievement."[21] Nevertheless, these conclusions about the relationship of experience and levels of education are debated. For example, based on their analysis of the literature, Rob Greenwald, et al, concluded: "[R]esource variables that attempt to describe the quality of teachers (teacher ability, teacher education, and teacher experience) show very strong relations with student achievement."[22]

---

[19] Protsik, Jean. History of Teacher Pay and Incentive Reforms. *Journal of School Leadership.* May 1996. (Hereafter cited as Protsik, *History of Teacher Pay*); English, Fenwick, History and Critical Issues of Educational Compensation Systems. *Teacher Compensation and Motivation.* Edited by Larry E. Frase. 1992.

[20] Cohn, *Methods of Teacher Remuneration.*

[21] Hanushek, Eric A. The Economics of Schooling. *Journal of Economic Literature.* September 1986. p. 1162. See, also: Hanushek, Eric. A. Assessing the Effects of School Resources on Student Performance: An Update. *Educational Evaluation and Policy Analysis.* Summer 1997.

[22] Greenwald, Rob, *et al.* The Effect of School Resources on Student Achievement. *Review of Educational Research.* Fall 1996. p. 384. See also: Ferguson, Ronald F. Paying for
(continued...)

## Types of Performance-Based Pay for Teachers

Performance-based pay plans for teachers may have features that fall into at least two broad categories — teacher-based merit-pay and school-based performance awards. These correspond to the individual and group incentive pay plans described earlier in this report. As illustrated below, individual plans may draw from both of these categories.

**Teacher-Based Merit-Pay.** This kind of pay is based on an individual teacher's performance inside and/or outside of the classroom. That performance can be defined and measured in myriad ways. Teachers may be rewarded for their perceived impact on various outcomes of their particular students, such as achievement levels. They may also be rewarded on the basis of such factors as evaluators' assessments of their performance in the classroom, completion of targeted activities that increase their subject matter knowledge or specific skills,[23] the range of duties assumed, or the extent and quality of their interaction with other teachers.

**School-Based Performance Awards.** These awards are based on the aggregate performance of schools that may include a wide range of possible measures. Student-related measures may include achievement levels, attendance rates, dropout rates (for secondary schools), participation rates in advanced placement courses (for secondary schools), college going rates (for secondary schools), etc. Measures of school performance need not be student-based. For example, they may include the extent of parental and community involvement in school activities, or whether the schools have developed and implemented new curricula. The awards are made to individual schools for use at the school level. Some, but not all, of the initiatives being implemented that include school-based performance awards call for distribution of these awards to individual teachers as additional compensation or permit such use of the awards.

## Implementation Issues for Performance-Based Pay in Education

The difficulties encountered in implementing performance-based pay plans in general, discussed above, can also arise in attempts to implement performance-based pay for teachers. These difficulties primarily involve:

- measures of teacher output or performance,
- impact on desired behavior by teachers.

---

[22](...continued)
Public Education: New Evidence on How and Why Money Matters. *Harvard Journal on Legislation.* 1991; and National Commission on Teaching and America's Future. *Doing What Matters Most: Investing in Quality Teaching.* November, 1997.

[23] Knowledge- and skills-based pay plans specifically identify skills and knowledge that are considered necessary for achievement of education reform objectives. Financial awards are provided to teachers who demonstrate that they have achieved such skills and knowledge. See: Odden, Allan, and Carolyn Kelley. *Paying Teachers for What They Know and Do: New and Smarter Compensation Strategies to Improve Schools.* 1997. (Hereafter cited as Odden and Kelly, *Paying Teachers for What They Know and Do.*)

**Measuring Output or Performance.** Measuring teacher output is quite difficult. Many highly valued activities by teachers are qualitative, and as a consequence, hard to measure:

> One key problem in predicting teacher quality is that managers using the criteria demand quantitative measurements, while the factors that actually relate to classroom performance are typically qualitative and vague. Even if the factors important in producing a good teacher were known, specifying true quality and implementation standards would still be exceedingly difficult.[24]

Merit-pay plans founder frequently on the evaluation portion of the plans which often have required assessment of teacher performance by principals, teachers, or others. In many instances, teachers have considered the process to be ill-defined, overly subjective, or basically biased.

Students' test scores are often suggested and sometimes used as a measure of teacher effectiveness. To many advocates, performance-based pay provides an opportunity to interject into teacher pay a measure of accountability for a highly desired outcome — changes in student achievement scores. Test scores may be viewed as a more quantitative and less subjective way of gauging teacher performance than traditional evaluation procedures. Debate over this use of student test scores focuses on the attribution of changes in student test scores to the effectiveness of an individual teacher, given the multitude of other factors, including family background and the quality of previous teachers, that are known to influence achievement. In addition, issues arise concerning the validity and reliability of the testing instruments, and whether such assessment instruments measure the full range of student outcomes that policymakers and others desire teachers to achieve with their students.[25]

**Generating Desired Teacher Behavior.** As noted, if evaluations are not to be subjective in nature, quantitative measures of output are helpful. However, if quantitative measures, like student test scores, are used to measure teacher performance, then teachers will be encouraged to emphasize teaching that will improve test scores, potentially at the expense of other teaching tasks, and at the expense of cooperation with other teachers. For example, if teachers are rewarded for a rise in student reading scores, in economic terms there is effectively a zero price for student improvements in other areas. Teachers would have an incentive to neglect

---

[24] Hanushek, Eric. *Making Schools Work*. Washington. The Brookings Institution, 1994. p. 79.

[25] Cohn, *Methods of Teacher Remuneration*; Glass, Gene V. Using Student Test Scores to Evaluate Teachers. *The New Handbook of Teacher Evaluation: Assessing Elementary and Secondary School Teachers*. Edited by Jason Millman and Linda Darling-Hammond. 1990; Conely, Sharon C. and Samuel B. Bacharach. Performance Appraisal in Education: A Strategic Consideration. *Teacher Compensation and Motivation*. Edited by Larry E. Frase. 1992.

other subjects, and to focus on students who are likeliest to bring up their reading scores the most with the least amount of teacher attention.[26]

In addition to difficulties encountered in finding accurate measures of teacher performance, merit-pay may encourage opportunistic behavior, like minimizing group related activities. This would potentially be detrimental because much of the work of schools involves significant cooperation and teamwork among teachers. For example, some teachers monitor halls so others can teach; all teachers work together to encourage good citizenship, and to discourage drugs and violence.

## Evidence of Success

Compounding the implementation issues considered above is the absence of evidence from previous research that financial incentives provided through performance-based pay, in general, or merit-pay, in particular, change teacher behavior in ways that lead to increased student achievement. In her history of teacher compensation, Protsik concluded:

> Many individual merit-pay plans were adopted as a means to increase teacher accountability and improve classroom performance. For the most part, these plans not only failed to improve student achievement, but also destroyed teachers' collaboration with each other and teachers' trust in the administrators in charge of evaluating their performance.[27]

Morrow found in her analysis of several states and districts with performance-based pay plans that, although all showed some degree of improvement in student performance, "[t]here was no evidence in this study to support the position that it was pay-for-performance which improved student achievement."[28]

Given the complexity, diversity, and short-term nature of most of the performance-based pay that have been implemented, such findings may be expected. This research does not suggest that performance-based pay plans are never associated with improved student performance and that more of them could not be fashioned that would be successful in this way. Further, much of the available research is dated, focused largely on merit-pay plans, and not necessarily applicable to different approaches to performance-based pay plans that appear to be increasingly popular, particularly school-based performance awards.

---

[26] Murnane and Cohn, *Merit Pay and the Evaluation Problem.*

[27] Protsik, *History of Teacher Pay*, p. 285-286.

[28] Morrow, Sharon Yvonne. *A Study of Student Achievement Results Using Selected Teacher Pay-For-Performance Models (Teacher Performance).* Dissertation, Baylor University. 1992. p. 229. (Hereafter cited as Morrow, *A Study of Student Achievement Results*).

CRS-12

## Examples of Performance-Based Pay Plans

Several examples of performance-based pay plans are described below. This is not a representative sample of plans.[29]    Rather, it is intended to show that performance-based pay plans for teachers can be structured in many different ways. The factors that can trigger a financial reward for a teacher may range from certification by the National Board for Professional Teaching Standards,[30] to completion of a skill- or knowledge-building activity, to improved academic performance of students. Individual teachers may receive financial compensation for their individual performance, or they may share in a group award. Particular grades or subjects may be targeted. Academic or non-academic activities of teachers may be eligible for additional pay. These plans may be established by districts or states. Despite these and other differences in the programs, the performance-based pay in each case above was an extension or adjunct to the single salary schedule, not a replacement for that schedule. Examples of wholly performance-based pay plans were not located in the available literature. Where some information is available, the impact of these plans is noted.

**Seiling School District.** A merit-pay program frequently cited in the research was initiated in the Seiling (Oklahoma) school district in 1980 and continued through 1986, when it was terminated for budgetary reasons.[31] This program included both teacher-based merit-pay as well as school-based performance awards. During the program's existence, awards to teachers (in addition to salary) were based on student achievement outcomes in reading at the elementary and secondary school level; mathematics at the elementary school level; and various other subjects at the secondary school level. Those teachers agreeing to participate entered into a separate contract acknowledging that the merit award was not part of their salary and would not carry forward into subsequent years. In other words, the payment had to be earned each year and was not covered by any cost-of-living adjustment applied to base salary. The district set objectives for gains in achievement tests in reading, math, and other subjects. Participating elementary teachers received a $500 bonus if their

---

[29] There are numerous recent examples, not described in this report, that may also be of interest. Among them are the pilot program underway in the Denver (Colorado) public school district in which bonus payments are made to voluntarily participating teachers on the basis of improvements in classroom test scores, and the new plan being implemented in the Cincinnati (Ohio) public school system which replaces the traditional salary schedule with one basing compensation increases and career mobility on teacher evaluations. It might also be noted that Oregon voters rejected a 2000 ballot measure that would have tied each individual public school teacher's base salary and salary increases, other than cost of living increases, to growth in the "appropriate knowledge" of his or her students.

[30] The Board, a non-profit organization, is creating and implementing an assessment process to certify on a voluntary basis teachers across the country who meet high standards. Nearly 9,500 teachers have already achieved National Board Certification.

[31] See, for example:  Hatry, Harry P., and John M. Greiner.  *Issues and Case Studies in Teacher Incentive Plans*.  The Urban Institute, 1985.  p. 181-186. (Hereafter cited as Hatry and Greiner, *Issues and Case Studies in Teacher Incentive Plans*); Morrow, *A Study of Student Achievement Results*, p. 158-164.  There were approximately 44 teachers working in this district of 550 students.

schools achieved the district's reading objective and an additional $250 bonus if their individual classes met the reading goal and another $250 if the classes met the math objective. Secondary teachers received a $300 bonus if their school reached the reading objective and $140 bonuses for each of their five classes that reached their subjects' objectives. The total that could be earned by an individual teacher was $1,000.[32]

**Douglas County School District.** In 1994, the Board of Education of the Douglas County (Colorado) school district and the Douglas County Federation of Teachers agreed to a performance-based pay plan.[33] Under this plan, teachers in the district have a pay schedule that determines base salary levels on length of service and education level, but increases in salary are dependent upon teachers being evaluated as "proficient." Teachers also are eligible for bonus pay under six different components of the district's compensation framework:

- Outstanding teacher bonuses — four types of bonuses, worth $1,250 a year to a teacher, are available: Type A bonuses go to individual teachers in recognition of their classroom performance determined on basis of portfolios documenting teaching practices with review and selection made by the teachers' principals (the criteria evaluated include instructional skills, content knowledge, and collaboration with other teachers); Type B bonuses are tied to teachers' demonstration, through portfolios, that their instructional practice is standards-based; Type C bonuses are for teachers pursuing National Board certification; and Type D bonuses (being piloted for 2000-2001) are tied directly to achievement increases in each teacher's students.
- Group incentive bonuses — bonuses to teachers who are involved in an approved schoolwide activity focused on student performance with measurable outcomes; bonuses made on basis of the teachers having implemented the proposed activity, not necessarily having improved student performance; the size of the bonus to each teacher depends upon the number of schools and teachers successfully implementing proposed activities.
- Site responsibility bonuses — school-based bonuses used to pay teachers for activities beyond those normally arising from classroom instruction (e.g., chairing a school committee, doing special activities with students, etc.); a fixed amount is distributed to each school in the district; a committee of teachers at the building level determines how the school-level award is to be

---

[32] The plan was intended to improve teacher retention and increase student test scores. For neither of these objectives did the district have substantive data that predated the implementation of the plan. Available data appear inconclusive concerning the impact of the plan on overall test scores in the district. See: Hatry and Greiner, *Issues and Case Studies in Teacher Incentive Plans*; Morrow, *A Study of Student Achievement Results*.

[33] Odden and Kelley, *Paying Teachers for What They Know and Do*; Consortium for Policy Research in Education. Skill-Based Pay and Performance-Based Pay in Douglas County, Colorado. Online: [www.wcer.wisc.edu/teachercomp]; and Hartman, Douglas B., and Rob Weil. *Developing a Performance Pay Plan for Teachers: A Process, Not an Event.* Submitted to American Federation of Teachers Research Department, January 30, 1997. Online: [http://www.aft.org/research/models/dougco]. (Hereafter cited as Hartman and Weil, *Developing a Performance Pay Plan for Teachers.*)

distributed; bonuses to selected teachers have ranged from $35 to $200 a year per teacher.

- District responsibility bonuses — bonuses provided to teachers for participating in districtwide professional activities that primarily involve serving on districtwide committees or taskforces.
- Skill block bonuses — bonuses provided to teachers who take district-provided training in particular skills and demonstrate mastery of those skills; in the past, these bonuses have ranged from $250 to $500 per teacher depending upon the skill block studied.
- Master teacher — the district and union are continuing to develop the master teacher designation for teachers whose students demonstrate achievement growth; master teachers must also be National Board certified or designated as Outstanding Teachers for two years; awards will be for five years and worth $2,500 a year.[34]

**Los Angeles Unified School District.** The Los Angeles Unified School District has a traditional single salary schedule.[35] Teachers move up the salary schedule primarily on the basis of longevity and credits earned. Nevertheless, teachers who hold certification from the National Board for Professional Teaching Standards receive an additional 15% salary supplement. Half of that additional compensation is provided solely on the basis of the receipt of the certification; the other half is to compensate Board certified teachers for additional professional duties they perform.

**Georgia Pay-for-Performance Program.** The state of Georgia administers a program that awards funds to schools that meet school-set performance objectives in four categories.[36] These categories include: student achievement (at least 40% of the school's overall score in the program is measured by a high level of performance on standardized tests, higher than expected performance, or educationally significant gains); parental and student involvement; educational programming (for example, implementation of a new program); and resource development (evidence of an increase in teachers' knowledge and skills, school reorganization, or restructuring that lead to achievement gains).

Schools submit initial applications for participation by the March prior to the applicable school year. These applications are reviewed by a statewide panel of

---

[34] Evaluations of the Douglas County pay plan appear to have centered largely on how well teachers understand the plan, how they have reacted to it, and what impact they believe it has had. For example, teachers believed that the group incentive bonuses positively affected student performance. Teachers and administrators report that the skill block bonuses are contributing to changes in classroom practice. See: Douglas County School District. *Executive Summary: Third Year Implementation Assessment of the Performance Pay Plan for Teachers.* Presented to the Board of Education, May 5, 1998. Online: [http://www.dcsd.k12.co.us/district/hr/Third.year.assess.98.html]; Hartman and Weil, *Developing a Performance Pay Plan for Teachers.*

[35] Los Angeles Unified School District. *Teachers' Salary Table for 1999-2000.* Online: [http://www.lausd.k12.ca.us].

[36] Georgia Department of Education. *Guidelines for the Pay for Performance Program.* 1999. Online: [http://www.doe.k12.ga.us].

readers to ensure that the objectives meet the statutory requirements of the program. Participating schools submit end-of-year performance reports which are used to evaluate whether schools' performance objectives have been met. The size of the award per school depends upon the number of certified personnel at the recipient schools and the amount of funding appropriated for the program. The uses of funds at individual schools, which can include teacher bonuses or spending on instructionally related activities, are determined by a consensus of certified personnel at those schools. For 1999-2000, awards in the amount of $12.5 million were made to 110 of the 165 schools that submitted acceptable plans ($2,000 provided per certified staff member in successful schools).[37]

# Implications for Federal Policymaking

Several findings from the preceding analysis appear to be important for federal policymakers as they consider legislative efforts to make some portion of the compensation of elementary and secondary school teachers sensitive to performance, either of the teacher or of the teacher's students. The discussion below identifies some of these findings and their importance for policymaking in this area.

In the development of, and debate over, federal initiatives to support performance-based pay plans, it is important to recognize that there is no single model for such pay plans. The illustrative examples demonstrate that the plans can differ markedly. Among the characteristics upon which they differ are their measures of performance, the size of the financial awards provided, and the portion of the teaching force the plans might benefit.

As a consequence, federal legislation in this area may apply to plans with many different features. At issue, then, are the characteristics of the plans that are **intended** to be supported through federal initiatives. The terms used in legislation may be ambiguous in application. For example, Title II of the HEA authorizes states to use Teacher Quality Enhancement Grants to support *performance-based compensation systems* (HEA II Section 202(d)(5)) without further definition. Are these plans to be teacher-based or school-based? Whose performance is to be measured, the teacher's or that of the teacher's students? How should that performance be measured? Similar kinds of questions would be triggered by other terms that have been considered in legislative action, such as *merit-pay* or *performance pay*.

---

[37] An evaluation provided by the Georgia Department of Education (*The Pay for Performance Program: Evidence of Program Impact*. August 2000. Online: [http://www.doe.k12.ga.us]) concluded that math and reading test scores were higher in participating schools than in other schools, including comparable schools in terms of students' free lunch eligibility (135% of the poverty threshold). Participating schools reported that the program helped to improve student achievement, faculty collaboration, and attention to school goals, among other positive outcomes. Nevertheless, the evaluation did **not** attempt to measure the impact, if any, that participation might have had on participating schools' test scores in comparison to these schools' pre-participation scores.

CRS-16

At the same time, a precise definition of performance-based pay plans in legislation may inappropriately narrow the range of plans that could be supported under a federal initiative. Available research suggests that successful implementation of performance-based pay plans has been the exception rather than the rule, particularly if a measure of success is longevity of the program or evidence of a positive impact on student achievement. Nevertheless, researchers and policymakers in districts and states are exploring and implementing performance-based pay plans that are intended to address the shortcomings of previous efforts, such as basing financial awards on school-based performance or on the acquisition of skills and content knowledge closely aligned to academic standards and goals. Still others call for direct links between teacher salaries and student test scores. However, as of yet, there is no consensus on what works best and which direction to go. Many analysts therefore support including diversity and experimentation in any future federal initiatives in this area.